Aaron Javian
David Kazlow
REED SMITH LLP
599 Lexington Ave
New York, NY 10022
(212) 521-5400 (Tel)

*Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 15 |
| | ) | |
| Quintis Limited, *et al.*,[1] | ) | Case No. 18-12739 (MG) |
| | ) | |
| Debtors in a Foreign Proceeding. | ) | |
| | ) | |

**DECLARATION OF RICHARD TUCKER IN SUPPORT OF**
**VERIFIED PETITION UNDER CHAPTER 15 FOR RECOGNITION**
**OF A FOREIGN MAIN PROCEEDING AND OTHER RELIEF**

Pursuant to 28 U.S.C. § 1746, I, Richard Tucker, hereby submit this declaration (the

"**Declaration**") under penalty of perjury:

1.      I, Richard Tucker, in my capacity as administrator and duly authorized foreign

representative (the "**Foreign Representative**") of Quintis Limited (Subject to Deed of Company

Arrangement) (Receivers and Managers Appointed) ("**Quintis**") and certain of Quintis'

subsidiaries (collectively, the "**Foreign Debtors**" or the "**Scheme Companies**"), which are the

subject of proceedings (the "**Australian Proceeding**") in relation to the scheme of arrangement

of the Foreign Debtors (the "**Scheme**"), pursuant to the Corporations Act 2001 (Commonwealth

of Australia) (the "**Corporations Act**") currently pending before Federal Court of Australia,

---

[1] The Foreign Debtors in these chapter 15 cases (the "**Chapter 15 Cases**") are Quintis, Sandalwood Properties Ltd,
Quintis Forestry Limited, Quintis Leasing Pty Ltd, Arwon Finance Pty Ltd, Mt Romance Holdings Pty Ltd, Mt
Romance Australia Pty Ltd and Australian Sandalwood Oil Co. Pty Ltd, each "(Subject to Deed of Company
Arrangement) (Receivers and Managers Appointed)."

US_ACTIVE-142608492

New South Wales District Registry (in Sydney, Australia) (the "**Australian Court**") am familiar with the Foreign Debtors and their worldwide affiliates (the "**Group**") businesses, day-to-day operations, and financial affairs. This Declaration has been drafted to support the Foreign Debtors' Verified Petition under Chapter 15 for Recognition of a Foreign Main Proceeding and Related Relief (the "**Verified Petition**").[2]

2.     I am a Partner in the Restructuring group of KordaMentha. I have nearly 10 years' experience in restructuring and insolvency matters, and a background as an M&A investment banker. I am registered as a liquidator by the Australian Securities and Investment Commission ("**ASIC**"). On January 20, 2018, I, together with my partners Scott Langdon and John Bumbak, was appointed as a voluntary administrator of each of the Foreign Debtors pursuant to Section 436A of the Corporations Act 2001.

3.     The Foreign Debtors' requests to approve the Scheme are currently pending before the Australian Court. I have been appointed by the Australian Court to be each of the Foreign Debtors' Foreign Representative for purposes of these Chapter 15 Cases, and I am authorized to commence these Chapter 15 Cases.

4.     On August 23, 2018, the Foreign Debtors applied to the Australian Court for permission to convene a meeting of its creditors for the purpose of considering and approving the Scheme.[3] The Australian Court considered that application at a convening hearing on September 4, 2018 (the "**Convening Hearing**") and issued an order (the "**Convening Order**"), attached as **Exhibit A** to the *Declaration of James Marshall in Support of Verified Petition under Chapter 15 for Recognition of a Foreign Main Proceeding and Related Relief* (the "**Marshall Declaration**"), which, among other things: (i) ordered the convening of a meeting (the "**Scheme**

---

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Verified Petition.
[3] A copy of the Scheme (omitting Schedule 18) is attached hereto at **Exhibit A**.

Meeting") of the Scheme Creditors on September 27, 2018; (ii) ordered that notice of the Scheme, together with an Explanatory Statement (as defined below) and proxy forms for voting at the Scheme Meeting, be made available to the Scheme Creditors; (iii) authorized me to act as a "foreign representative" as defined in section 101(24) of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "**Bankruptcy Code**") in these Chapter 15 Cases.

5.       On the date hereof (the "**Petition Date**"), I filed the Verified Petition pursuant to sections 1504 and 1515 of the Bankruptcy Code commencing these Chapter 15 Cases, seeking recognition of the Australian Proceeding as a "foreign main proceeding," as such term is defined in section 1502(4) of the Bankruptcy Code, and seeking other necessary relief in support of the Australian Proceeding.

6.       The Declaration begins with the background of the Foreign Debtors and other relevant corporate entities in the Group. Further, the Declaration discusses the Foreign Debtors' current capital structure, relevant financing arrangements, the current financial position of the Foreign Debtors and the Group and the negotiations with the Foreign Debtors' creditors and stakeholders that have taken place over the past approximately 18 – 24 months.  This Declaration will also provide an overview of a restructuring framework that, if approved by the requisite majorities of the beneficial holders of the Group's senior, secured notes (the "**Scheme Creditors**"), will be implemented through the Scheme and a deed of company arrangement (the "**Deed of Company Arrangement**"). Finally, the Declaration ends with statements in my capacity as the Foreign Debtors' foreign representative to satisfy the requirements of section 1515 of the Bankruptcy Code and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

## BACKGROUND

7.      The following is an overview of the Group's businesses, capital structure, events leading to the restructuring and the filing of the Scheme and these Chapter 15 Cases as of the Petition Date.[4]

**I.      Introduction to the Foreign Debtors**

**A.      Overview of the Group's Businesses**

8.      Quintis is the largest processor, owner, manager and grower of Indian Sandalwood plantations in the world. It was founded in 1997 after more than 15 years of government-funded pilot programs in Western Australia. The Group commenced the commercial planting of Indian sandalwood trees in 1999 and successfully completed the first commercial harvests of Quintis-planted and grown Indian sandalwood in 2014.  It grows Indian Sandalwood trees in Northern Australia and processes Australian and Indian Sandalwood trees at the Mt. Romance distillation plant in Albany, Western Australia. Quintis was listed on the Australian Stock Exchange in 2004.

9.      Indian Sandalwood (also known as Santalum album) is an aromatic oil-bearing tree and is one of the world's most valuable hardwoods. It grows naturally in only a few places in the world, including India and, to a limited extent, Southeast Asia and China. Indian Sandalwood has been used for over 2,500 years. It was declared a royal tree in India in 1792 and is recognized as a vulnerable species by the International Union for Conservation of Nature on its Threatened Species Red List. Due to increasing domestic consumption of sandalwood, the Indian government imposed export restrictions on oil and wood. The Indian Sandalwood tree's

---

[4] For further information regarding the Foreign Debtors' business, please refer to the (i) Explanatory Statement to the Scheme, filed with the Australian Court on September 3, 2018, and attached hereto (omitting schedules) as **Exhibit B** (the "**Explanatory Statement**"), (ii) Scheme Expert Report, dated August 30, 2018, attached hereto as **Exhibit C** and (iii) Report by Administrators, dated May 31, 2018, attached hereto (omitting appendix 14) as **Exhibit D**.

value lies in its heartwood, the oil bearing innermost layer of timber. Heartwood found at the core of Indian Sandalwood trees, and the oil distilled from it, has many applications and end markets. It is used in fragrances, cosmetics, toiletries, medicines, medicinal skin care products, carvings, furnishings, incense and religious ceremonies around the globe (including the United States, China, India and Europe).

10.     The Group's Indian Sandalwood plantations are in six separate locations throughout Northern Australia, including Kununurra and Kingston Rest in Western Australia, Douglas Daly, Katherine and Mataranka in the Northern Territory and Burdekin in Queensland. The Group has two processing facilities located in in Kununurra and Albany.  The Kununurra facility is used to process harvested logs into value-added wood end-products for sale or into wood chips to be transported to the Group's Mt. Romance distillation facility in Albany, where it is processed into sandalwood oil.  The Group has offices located in Darwin and Perth and operational locations through Western Australia, Northern Territory and Queensland. The Foreign Debtors currently employ approximately 221 employees, with all or substantially all of their employees based in Australia.

11.     In 2015, Quintis acquired a 100% ownership stake in each of Santalis Healthcare, Inc. and Santalis Pharmaceuticals, Inc. (the "**Santalis Subsidiaries**").  The Santalis Subsidiaries have pending clinical programs using sandalwood oils to target dermatitis, psoriasis, genital warts, HPV and molluscum contagiosm.  The strategic rationale behind the Group's acquisition of the Santalis Subsidiaries was to formulate and develop products that maximize the demand for the Group's Indian Sandalwood oil, provide the Group with increased revenue streams through royalty and licensing fees and provide direct relationships with global pharmaceutical

companies.  Neither of the Santalis Subsidiaries is currently subject to a formal insolvency proceeding.

12.    The Group's operations are vertically integrated, comprising each part of the Indian sandalwood tree's life cycle, plus financing.  Principally, this includes:

- Sale of investment products to finance plantations;
- Plantation establishment;
- Plantation management;
- Tree and oil processing;
- Marketing and distribution; and
- Commercialization of Indian Sandalwood oil based pharmaceutical products.

13.    Based on my discussions with the Receivers, I understand that following implementation of the Scheme, the Group intends to refocus its business operations around the following core activities

- Plantation Management: Application of leading silviculture and forestry practices to deliver yield improvements.
- Market Development and Sales: Using market research to focus on developing broad geographic and market segment demand for products.
- Research and Development: R&D to support the forestry and silviculture activities and build on the 19 years of expertise which the Quintis Group already has, and  continued work on pharmaceutical and over the counter products.
- Future plantings: Development of a sustainable reinvestment model for future plantings.

**B.    The Foreign Debtors**

14.    Each of the Foreign Debtors is organized under Australian law with registered offices and executive headquarters in Perth, Australia.  Prior to insolvency, all key corporate activities of the Foreign Debtors, including meetings of the board of directors, typically occurred in Australia.  The public filings made by the Foreign Debtors indicate that each of the Foreign Debtors is organized under Australian law and maintains registered offices in Australia.  Quintis' shares were publicly listed and traded on the Australian Securities Exchange.  Upon their appointment, the Receivers assumed primary day-to-day management responsibility and

6

authority for each of the Foreign Debtors. Each of the Receivers is an Australian citizen, domiciled in Australia and conducting business in Australia.

### C.    Overview of the Group's Financial Position and Capital Structure

15.    I am advised by the Receivers that, as of August 31, 2018, the Group had outstanding indebtedness of approximately $320 million arising under the following material financing agreements:[5]

- $250 million in aggregate principal amount of 8.75% Senior Secured Notes due 2023 (the "**Original Notes**," and the noteholders thereunder, the "**Senior Noteholders**") issued pursuant to that certain New York law governed Amended and Restated Indenture, dated July 20, 2017, between, among others, Quintis, as issuer, certain of Quintis' subsidiaries, as guarantors, The Bank of New York Mellon, as indenture trustee (the "**Original Indenture Trustee**") and BTA Institutional Services Australia Limited, as collateral trustee (the "**Original Collateral Trustee**") (as amended, restated, supplemented or modified from time to time, the "**Original Indenture**");

- $15 million in aggregate principal amount of 12% super senior, secured notes due May 31, 2018 (the "**Tranche 1 Super Senior Notes**"), issued under that certain New York law governed Note Agreement and Guaranty (the "**First Interim Financing Agreement**"), dated November 13, 2017, between, among others, Quintis, as issuer, certain of Quintis' subsidiaries, as guarantors, and certain of the Senior Noteholders (the "**Tranche 1 Noteholders**"), as note purchasers; and

- $15 million in aggregate principal amount of 14% super senior, secured notes due September 30, 2018 (the "**Tranche 2 Super Senior Notes**," together with the Tranche 1 Super Senior Notes, the "**Super Senior Notes**," and, together with the Original Notes, the "**Outstanding Indebtedness**"), issued pursuant that certain New York law governed Second Note Agreement and Guaranty (the "**Second Interim Financing Agreement**" and, together with the First Interim Financing Agreement, the "**Interim Financing Agreements**") dated May 29, 2018, between, among others, Quintis, as issuer, certain of Quintis' subsidiaries, as guarantors, and certain of the Senior Noteholders or their affiliates (the "**Tranche 2 Noteholders**," and, together with the Tranche 1 Noteholders, the "**Super Senior Noteholders**"), as note purchasers.

16.    I am advised by the Receivers that the claims of the Super Senior Noteholders rank *pari passu* among themselves and senior in right of payment to the claims of the Senior

---

[5] Unless otherwise noted, all monies referenced herein are denominated in United States currency.

Noteholders, and the claims of the Senior Noteholders rank *pari passu* among themselves. The priority and intercreditor rights of the Super Senior Noteholders and the Senior Noteholders are governed by that certain Amended and Restated Collateral Trust Deed dated July 27, 2016, between, among others, certain of Quintis' subsidiaries, and the Original Collateral Trustee (as amended, restated, supplemented or modified from time to time, the "**Collateral Trust Deed**"). Each of the Super Senior Noteholders is a Scheme Creditor or an affiliate of a Scheme Creditor.

17.    I am further advised by the Receivers that the Outstanding Indebtedness is irrevocably and unconditionally guaranteed by certain subsidiaries of Quintis, including each of the other Foreign Debtors and the Santalis Subsidiaries (collectively, the "**Subsidiary Guarantors**"). Security for the Outstanding Indebtedness consists of a general security interest over all or substantially all of the assets of Quintis and the Subsidiary Guarantors and a first registered mortgage over all freehold property owned by the Foreign Debtors.

**D.    The Group's Secured Creditors**

18.    Based on my discussions with the Receivers, I understand that the main secured creditors of the Group are:

    a.    a group of funds advised or sub-advised by BlackRock Advisers, LLC or its affiliates which hold just under 75% of the secured debt;

    b.    a group of funds advised by BlueBay Asset Management LLP which hold approximately 13% of the secured debt; and

    c.    Tor Asia Credit Master Fund LP which holds approximately 11.2% of the secured debt.

19.    Those aforementioned secured creditors together:

    a.    hold in excess of 99% of the Original Notes; and

    b.    provided all of the funding under the Interim Financing Agreements.

### E.    The Group's Connections to the United States

20.    Based on my discussions with the Receivers, I understand that each of Quintis and the Subsidiary Guarantors issued or guaranteed Original Notes in the aggregate principal amount of $250 million pursuant to the Original Indenture, which is governed under New York law and contains a New York forum selection clause.[6]  In addition, each of Quintis and the Subsidiary Guarantors issued or guaranteed the Super Senior Notes in principal amount of $30 million pursuant to the Interim Financing Agreements governed under New York law and containing New York forum selection clauses.[7]  Quintis owns 100% of the equity of the Santalis Subsidiaries, which are each organized and do business in the United States. I am further advised by the Receivers that the certificated equity certificates of each of the Santalis Subsidiaries, which Quintis pledged in favor of the secured creditors, are custodied in the borough of

---

[6] *See* Original Indenture, §§ 13.6, 13.7.  Section 13.6 of the Original Indenture states: "[t]his indenture and the notes shall be governed by, and construed in accordance with, the laws of the state of New York."  *Id*. Section 13.7 of the Original Indenture states:

> [t]he Issuer and each Subsidiary Guarantor agree that any suit, action or proceeding against them brought by the Trustee or any Holder, arising out of or based upon this Indenture may be instituted in any State or Federal court in the Borough of Manhattan in The City of New York, New York, and waive any objection which they may now or hereafter have to the laying of venue of any such proceeding, and irrevocably submit to the non-exclusive jurisdiction of such courts in any suit, action or proceeding.

*Id*.

[7] *See, e.g.*, First Interim Financing Agreement, §§ 37.1 (*Governing Law*), 37.2 (*Jurisdiction*).  Section 37.1 of the First Interim Financing Agreement states: "[t]his Agreement shall be construed in accordance with and governed by the law of the State of New York including Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York)."  *Id*.  Section 37.2 of the First Interim Financing Agreement states:

> [e]ach of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.

*Id*. Sections 36.1 (*Governing law*) and 36.2 (*Jurisdiction*) of the Second Interim Financing Agreement contain identical language as the corresponding provisions of the First Interim Financing Agreement quoted above.

Manhattan in the City of New York.  I am also advised by the Receivers that each of the Foreign

Debtors has an undivided interest in $100,000 deposited pursuant to an evergreen retainer in

favor of Reed Smith LLP, as counsel to the Foreign Representative in these Chapter 15 Cases,

which is being held in a client trust account located in the borough of Manhattan in the City of

New York (the "**Client Trust Account**").

## II.    Events Giving Rise to the Group's financial distress

21.    Numerous events contributed to the Group's financial distress.  In April 2017, the

Group commenced a strategic review of its business, which included hiring external advisors to

explore potential sale and recapitalization transactions.  The strategic review was prompted by a

report issued by Glaucus Research in March 2017 that was critical of the Group's business

model and, shortly thereafter, the resignation of the Group's founder, Frank Wilson, as managing

director to pursue a potential buyout of the Group.

22.    On May 10, 2017, Quintis' board announced that a contract of one of the Santalis

Subsidiaries to supply sandalwood oil to Galderma S.A. ("**Galderma**") had been terminated in

December 2016. On May 12, 2017, Moody's downgraded Quinitis' corporate rating and senior

secured notes rating from B2 to B3 and placed the ratings on review for further potential

downgrades. On May 17, 2017, with its share price continuing to decline, Quintis was placed in a

trading halt and it was suspended from official quotation on the Australian Securities Exchange.

23.    In July 2017, the Group failed to lodge its quarterly financial statements in

accordance with its reporting covenants under the Original Indenture for the quarter ended

March 2017.  Quintis reached an agreement with a majority of the Senior Noteholders to waive

any default arising from its failure to timely file its financial statements in exchange for various

concessions.  On July 31, 2017, Quintis announced that it did not expect to make its bi-annual

interest payment in the amount of $10.9 million under the Original Notes due on August 30, 2017. On August 31, 2017, the Group announced that it had entered into an agreement with a majority of the Senior Noteholders under which they agreed to forbear from exercising their rights and remedies under the Original Notes provided, among other things, that Quintis agreed to the terms of an acceptable recapitalization transaction with third party equity providers.

24.     On September 12, 2017, Quintis announced that a class action was being brought against it by shareholders alleging that Quintis had breached its continuous disclosure obligations under Australian law. On November 16, 2017, a second class action was brought against Quinits alleging that Quintis engaged in misleading or deceptive conduct and breached continuous disclosure obligations under Australian law, specifically in relation to the termination of the supply contract with Galderma and announcements about sales and projected financial performance.

25.     Based on my discussions with the Receivers, I understand that in November 2017, the Group executed a non-binding term sheet for a potential recapitalization with new equity investors. On or around the same time, certain of the Senior Noteholders agreed to purchase $15 million in principal amount of Tranche 1 Notes to provide the Group with interim liquidity while negotiations to finalize a potential recapitalization transaction were ongoing. After months of negotiations, however, the Group was unable to agree binding terms of a recapitalization transaction with a third party equity provider. Quintis continued to explore a potential alternative restructuring transaction with another investor group, until that investor group was unable to demonstrate that it had obtained financing commitments necessary to proceed with an alternative transaction.

26.    On January 19, 2018, an institutional investor exercised a put option, requiring Quintis to buy back 400 hectares of plantations for a purchase price of approximately $37 million.  On January 20, 2018, lacking sufficient liquidity to pay the put option, the board of directors of each of the Foreign Debtors voluntarily appointed the Administrators under Section 436A of the Corporations Act.  On January 23, 2018, a majority of the Senior Noteholders and Super Senior Noteholders instructed the Original Collateral Trustee to appoint the Receivers to continue to manage the business of the Foreign Debtors in insolvency.

27.    In summary, the Group's insolvency was ultimately precipitated by the combined effect of:

- Decreasing sales of plantation investment products in Q4 FY17 due to the loss of investor confidence following the issue of the Glaucus Research report;

- Failure to implement a recapitalization/restructuring transaction following protracted negotiations with key stakeholders and various third-party investors;

- Material level of debt relative to its asset base and projected cash flows;

- Ongoing liquidity requirement to fund operations and the maintenance of biological assets; and

- Exercise of a put option by an institutional investor due to the failed recapitalization transaction.

## III.    Commencement of Voluntary Administration, the Appointment of Receivers and the Development of the Scheme

### A.    Management of Foreign Debtors' Affairs Under Voluntary Administration and Receivership.

28.    On January 23, 2018, the Original Collateral Trustee appointed Jason Preston, Robert Conry Brauer and Shaun Robert Fraser (the "**Receivers**") as joint and several receivers and managers of the Scheme Companies.  In accordance with their powers under the Collateral Trust Deed and Australian law, the Receivers assumed primary day-to-day management

authority over the operations of the Foreign Debtors.  The Receivers promptly recommenced a sale and recapitalization process that Quintis first started in March 2017. On February 6, 2018, the Receivers engaged Sternship Advisors Pty Ltd (the successor of the entity that Quintis engaged prior to Administration) ("**Sternship**") to assist them in managing this process. Based on my discussions with the Receivers, I understand that they placed advertisements in numerous publications, including the Australian Financial Review and the Financial Times (Asia) requesting expressions of interest.  In addition, the Receivers and Sternship reached out to industry participants and parties who had been contacted during the pre-appointment process. The Receivers sought indicative offers from parties interested in the recapitalization or purchase of the business and/or assets of the Group either on an "all-of-company" or "separate assets" basis.  The sale and recapitalization process was intended to be conducted in two stages, stage 1 (non-binding offers) and stage 2 (final binding offers).

29.     I am advised by the Receivers that stage 1 of the process ran from February 6, 2018, until March 23, 2018.  During stage 1, 104 strategic parties were identified and contacted. Sixteen expressions of interest were received from interested parties.  Following completion of stage 1 of the process, six non-binding indicative offers were received; a single whole of company proposal and five partial asset or marketing proposals.  The single whole of company proposal was considered not capable of acceptance by the Receivers on the basis that the offer fell short of the secured debt of the Scheme Creditors and was not pursued further.

30.     The Receivers have informed me that, in the absence of any acceptable "all-of-company" sale or recapitalization  proposals, Sternship conducted a secondary process for those parties who were interested in specific assets of the Group and the five parties who had submitted partial asset or marketing proposals in stage 1, who were given the opportunity to put

13

forward revised proposals.  These parties were requested to submit non-binding indicative offers by April 20, 2018.  The Receivers determined that each of the revised offers received had under-valued the assets of the Group and were therefore not accepted.

### B.    The Scheme of Arrangement

31.    Following the unsuccessful sale and recapitalization process, the Receivers engaged in further discussions with the Senior Noteholders and the Super Senior Noteholders regarding alternative options for recapitalization.  The Scheme, in conjunction with the Deed of Company Arrangement, attached hereto as **Exhibit E** and described below, represents the outcome of those discussions.[8]

32.    Under the Scheme, each Scheme Creditor is entitled to the following consideration in exchange for relinquishing its rights under the Original Notes: (i) a pro rata share of $185 million of Second Lien 0%/12%/12% Senior Secured PIK Toggle Notes due 2028 (the "**New Second Lien Notes**") issued by Quintis (Australia) Pty Limited ("**New Quintis**") pursuant to a New York law governed Indenture (the "**Second Lien Indenture**"); (ii) a pro rata share of all of the equity of Quintis Holdco Pty Ltd ("**New Quintis Holdco**"), an entity organized in Australia and the direct, 100% owner of New Quintis; (iii) a pro rata share of $10 million of up to $156 million of First Lien 7.50%/8.50% Senior Secured PIK Toggle Notes due 2026 (the "**New First Lien Notes**") issued by New Quintis pursuant to a New York law governed Indenture (the "**First Lien Indenture**"); and (iv) the option to subscribe for and purchase, on a pro rata basis, up to $146 million of New First Lien Notes (collectively, the "**Scheme Consideration**").  Scheme Creditors that either do not vote in the Scheme or that fail to provide representations evidencing their eligibility under United States securities laws to

---

[8] Although no Scheme Creditor has entered into a formal lock-up or similar agreement with respect to the Scheme, I believe, based on the extensive consultation between the Receivers and a supermajority of the Senior Noteholders, that the Scheme will be supported by the overwhelming majority of Scheme Creditors.

receive the Scheme Consideration may be entitled to receive a cash payment in the amount of

30% of their claim arising from their holdings of the Original Notes.

33.     In summary, the Scheme provides a new ownership structure of the Group and the

release of Quintis as follows:

- Quintis will transfer ownership of all of its subsidiaries and other assets to New Quintis.  New Quintis will be a wholly owned subsidiary of New Quintis Holdco, which will, in turn, be owned by the Scheme Creditors;

- New Quintis will assume Quintis' obligations as borrower and security provider under the Finance Documents and will enter into the New Finance Documents (both as defined in the Scheme);

- and Quintis will receive a full release of its obligations in relation to the existing secured debt under the Finance Documents.

34.     The following chart shows a simplified summary of what the Group's corporate

structure will look like if the Scheme is implemented (the "**Restructured Group**").



35.     The proposed new debt capital structure of the Restructured Group will be as

follows:

- New First Lien Notes with a face value of up to $156 million to be issued by New Quintis pursuant to the New First Lien Indenture; and

- New Second Lien Notes with a face value of $185 million will be issued by New Quintis pursuant to the Second Lien Indenture.

36.    The New First Lien Notes and the New Second Lien Notes will be guaranteed and secured by each of the Subsidiary Guarantors pursuant to a security grant substantially similar to the security granted under the Senior Notes and the Super Senior Notes and another subsidiary, Fieldpark Pty Ltd, will serve as an additional guarantor.

37.    The exchange of the Original Notes for the New Second Lien Notes will reduce the amount of debt owed by the Group under the Original Notes by approximately $100 million. In relation to the First Lien Notes, $10 million of the Original Notes will be "rolled" into the First Lien Notes; a portion of a minimum of $140.7 million in new money raised will be used to repay the Super Senior Notes in full, being the sum of approximately $32.8 million, and the balance of the monies raised will be available to meet the Restructured Group's ongoing capital requirements, being the sum of approximately $108 million.

38.    Based on my discussions with the Receivers I understand that the terms of the First Lien Notes and Second Lien Notes provide the Restructured Group with, in relation to the First Lien Notes, the option of capitalizing interest payments for the first six years of the term, and, in relation to the Second Lien Notes, an interest free period for the first five years of the term of the instrument and the ability to capitalize interest payments for the remaining five years of the term. In the view of the Receivers, these provisions will assist the Restructured Group in managing its capital requirements.

39.     Details of the Scheme can also be found in the Explanatory Statement, attached hereto (omitting schedules) as **Exhibit B**, which sets out information relevant to the Scheme and contains schedules of documents relevant to the Scheme including the following:

   a. a discussion of the Scheme proposal (section 5.3);
   b. the terms of the proposed Scheme (schedule 1);
   c. reasons why the Scheme Creditors may consider voting in favor of the Scheme (section 6.3);
   d. reasons why Scheme Creditors may consider voting against the Scheme (section 6.4);
   e. a discussion of the Deed of Company Arrangement (section 5.8);
   f. the existing and proposed new debt capital structure (sections 5.9 and 5.10);
   g. a voting proof of debt (schedule 10); and
   h. notice of the second court hearing (section 2.5).

### C.     The Releases

40.     Pursuant to, and as set forth more fully in, the Scheme, the Scheme Creditors (among other parties) will grant certain releases (the "**Releases**"), including certain non-debtor guarantor releases (the "**Non-Debtor Guarantor Releases**").  The Releases release all Claims (as defined in the Scheme) against Quintis, the Subsidiary Guarantors, the Original Indenture Trustee, the Original Collateral Trustee, the Instructing Scheme Creditors (as defined in the Scheme), each person who advises or sub advises an Instructing Scheme Creditor, the Scheme Creditors, and the current directors of the Scheme Companies, except in relation to, as applicable, the New Finance Documents (as defined in the Scheme) and/or a breach of the Scheme. The Non-Debtor Guarantor Releases release all Claims (as defined in the Scheme) against the Santalis Subsidiaries except in relation to a breach of the Scheme and in relation to the New Finance Documents (as defined in the Scheme) (all beneficiaries of the Releases, the "**Released Parties**").

**D.** **The Scheme and the Deed of Company Arrangement.**

41.     Sanctioning the Scheme is a condition to the effectiveness of the Deed of Company Arrangement amongst the Administrators, the Receivers, and the Scheme Companies, that was proposed by the Receivers as part of their efforts to recapitalize the Group. The Deed of Company Arrangement was approved by creditors on June 8, 2018 and executed on June 29, 2018.[9]  Under the Deed of Company Arrangement:

- unsecured creditors (subject to conditions precedent) will be transferred to a creditors' trust and will receive a distribution from a distribution pool of AUD$2.5 million to be paid by the secured creditors to the creditors' trust; and

- the funds will be distributed from the creditors' trust to unsecured creditors based on classes/pools of unsecured claims (with employee creditors retaining their statutory priority).

42.     A creditors' trust is a mechanism for the distribution of a fund to creditors of a company or group of companies, which accelerates a company's exit from external administration.  A trust is formed for the benefit of the relevant creditors, and the trust funds (usually contributed by the proponent of the Deed of Company Arrangement) are paid to the trust for distribution to creditors in accordance with a trust deed.  The Deed of Company Arrangement requires the use of the creditors' trust.  The reason for the creditors' trust structure is to allow Quintis' business to exit insolvency and operate without the words "subject to Deed of Company Arrangement" after each of the Foreign Debtors name.  The deed establishing the creditors' trust provides that certain of the Administrators will become trustees (in such capacity, the "**Trustees**") of the creditors' trust.

---

[9] A copy of the Deed of Company Arrangement is attached hereto at **Exhibit E**.

43.    The creditors' trust contribution has been made available by the secured creditors to ensure that the Group's unsecured creditors receive a better return than in a liquidation scenario.  The Trustees will distribute the funds from the creditors' trust in the following order:

- Any applicable employee claims (approximately AUD$0.9 million);
- Any unpaid Administrators' fees and expenses.  As these fees are to be paid by the Receivers prior to completion, it is expected to be nil;
- Deed Administrators and Trustees' fees and expenses (estimated to be approximately AUD$500,000 - AUD$700,000);
- A distribution to creditors, within two creditor pools: Pool A and Pool B
  - Pool A (ongoing trade creditors)
    - Trade creditors of Quintis will be allocated two thirds of the balance of funds available in the creditors' trust (it is estimated that these creditors will receive approximately AUD$14.4 to AUD$21.8 cents on the dollar)
  - Pool B
    - Other unsecured creditors of Quintis will be allocated one third of the balance of funds.  It is estimated that these creditors will receive approximately AUD$0.6 to AUD$1.0 cents on the dollar.

The key reasons the Deed of Company Arrangement provides for different treatment of creditors is:

- Trade creditors with an ongoing relationship with the business going forward are deemed to be important for the ongoing viability of the business and add value.
- Other creditor claims relate to financial products, disputes and other claims where the relationship is such that the debtor/creditor relationship that led to the liability will not continue with the business in the future.
- Notwithstanding the different treatment of creditors, the return to all creditors is considered to be better than a liquidation scenario.

Accordingly, the Administrators have concluded in their report under section 439A of the Corporations Act that the Deed of Company Arrangement provides a better outcome for unsecured creditors than the likely outcome if the Group was placed in liquidation.

44.    The conditions precedent to the Deed of Company Arrangement include (a) delivery of a signed Scheme certificate by the Receivers to the Administrators and (b) execution of a deed that will govern the terms of the creditors' trust.  If the Scheme has not been

implemented on or before November 30, 2018 (the "**Sunset Date**"), the Scheme will lapse and be of no further force or effect. Accordingly, both the Deed of Company Arrangement and the Scheme must be implemented by the Sunset Date in order for the recapitalization of the Foreign Debtors to proceed.

## IV.    Commencement of the Australian Proceeding

45.    The Australian Court, at the Convening Hearing, issued the Convening Order, which, among other things: (i) ordered the commencement of the Scheme Meeting of the Scheme Creditors on September 27, 2018; (ii) ordered that notice of the Scheme, together with the Explanatory Statement and proxy forms for voting at the Scheme Meeting, be made available to the Scheme Creditors; and (iii) authorized me to act as Foreign Representative in these Chapter 15 Cases. *See* Convening Order, **Exhibit A** to Marshall Declaration, ¶ 5. As only the Scheme Creditors, comprised of the holders of the Original Notes, are affected by the Scheme, the Scheme contains only one voting class.

46.    Following the Scheme Meeting, and upon receiving the necessary votes in favor of the Scheme from the Scheme Creditors, the Australian Court will conduct a sanction hearing on October 4, 2018, and, if agreed by the Scheme creditors at the Scheme Meeting, the Australian Court will enter an order finally approving the Scheme (the "**Sanction Order**").

47.    I believe the aforementioned timetable is fair and appropriate, giving all Scheme Creditors sufficient time to consider the documentation. In particular:

   a.   The Group, collectively, is a high-profile company and its discussions and negotiations with its stakeholders and creditors have been widely reported. In order to maintain market confidence (amongst its investors, customers and suppliers as well as its key managers and employees) and accordingly maintain the viability of the Group's business, it is critical that the Foreign Debtors are able to implement the Scheme by the Sunset Date;

b. The current Scheme will accomplish a balance sheet restructuring of each of the Foreign Debtors' debt obligations and is a crucial component of the overall restructuring of the Group. The Scheme Creditors have known about the likely shape of the Foreign Debtors' restructuring for a number of months;

c. The Scheme Creditors are all, as far as I am aware, sophisticated financial institutions; and

d. The Scheme does not require the Scheme Creditors to undertake any complicated or laborious tasks in order to vote at the Scheme Meeting.

48.    For the reasons outlined herein, any delay to the sanctioning of the Scheme and recognition and enforcement of the Scheme by this Court that could breach the Sunset Date would be detrimental to the Foreign Debtors' restructuring efforts.  Any delay may also: (i) undermine market confidence (amongst the Group's investors, customers and suppliers as well as its key managers and employees), which may significantly impair the Group's ability to win and maintain business and (ii) therefore prove value destructive for the Foreign Debtors and their subsidiaries and represent a negative outcome for the Foreign Debtors' creditors (including the Scheme Creditors).

## V.    STATEMENT PURSUANT TO SECTION 1515 OF THE BANKRUPTCY CODE

49.    I am informed that section 1515 of the Bankruptcy Code provides, in pertinent part, as follows:

a. A foreign representative applies to the court for recognition of a foreign proceeding in which the foreign representative has been appointed by filing a petition for recognition.

b. A petition for recognition shall be accompanied by—
  i. a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;
  ii. a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or
  iii. in the absence of evidence referred to in paragraphs (i) and (ii), any other evidence acceptable to the court of the existence of such foreign and of the appointment of the foreign representative.

21

      c.    A petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.

11 U.S.C. § 1515.

50.    Pursuant to section 1515(b) of the Bankruptcy Code, a copy of the Convening Order commencing the Australian Proceeding is attached to the Marshall Declaration as **Exhibit A**.  The Convening Order appoints me as one of the Foreign Representatives and authorizes me to file the Verified Petition and commence these Chapter 15 Cases.  Additionally, the Convening Order affirms the existence of the Australian Proceeding.

51.    Pursuant to section 1515(c) of the Bankruptcy Code, I am aware of the definition of "foreign proceeding" under section 101(23) of the Bankruptcy Code, and I believe the Australian Proceeding is a "foreign proceeding" as defined therein.  I am aware of no other foreign proceeding with respect to the Foreign Debtors.

52.    I am informed that Bankruptcy Rule 1007(a)(4) provides, as follows:

In addition to the documents required under § 1515 of the Code, a foreign representative filing a petition for recognition under chapter 15 shall file with the petition: (A) a corporate ownership statement containing the information described in Rule 7007.1; and (B) unless the court orders otherwise, a list containing the names and addresses of all persons or bodies authorized to administer foreign proceedings of the debtor, all parties to litigation pending in the United States in which the debtor is a party at the time of the filing of the petition, and all entities against whom provisional relief is being sought under § 1519 of the Code.

Fed. R. Bankr. P. 1007(a)(4).

53.    I am further informed that Bankruptcy Rule 7007.1 provides in pertinent part that a corporate ownership statement:

. . . identif[y] any corporation, other than a governmental unit, that directly or indirectly owns 10% or more of any class of the corporation's equity interests, or states that there are no entities to report under this subdivision.

Fed. R. Bankr. P. 7007.1(a).

### A.    Corporate Ownership Statement

54.    In compliance with the requirements of Bankruptcy Rule 1007(a)(4)(A), the following is a corporate ownership statement of each of the Foreign Debtors, which identifies any corporation that directly or indirectly owns 10% or more of any class of each of the Foreign Debtors' equity interests:

- Frank Wilson and associated entities own 12.52% of the equity interests in Quintis.

- Quintis owns 100% of the equity interests in each of the following Foreign Debtors: Sandalwood Properties Ltd, Quintis Forestry Limited, Quintis Leasing Pty Ltd, Arwon Finance Pty Ltd, Mt Romance Holdings Pty Ltd, Mt Romance Australia Pty Ltd and Australian Sandalwood Oil Co. Pty Ltd.

### B.    List of Administrators

55.    In compliance with the requirements of Bankruptcy Rule 1007(a)(4)(B), each of Scott Langdon, Jennifer Nettleton and I were specifically authorized by the Australian Court to act as a foreign representative for the purposes of these Chapter 15 Cases. The service address for the Foreign Representative in these Chapter 15 Cases is: Ashurst, Level 11, 5 Martin Place, Sydney NSW 2000, Australia (Attn: James Marshall).  I am aware of no other persons or bodies authorized to administer the Australian Proceeding.

### C.    Litigation Parties in the United States

56.    As of the Petition Date, the Foreign Debtors are not a party to any pending litigation in the United States.

**D.**      **Entities Against Whom Provisional Relief Is Being Sought Under Section 1519 of the Bankruptcy Code.**

57.      The Foreign Debtors are not seeking provisional relief pursuant to section 1519 of the Bankruptcy Code against any entities.[10]

*[Remainder of page intentionally left blank]*

---

[10] While the Foreign Representative is not presently seeking provisional relief with respect to the Foreign Debtors pursuant to section 1519 of the Bankruptcy Code, the Foreign Representative reserves the right to do so in the future should the need arise.

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information and belief.

Executed:      Perth, Australia
               September 12, 2018


                                             /s/ Richard Tucker
                                             Richard Tucker
                                             *Foreign Representative of the Australian Proceeding*