## **Exhibit B**

(Explanatory Statement)



# Explanatory Statement

**to the Scheme of Arrangement**

Quintis Ltd (Subject to Deed of Company Arrangement) (Receivers and Managers Appointed) (ACN 092 200 854)

Sandalwood Properties Ltd (Subject to Deed of Company Arrangement) (Receivers and Managers Appointed) (ACN 093 330 977)

Quintis Forestry Limited (Subject to Deed of Company Arrangement) (Receivers and Managers Appointed) (ACN 080 139 966)

Quintis Leasing Pty Ltd (Subject to Deed of Company Arrangement) (Receivers and Managers Appointed) (ACN 080 978 721)

Arwon Finance Pty Ltd (Subject to Deed of Company Arrangement) (Receivers and Managers Appointed) (ACN 072 486 643)

Mt Romance Holdings Pty Ltd (Subject to Deed of Company Arrangement) (Receivers and Managers Appointed) (ACN 115 659 606)

Mt Romance Australia Pty Ltd (Subject to Deed of Company Arrangement) (Receivers and Managers Appointed) (ACN 060 122 698)

Australian Sandalwood Oil Co. Pty Ltd (Subject to Deed of Company Arrangement) (Receivers and Managers Appointed) (ACN 088 257 498)

The date of this Explanatory Statement is 5 September 2018.

# Contents

| 1 | **Letter from the Receivers and Managers** | **5** |
|---|---|---|
| 2 | **Important Information** | **6** |
| | 2.1 Orders to convene Scheme Meeting not an endorsement | 6 |
| | 2.2 Prescribed information | 6 |
| | 2.3 Responsibility Statement | 7 |
| | 2.4 Date of this Explanatory Statement | 7 |
| | 2.5 Notice of Second Court Hearing | 7 |
| | 2.6 Professional advice | 7 |
| | 2.7 Forward looking statements | 8 |
| | 2.8 Scheme Creditors' acknowledgement regarding information | 8 |
| | 2.9 ASIC | 8 |
| | 2.10 Rounding | 8 |
| | 2.11 Defined terms | 8 |
| | 2.12 Scheme Creditors outside Australia | 8 |
| | 2.13 Tax implications of the Scheme | 9 |
| | 2.14 International offer restrictions | 9 |
| | 2.15 Privacy | 14 |
| 3 | **Key Dates and Steps** | **16** |
| 4 | **Questions and Answers** | **17** |
| 5 | **Overview of the Scheme** | **22** |
| | 5.1 Events leading up to voluntary administration and receivership of the Quintis Group | 22 |
| | 5.2 Sale and Recapitalisation Process | 22 |
| | 5.3 The Scheme proposal | 23 |
| | 5.4 Overview of the Scheme | 24 |
| | 5.5 Conditions Precedent | 24 |
| | 5.6 Chapter 15 recognition | 25 |
| | 5.7 Sunset Date | 26 |
| | 5.8 Deed of Company Arrangement | 26 |
| | 5.9 Existing Debt Capital Structure | 27 |
| | 5.10 Proposed New Debt Capital Structure | 28 |
| | 5.11 Scheme Steps and Implementation | 35 |
| | 5.12 Minimum Subscription Amount | 41 |
| | 5.13 Eligibility to be an Equity Noteholder | 41 |
| | 5.14 Shareholders' Agreement | 42 |
| | 5.15 Eligibility to receive Second Lien Notes or First Lien Notes | 42 |
| | 5.16 First Lien Notes and Participating Noteholders | 43 |
| | 5.17 Incoming Agent and Indenture Trustee and Incoming Collateral Trustee | 43 |
| | 5.18 Scheme Administrators | 43 |
| | 5.19 Expert Report recommendation | 44 |
| | 5.20 Transaction costs | 44 |
| | 5.21 Consequences if Scheme is not implemented | 44 |
| 6 | **Key Considerations for Scheme Creditors** | **45** |
| | 6.1 Why you are receiving this Explanatory Statement | 45 |
| | 6.2 Scheme Procedure | 45 |
| | 6.3 Reasons why Scheme Creditors may consider voting in favour of the Scheme | 46 |

| | 6.4 | Reasons why Scheme Creditors may consider voting against the Scheme | 48 |
|---|---|---|---|
| | 6.5 | Key risks | 50 |
| **7** | | **Scheme Meeting and Voting Procedures** | **53** |
| | 7.1 | Scheme Meeting | 53 |
| | 7.2 | Eligibility and entitlement to vote | 53 |
| | 7.3 | How to vote at the Scheme Meeting | 53 |
| | 7.4 | Voting in person | 53 |
| | 7.5 | Voting by proxy, attorney or corporate representative | 53 |
| | 7.6 | Adjudication of Voting Proof of Debt Forms | 53 |
| | 7.7 | Modification of Scheme | 54 |
| | 7.8 | Lodgement of documents and queries | 54 |
| **8** | | **Current operations of the Quintis Group and following Scheme implementation** | **55** |
| | 8.1 | Overview | 55 |
| | 8.2 | Financial Position | 55 |
| | 8.3 | Australian Operations | 55 |
| | 8.4 | US Operations | 57 |
| | 8.5 | Investor Product Offerings | 57 |
| | 8.6 | AFSL and Compliance Matters | 59 |
| | 8.7 | Current Corporate Structure | 60 |
| | 8.8 | Post-Scheme Corporate Structure | 60 |
| | 8.9 | Directors of Quintis Holdco | 60 |
| **9** | | **Taxation Considerations** | **61** |
| | 9.1 | Certain Australian Tax Considerations | 61 |
| | 9.2 | Certain U.S. Federal Income Taxation Considerations | 61 |
| **10** | | **Proforma Balance Sheet** | **74** |
| **11** | | **Additional Information** | **75** |
| | 11.1 | Material interests of current directors | 75 |
| | 11.2 | Material interests of Scheme Administrators | 75 |
| | 11.3 | Expected dividend if Scheme was implemented as proposed | 75 |
| | 11.4 | Expected dividend if Scheme Companies were wound up in 6 months | 75 |
| | 11.5 | Names of all known creditors, guaranteed creditors and internal creditors to the Scheme and the details of debts owed to those creditors | 75 |
| | 11.6 | Certified copies of financial statements | 75 |
| | 11.7 | Report as to affairs of Scheme Companies - ASIC Form 507 | 76 |
| | 11.8 | No endorsement from the Court or ASIC | 76 |
| **12** | | **Glossary** | **77** |
| **Schedule 1 – Scheme of Arrangement** | | | **84** |
| **Schedule 2 – Expert Report** | | | **85** |
| **Schedule 3 – First Lien Indenture** | | | **86** |
| **Schedule 4 – Second Lien Indenture** | | | **87** |
| **Schedule 5 – Amended Collateral Trust Deed** | | | **88** |
| **Schedule 6 – Note Subscription and Purchase Agreement** | | | **89** |
| **Schedule 7 – Notice of Scheme Creditors' Meeting** | | | **90** |
| **Schedule 8 – Financial Statements required to be lodged with ASIC** | | | **91** |
| **Schedule 9 – Report on the affairs of the Scheme Companies as required by Form 507** | | | **92** |

**Schedule 10 – Voting Proof of Debt Form (including US Securities Representation) and Proxy Form** **93**

**Schedule 11 – Names of all known creditors, guaranteed creditors and internal creditors to the Scheme and the details of debts owed to those creditors** **94**

**Schedule 12 – Scheme Administrators' Declaration of Independence, Relevant Relationships and Indemnities** **96**

## 1      Letter from the Receivers and Managers

Dear Scheme Creditors

Following a period of financial distress and unsuccessful restructuring efforts in 2017, the Quintis Group entered into external voluntary administration on 20 January 2018. Jason Preston, Robert Brauer and I were appointed as joint and several receivers and managers of the Quintis Group on 23 January 2018.

During the course of our appointment, we have explored various alternatives for the future of the Quintis Group, including a potential sale of the Group and/or its assets. We have also engaged in discussions with key stakeholders in the secured creditor group regarding a possible recapitalisation of the Quintis Group.

After conducting a sale process for the Group and/or its assets which did not ultimately result in any bids capable of acceptance (more information about the sale process is set out in section 5.2 below) and engagement in further discussions with secured creditors, we are pleased to be able to put forward a proposed recapitalisation plan for the Quintis Group. This recapitalisation is proposed to be implemented by a deed of company arrangement for the Scheme Companies (which has already been entered into by the Scheme Companies) and a creditors' scheme of arrangement, being the Scheme proposal.

If approved by the requisite majorities of Scheme Creditors and approved by the Court, the recapitalisation will result in:

(a)      the Scheme Creditors becoming the ultimate owners of the Quintis Subsidiaries and the new holding company of the Quintis Group (which will replace Quintis Limited);

(b)      the Scheme Creditors continuing to be owed secured debt by the Quintis Subsidiaries (as restructured by the Scheme) and the new holding company of the Quintis Group that will replace Quintis Limited; and

(c)      a very substantial injection of new capital for the Quintis Group which will enable the Group to exit external administration and continue to carry on its business on a going concern basis.

If you wish the recapitalisation to proceed, it is important that you vote in favour of the Scheme proposal.

Absent a superior proposal, the receivers and managers of the Quintis Group recommend that you vote in favour of the Scheme. In coming to this recommendation, the receivers and managers have carefully considered all other available options for the Quintis Group, including a sale of the Quintis Group and/or its assets and/or a liquidation of the Quintis Group. In the circumstances and in the absence of a superior proposal, we are of the view that the Scheme proposal provides the Scheme Creditors with the best opportunity to realise the value of their investment in the Quintis Group.

Important details of the Scheme proposal and the steps associated with its implementation are set out in this Explanatory Statement. You are urged to read this Explanatory Statement carefully as the information it contains is important. If you have any questions, please contact quintis@mcgrathnicol.com. Alternatively, please contact your legal, financial, taxation or other professional adviser.

Your vote is important and we look forward to your participation at the Scheme Meeting on Thursday, 27 September 2018.

 Yours sincerely


Shaun Fraser
Receiver and Manager of each Scheme Company

## 2    Important Information

It is recommended that Scheme Creditors read this Explanatory Statement in its entirety before making a decision whether or not to vote in favour of the Scheme.

### 2.1    Orders to convene Scheme Meeting not an endorsement

This Explanatory Statement has been provided to Scheme Creditors in connection with the Scheme Meeting for the purpose of considering and, if thought fit, agreeing to the proposed Scheme between the Scheme Companies and the Scheme Creditors. The Scheme Meeting will be held at:

> 10am (Sydney time)  on Thursday, 27 September 2018
>
> at
> Allens
> Level 28
> 126 Philip Street
> Sydney  NSW  Australia

For further information on the procedures for voting at the Scheme Meeting, refer to Section 7 of this Explanatory Statement.

The Court has made orders under section 411(1) of the Corporations Act directing that a meeting of Scheme Creditors be convened to vote upon the proposed Scheme. The orders are not an endorsement of, or any opinion on, the Scheme by the Court. The Court is not responsible for the contents of this Explanatory Statement and, in ordering that the Scheme Meeting be held, the Court does not, in any way, indicate that it has approved or will approve the terms of the Scheme.

### 2.2    Prescribed information

Under section 412(1) of the Corporations Act and Corporations Regulation 5.1.01, this Explanatory Statement must contain certain information to assist the Scheme Creditors in deciding whether or not to vote in favour of the proposed Scheme. The below table indicates where in this Explanatory Statement that information can be found.

| | |
|---|---|
| An explanation of the effect of the proposed Scheme | Sections 5.4 and 5.11 |
| The criteria and the date for determining the participants in the Scheme, the persons entitled to vote at the Scheme Meeting, and the persons who will be bound by the Scheme (being the Scheme Creditors) | Section 7 |
| The expected dividend that would be paid to the Scheme Creditors if the Scheme Companies were wound up within six months after the date of the hearing of the application to the Court for an order convening the Scheme Meeting | Section 11.4 and Schedule 2 |
| The expected dividend that would be paid to Scheme Creditors if the Scheme were put into effect as proposed | Section 11.3 and Schedule 2 |
| A copy of all financial statements required to be lodged by the Scheme Companies with ASIC | Schedule 8 |
| A report on the affairs of the Scheme Companies | Schedule 9 |
| The scale of charges that the Scheme Administrators propose to charge to manage the Scheme | See Schedule 17 of the Scheme of Arrangement, a copy of which is at Schedule 1 |

| A list of the names of all known Scheme Creditors and the debts owed to those Scheme Creditors | Schedule 11 |

## 2.3    Responsibility Statement

This Explanatory Statement is solely for use by each Scheme Creditor in evaluating whether or not to vote in favour of the Scheme. No other persons apart from those named in the Responsibility Statement have been authorised to make any representation or warranty, express or implied, as to its accuracy or completeness. Nothing contained in this Explanatory Statement is, or should be relied upon as, a representation, assurance or guarantee as to the benefits of the Scheme over any alternative for Scheme Creditors.

Except as expressly stated below, the Scheme Companies have provided, and are responsible for, the information in this Explanatory Statement. The Outgoing Agent and Indenture Trustee, the Incoming Agent and Indenture Trustee, the Outgoing Collateral Trustee, the Incoming Collateral Trustee, the Receivers, the Scheme Administrators, Quintis (Australia) and Quintis Holdco and their respective directors, officers, employees and advisers do not assume any responsibility for the accuracy or completeness of this Explanatory Statement.

KordaMentha have prepared the Expert Report in relation to the Scheme Companies and the proposed Scheme based, in part, on information provided by the Scheme Companies. Except to the extent that the Scheme Companies are responsible for the information they have provided to KordaMentha for the purpose of the Expert Report (and the Scheme Companies take responsibility for that information) KordaMentha takes responsibility for the Expert Report.

## 2.4    Date of this Explanatory Statement

The date of this Explanatory Statement is 5 September 2018.

## 2.5    Notice of Second Court Hearing

The Scheme, if approved by the requisite majorities of Scheme Creditors, is subject to approval of the Court on the Second Court Hearing. Scheme Creditors have the right to appear at the Second Court Hearing and oppose the approval of the Scheme by the Court and be heard, including in opposition to the approval of the Scheme.

The Second Court Hearing is expected to be held on Thursday, 4 October 2018 at the Federal Court of Australia, Queens Square, Sydney NSW 2000. Any Scheme Creditor who wishes to oppose approval of the Scheme at the Second Court Hearing may do so by filing with the Court and serving on the Scheme Companies, a notice of appearance in the prescribed form together with any affidavit on which the Scheme Creditor proposes to rely.

## 2.6    Professional advice

This Explanatory Statement does not constitute financial product advice and has been prepared without reference to the investment objectives, financial situation, taxation position or particular needs of any Scheme Creditor. Scheme Creditors should not construe any statements made in this Explanatory Statement as investment, tax or legal advice. Each Scheme Creditor's decision whether to vote for or against the Scheme will depend on an assessment of the Scheme Creditor's individual circumstances. As the financial, legal and taxation consequences of that decision may be different for each Scheme Creditor, it is recommended that Scheme Creditors seek professional financial, legal and taxation advice before making their decision.

### 2.7 Forward looking statements

Certain statements in this Explanatory Statement relate to the future.  These forward looking statements and information, including the statements and information relating to the Quintis Group, are not based solely on historical facts, but rather reflect the current expectations of the Quintis Group. These statements may sometimes be identified by the use of forward looking words or phrases such as expect, anticipate, contemplate, intend, likely, plan, may, estimate, should, potential or other similar words or phrases.

Forward looking statements involve known and unknown risks, uncertainties, assumptions and other important factors that could cause the actual outcomes to be materially different from future outcomes expressed or implied by such statements. Such statements and information are based on numerous assumptions regarding present and future circumstances. Certain important factors could cause actual outcomes to differ materially from those in the forward looking statements including, among others, that the Scheme and future performance of the Quintis Group is subject to the satisfaction of certain Conditions Precedent, litigation risks, regulatory restriction, activities by governmental authorities (including changes in taxation), risks of sovereign investment, currency fluctuations, the global economic climate, dilution, share price volatility, competition, loss of key employees and additional funding requirements.

Given this, Scheme Creditors are cautioned not to place undue reliance on such forward looking statements.

### 2.8 Scheme Creditors' acknowledgement regarding information

A copy of this Explanatory Statement and any related amendments or supplements to it will be provided to each person who, as at the Effective Date, is a holder of the Original Notes as a person potentially entitled to vote at the Scheme Meeting.  No person has been authorised to give any information or to make representations in connection with the Scheme other than the information and representations contained in this Explanatory Statement.

### 2.9 ASIC

A copy of this Explanatory Statement has been sent to ASIC for the purposes of section 411(2)(a) of the Corporations Act. Neither ASIC nor any of its officers take any responsibility for its contents.

### 2.10 Rounding

A number of figures, amounts, percentages, estimates, calculations of values and fractions in this Explanatory Statement are subject to the effect of rounding. Accordingly, the actual calculation of these figures may differ from the figures set out.

### 2.11 Defined terms

Capitalised terms and certain abbreviations used in this Explanatory Statement have the defined meaning set out in the Glossary to this Explanatory Statement except where otherwise stated (including in section 5.10).  The documents contained in the Schedules to this Explanatory Statement have their own defined terms that may be different from the definitions in the Glossary.

### 2.12 Scheme Creditors outside Australia

This Explanatory Statement has been prepared to reflect the applicable disclosure requirements of Australia, which may be different from the requirements applicable in other jurisdictions. The financial information included in this document is based on financial statements that have been prepared in accordance with accounting principles and practices generally accepted in Australia,

which may differ from generally accepted accounting principles and practices in other jurisdictions.

### 2.13 Tax implications of the Scheme

As the financial, legal and taxation consequences of the Scheme may be different for each Scheme Creditor, it is recommended that Scheme Creditors seek professional financial, legal and taxation advice in relation to the Scheme.

See Section 9 for a description of certain Australian and U.S. tax considerations relevant to the Scheme.

The implications of the Scheme for Scheme Creditors who are resident in, have a registered address in or are citizens of and/or are taxable in jurisdictions other than Australia may be affected by the laws of the relevant jurisdiction. Such overseas Scheme Creditors should inform themselves about and observe any applicable legal requirements.

Any person outside Australia who is resident in, or who has a registered address in, or is a citizen of and/or is taxable in, an overseas jurisdiction and who is to receive or subscribe for any Scheme consideration should consult its professional advisers and satisfy itself as to the full observance of the laws of the relevant jurisdiction in connection with the Scheme, including obtaining any requisite governmental or other consents, observing any other requisite formalities and paying any issue, transfer or other taxes due in such jurisdiction.

### 2.14 International offer restrictions

For the purpose of this clause 2.14, "**Transaction Securities**" means the First Lien Notes, Second Lien Notes and/or shares in Quintis Holdco (as applicable).

(a)     **General**

This Explanatory Statement or the electronic transmission thereof does not constitute an offer to buy, or the solicitation of an offer to sell, any Transaction Securities in any circumstances in which such offer or solicitation is unlawful. In addition, this Explanatory Statement does not constitute an invitation to participate in the Scheme in any jurisdiction in which, or to any person to or from whom, it is unlawful to make such invitation or for there to be such participation under applicable securities laws. The distribution of this Explanatory Statement in certain jurisdictions may be restricted by law. Persons into whose possession this Explanatory Statement comes are required by each of the Scheme Companies and each of the Guarantors and New Guarantors to inform themselves about, and to observe, any such restrictions.

(b)     **Australia**

This document is not a "prospectus" or an "offer information statement" for the purposes of Part 6D.2 of the Corporations Act or a "product disclosure statement" for the purposes of Chapter 7 of the Corporations Act and is not required to be lodged with the Australian Securities and Investments Commission under the Corporations Act as each offer for the issue, any invitation to apply for the issue, and any offer for the sale of, and any invitation for offers to purchase, the offered notes to a person under this offering circular:

(i)     will be for a minimum amount payable, by each person (after disregarding any amount lent by the person offering the offered notes (as determined under section 700(3) of the Corporations Act) or any of their associates (as determined under sections 10 to 17 of the Corporations Act) on acceptance of the offer or application (as the case may be) of at least a A$500,000 (calculated in accordance with both section 708(9) of the Corporations Act and regulation 7.1.18 of the Corporations Regulations 2001); or

(ii)     does not otherwise require disclosure to investors under part 6D.2 of the
Corporations Act and is not made to a retail client for the purposes of Chapter 7
of the Corporations Act.

(c)     **European Economic Area**

This Explanatory Statement and any other document relating to the Scheme and the offer
are only addressed to, and directed in, member states of the European Economic Area
(the ***EEA***) (each, a ***Member State***), at persons who are "Qualified Investors" within the
meaning of article 2(1)(e) of the Prospectus Directive (***Qualified Investors***). Each person
in a Member State who initially acquires any Transaction Securities or to whom any offer
of Transaction Securities may be made and, to the extent applicable, any funds on behalf
of which such person is acquiring the Transaction Securities that are located in a Member
State will be deemed to have represented, acknowledged and agreed that it is a Qualified
Investor. For these purposes, the expression "**Prospectus Directive**" means Directive
2003/71/EC (and amendments thereto, including the 2010 PD amending directive), and
includes any relevant implementing measure in the Member State and the expression
"**2010 PD amending directive**" means directive 2010/73/EU.

(d)     **Hong Kong**

WARNING: The contents of this document have not been reviewed or approved by any
regulatory authority in Hong Kong. You are advised to exercise caution in relation to the
offer. If you are in any doubt about any of the contents of this document, you should
obtain independent professional advice. This document does not constitute an offer or
invitation to the public in Hong Kong to acquire or subscribe for or dispose of any
securities. This document also does not constitute a prospectus (as defined in section
2(1) of the Companies (Winding Up and Miscellaneous Provisions) Ordinance (Chapter
32 of the Laws of Hong Kong) (the ***CWUMPO***)) or notice, circular, brochure or
advertisement offering any securities to the public for subscription or purchase or
calculated to invite such offers by the public to subscribe for or purchase any securities,
nor is it an advertisement, invitation or document which is or contains an invitation falling
within the meaning of section 102 of the Securities and Futures Ordinance (Chapter 571
of the Laws of Hong Kong) (the ***SFO***). Accordingly, unless permitted by the securities
laws of Hong Kong, no person may issue or cause to be issued this document in Hong
Kong, other than to persons who are "professional investors" as defined in the SFO and
any rules made thereunder or in other circumstances which do not result in the document
being a "prospectus" as defined in the CWUMPO or which do not constitute an offer to
the public within the meaning of the CWUMPO; and no person may issue or have in its
possession for the purposes of issue, this document or any advertisement, invitation or
document relating to the Scheme, whether in Hong Kong or elsewhere, which is directed
at, or the contents of which are likely to be accessed or read by, the public in Hong Kong
(except if permitted to do so under the securities laws of Hong Kong) other than any such
advertisement, invitation or document relating to the Scheme that are or are intended to
be disposed of only to persons outside Hong Kong or only to "professional investors" as
defined in the SFO and any rules made thereunder.  Copies of this document may be
issued to a limited number of persons in Hong Kong in a manner which does not
constitute any issue, circulation or distribution of this document, or any offer or an
invitation in respect of these securities, to the public in Hong Kong. This document is for
the exclusive use of the Scheme Creditors in connection with the Scheme, and no steps
have been taken to register or seek authorisation for the issue of this document in Hong
Kong. Only the person to whom a copy of this document has been issued may take action
in response to this document. The offer of the Scheme is personal to the person to whom

this document has been delivered, and an acquisition or subscription for Transaction Securities under the Scheme will only be accepted from such person.  This document is confidential to the person to whom it is addressed and no person to whom a copy of this document is issued may issue, circulate, distribute, publish, reproduce or disclose (in whole or in part) this document to any other person in Hong Kong or use for any purpose in Hong Kong other than in connection with the consideration of the Scheme by the person to whom this document is addressed.

(e)     **Luxembourg**

The Transaction Securities are not offered to the public in or from Luxembourg and no person may offer the Transaction Securities or cause the offering of the Transaction Securities or contribute to the offering of the Transaction Securities to the public in or from Luxembourg, unless all the relevant legal and regulatory requirements concerning a public offer in or from Luxembourg have been complied with. In particular, neither the information in this Explanatory Statement nor any other document relating to the Scheme has been announced to the public nor will this Explanatory Statement or any other document relating to the Scheme be made available to the public in Luxembourg.

(f)     **Japan**

Neither the information in this Explanatory Statement nor any other document relating to the Scheme has been nor will be registered under the Financial Instruments and Exchange Act of Japan (Act No. 25 of 1948, as amended, the ***Financial Instruments and Exchange Act***). Accordingly, no Transaction Securities may be, directly or indirectly, offered or sold and in Japan or to, or for the benefit of, any resident of Japan (which term as used herein means any person resident in Japan, including any corporation or other entity organised under the laws of Japan) or to others for re-offering or re-sale, directly or indirectly, in Japan or to, or for the benefit of, any resident of Japan, except pursuant to an exemption from the registration requirements of, and otherwise in compliance with, the Financial Instruments and Exchange Act and other relevant laws and regulations of Japan.

(g)     **Singapore**

Neither the information in this Explanatory Statement nor any other document relating to the Scheme has been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this document and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of any Transaction Securities may not be circulated or distributed, nor may any Transaction Securities be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than:

(I)     to an institutional investor under Section 274 of the Securities and Futures Act, Chapter 289 of Singapore (the ***SFA***);

(II)     to a relevant person pursuant to Section 275(1), or any person pursuant to Section 275(1A), and in accordance with the conditions specified in Section 275, of the SFA; or

(III)     otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

Where any Transaction Securities are subscribed or purchased under Section 275 of the SFA by a relevant person which is:

(a)     a corporation (which is not an accredited investor (as defined in Section 4A of the SFA)) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or

(b)     a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary of the trust is an individual who is an accredited investor,

securities (as defined in Section 239(1) of the SFA) of that corporation or the beneficiaries' rights and interest (howsoever described) in that trust shall not be transferred within six months after that corporation or that trust has acquired the Transaction Securities pursuant to an offer made under Section 275 of the SFA except:

(i)     to an institutional investor or to a relevant person defined in Section 275(2) of the SFA, or to any person arising from an offer referred to in Section 275(1A) or Section 276(4)(i)(B) of the SFA;

(ii)    where no consideration is or will be given for the transfer;

(iii)   where the transfer is by operation of law;

(iv)    as specified in Section 276(7) of the SFA; or

(v)     as specified in Regulation 32 of the Securities and Futures (Offers of Investments) (Shares and Debentures) Regulations 2005 of Singapore.

In connection with Section 309B of the SFA and the Securities and Futures (Capital Markets Products) Regulations 2018 of Singapore (the **CMP Regulations 2018**), the Scheme Companies have determined the classification of each Transaction Security as prescribed capital markets products (as defined in the CMP Regulations 2018) and Excluded Investment Products (as defined in MAS Notice SFA 04-N12: Notice on the Sale of Investment Products and MAS Notice FAA-N16: Notice on Recommendations on Investment Products).

(h)    **United Kingdom**

Neither the information in this Explanatory Statement nor any other document relating to the Scheme has been delivered for approval to the Financial Conduct Authority in the United Kingdom and no prospectus (within the meaning of section 85 of the Financial Services and Markets Act 2000, as amended (FSMA)) has been published or is intended to be published in respect of the Transaction Securities. This document is issued on a confidential basis to "qualified investors" (within the meaning of section 86(7) of FSMA) in the United Kingdom, and the Transaction Securities may not be offered or sold in the United Kingdom by means of this document, any accompanying letter or any other document, except in circumstances which do not require the publication of a prospectus pursuant to section 86(1) FSMA. In the United Kingdom, this document is being distributed only to, and is directed at, persons (i) who have professional experience in matters relating to investments falling within Article 19(5) (investment professionals) of the Financial Services and Markets Act 2000 (Financial Promotions) Order 2005 ("FPO"), (ii) who fall within the categories of persons referred to in Article 49(2)(a) to (d) (high net worth companies, unincorporated associations, etc.) of the FPO, or (iii) to whom it may otherwise be lawfully communicated (together "relevant persons"). The investments to which this document relates are available only to, and any invitation, offer or agreement to purchase will be engaged in only with, relevant persons. Any person who is not a relevant person should not act or rely on this document or any of its contents.

(i)      **United States**

In connection with the issue of the Transaction Securities, the Quintis Group will, from time to time, require Scheme Creditors who intend to receive Transaction Securities to confirm, amongst other things, that the relevant Scheme Creditor (or Scheme Creditor Affiliate) is a person eligible to receive securities under the Securities Act and will require Scheme Creditors (or Scheme Creditor Affiliates) who are located in the United States or are U.S. Persons and intend to receive Transaction Securities to agree in writing to certain representations and covenants. If the confirmations required by the Quintis Group cannot be or are not given, the relevant Scheme Creditor (or Scheme Creditor Affiliate) will not be eligible to receive the Transaction Securities.

The Transaction Securities delivered under the Scheme will be issued and delivered in reliance upon exemptions from the registration requirements of the Securities Act. The Transaction Securities will be issued and delivered to (i) persons within the United States and to U.S. Persons, in each case where each such person is either a "qualified institutional buyer" (a "QIB") as defined in Rule 144A under the Securities Act ("Rule 144A") or an institutional "accredited investor" (as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act) and (ii) to non-U.S. persons in offshore transactions outside the United States, in reliance on Regulation S under the Securities Act ("Regulation S").

None of the Transaction Securities has been or will be registered under the Securities Act. The Transaction Securities are "restricted securities" (as defined by Rule 144(a)(3) under the Securities Act) and may not be offered, sold, pledged or otherwise transferred except (a) pursuant to an effective registration statement under the Securities Act and such transfer is registered pursuant to, exempt from or not subject to any other applicable securities laws covering such securities; (b) in accordance with Rule 144A, if available, under the Securities Act to a person that the transferor, and any person acting on its behalf, reasonably believes is a QIB purchasing for its own account; (c) in accordance with Rule 144 ("Rule 144") under the Securities Act, and the Quintis Group receives evidence satisfactory to it that the provisions of Rule 144 have been complied with; (d) in an offshore transaction in accordance with Regulation S; (e) to any member of the Quintis Group, or (f) in accordance with another exemption from registration under the Securities Act and, if requested, the Quintis Group receives an opinion of counsel from the holder of these securities to such effect, reasonably satisfactory to the Quintis Group, and in the case of each of (a), (b), (c) or (f), the transferee is also a QIB or an "accredited investor", and in each case in accordance with any applicable securities laws of any State of the United States. Scheme Creditors who are citizens or residents of the United States are advised that none of the Transaction Securities will be registered under the Securities and Exchange Act of 1934, as amended, and the Quintis Group does not expect that the Transaction Securities will be subject to the reporting requirements applicable thereunder.

The Scheme Creditors understand that the Transaction Securities will not be listed on a U.S. securities exchange or any inter-dealer quotation system in the United States. The Quintis Group does not intend to take action to facilitate a market in any of the Transaction Securities in the United States. Consequently, the Quintis Group believes that it is unlikely that an active trading market in the United States will develop for any such securities.

Neither the SEC nor any U.S. federal, state or other securities commission or regulatory authority has registered, approved or disapproved the Transaction Securities or passed upon the accuracy or adequacy of this Explanatory Statement.  Any representation to the contrary is a criminal offence in the United States.

Scheme Creditors who are citizens or residents of the United States should consult their own legal, financial and tax advisers with respect to the legal, financial and tax consequences of the Scheme in their particular circumstances.

**ERISA**

Each purchaser and subsequent transferee of any Transaction Securities will be deemed to have represented and warranted that either (i) no portion of the assets used by such purchaser or transferee to acquire and hold such Transaction Securities (A) constitutes assets of any employee benefit plan as defined in and subject to Title I of the U.S. Employee Retirement Income Security Act, as amended ("ERISA"), (B) includes any plan, individual retirement account or other arrangement that is subject to Section 4975 of the U.S. Internal Revenue Code of 1986, as amended (the "Code"), (C) has provisions that under any federal, state, local non-U.S. or other laws or regulations are similar to the applicable provisions (including the fiduciary responsibility or prohibited transaction provisions) of ERISA or the Code, or (D) is any entity whose underlying assets include "plan assets" of any such plan, account or arrangement described in (A), (B) or (C) of this paragraph, or (ii) the purchase and holding of the Transaction Securities by such purchaser or transferee will not constitute a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or, in the case of any other federal, state, local non-U.S. Plan, a non-exempt violation under any applicable law.

## 2.15   Privacy

The Chairperson, the Scheme Administrators, the Scheme Companies, Quintis Holdco and Quintis (Australia) may collect, use and disclose personal information in the process of implementing the Scheme.  This information may include the names, contact details, bank account details, details of any client accounts or securities deposited with Scheme Companies, and the name and contact details of persons appointed by Scheme Creditors to act as proxy, corporate representative or attorney at Scheme Meeting.  The primary purpose of collecting this information is to assist the Chairperson, the Scheme Administrators, the Scheme Companies, Quintis Holdco and Quintis (Australia) in the conduct of the Scheme Meeting and to enable the Scheme to be implemented by the Scheme Administrators in the manner described in this Explanatory Statement.  Personal information may be disclosed to the Chairperson, the Scheme Administrators, the Scheme Companies, Quintis Holdco and Quintis (Australia), third party service providers, professional advisers, to ASIC and other regulatory authorities and, in any case, where disclosure is required by law or where you have consented.  Scheme Creditors have the right to access personal information that has been collected.  Scheme Creditors should contact the Scheme Companies in the first instance if they wish to exercise this right.

The main consequence of not collecting such information would be that the Chairperson, the Scheme Administrators, the Scheme Companies Quintis Holdco and Quintis (Australia) may be hindered in, or prevented from, conducting the Scheme Meeting and implementing the Scheme.

Scheme Creditors appointing a proxy, corporate representative or attorney should ensure that these matters are communicated to that person.

**IMPORTANT NOTICE ASSOCIATED WITH COURT ORDERS UNDER SUBSECTION 411(1) OF THE CORPORATIONS ACT**

**The fact that under subsection 411(1) of the Corporations Act the Court has ordered that a meeting be convened and has approved the explanatory statement required to accompany the notices of the meeting does not mean that the Court:**

    (a)    **has formed any view as to the merits of the proposed scheme or as to how members/creditors should vote (on this matter members/creditors must reach their own decision); or**

    (b)    **has prepared, or is responsible for the content of, the explanatory statement.**

## 3    Key Dates and Steps

| Event | Time and Date |
|---|---|
| **Time and date by which Scheme Creditors must lodge Voting Proof of Debt Form and Proxy Form (if you wish to vote by proxy) for the Scheme Meeting** | 5pm on Tuesday, 25 September 2018 |
| **Scheme Meeting** | Thursday, 27 September 2018 at 10am |
| **Time by which Scheme Creditors must enter into the Note Subscription and Purchase Agreement** | 8:00am on the date of the Second Court Hearing |
| **Second Court Hearing (seeking orders for approval of the Scheme)** | Thursday, 4 October 2018 |
| **Court orders approving the Scheme are lodged with ASIC and Scheme takes effect (*Effective Date*)** | No earlier than the next Business Day after the day on which the Court makes the orders approving the Scheme at the Second Court Hearing |
| **Time by which Scheme Creditors must provide US Securities Representation to Quintis (Australia), Quintis Holdco and the New Guarantors** | Effective Date |
| **Time by which Scheme Creditors must enter into the Shareholders' Agreement** | Completion Date |
| **Date on which the Scheme becomes fully operative** | Completion Date, being the date that is as soon as practicable after the Effective Date for implementation of the Scheme but must be no later than the date that is five Business Days after the Effective Date (or such other later date agreed in writing by the Scheme Companies and Majority Consent) |

Note: Unless otherwise stated, all times referred to in this Explanatory Statement and the documents contained in its Appendices are Sydney, New South Wales, Australia times. The dates referred to in the above table are indicative only and are subject to change. The Scheme Companies reserve the right to vary the times and dates set out above, subject to the Corporations Act and approval of any variations by the Court and/or ASIC where required.

## 4        Questions and Answers

| Question | Answer |
|---|---|
| Why was this Explanatory Statement sent to me? | You have been sent this document (and should read it) because, according to the records of the Scheme Companies, you might be a Scheme Creditor of one or more of the Scheme Companies (as a holder of Original Notes as at the Effective Date). |
| | If you are a Scheme Creditor, you will be eligible to vote at the Scheme Meeting to consider and, if thought fit, agree to the Scheme. In order to vote, you will need to lodge your Voting Proof of Debt Form and, if you wish to vote by proxy, your Proxy Form, so that the forms are received by the Chairperson by 5pm on Tuesday, 25 September 2018. |
| | For further details of the Scheme Meeting, refer to the Scheme Meeting Notice in Schedule 7 of this Explanatory Statement. |
| | Receipt of this Explanatory Statement does not amount to confirmation that you have a valid Claim against or are owed any amount by any of the Scheme Companies. |
| What is a creditors' scheme of arrangement? | A creditors' scheme of arrangement is a binding, court approved agreement between a company and its creditors. Creditors' schemes of arrangement are regulated under Part 5.1 of the Corporations Act. |
| Why are the Scheme Companies proposing the Scheme? | Quintis Limited owes debts of approximately US$320 million to its secured creditors (being the holders of the Original Notes, the Tranche 1 Super Senior Notes and the Tranche 2 Super Senior Notes). Quintis Limited and the other Scheme Companies have granted security for these debts over all or most of their assets as well as other security in favour of the Outgoing Collateral Trustee for the benefit of the secured creditors. |
| | The Scheme Companies are currently in external administration. Voluntary administrators (being Richard Tucker, Scott Langdon and John Bumbak of KordaMentha) were appointed on 20 January 2018. On 23 January 2018, the Outgoing Collateral Trustee, on the instructions of the secured creditors, appointed Jason Preston, Shaun Fraser and Rob Brauer of McGrathNicol as receivers and managers of the Scheme Companies. |
| | The secured debt which is owing by the Quintis Group exceeds the current enterprise value of the Quintis Group. Earlier this year, the Receivers conducted a sale process for the business and/or assets of the Quintis Group. Offers received by the Receivers allocated values to the business and the assets of Quintis Group that were substantially below the quantum of the secured debt and, for this reason, the process did not ultimately result in any sale of assets or business of the Quintis Group. |
| | In these circumstances, the Quintis Group is proposing a restructure of the secured debt owed by it to secured creditors as part of a broader recapitalisation proposal. That restructure and the other aspects of the recapitalisation proposal are to be effected through a creditors' scheme of arrangement under Part 5.1 of the Corporations Act and the DOCA into which the Scheme Companies entered on 29 June 2018. The DOCA and the Scheme are inter-conditional and one will not be implemented without the other. |

| Question | Answer |
|----------|--------|
| What is the Scheme proposal? | The Scheme proposal is described more fully at section 5.11 below. By way of summary only, the Scheme proposal will involve: <br><br>• The release of certain intercompany debts between companies in the Quintis Group; <br><br>• Cancellation and exchange of the Original Notes for the Second Lien Notes which will have a lower face value than the Original Notes currently on issue and will include terms which will enable certain interest payments to be capitalised; <br><br>• The issue of shares by Quintis Holdco (the new holding company of the Quintis Group) to the Scheme Creditors who enter into the Shareholders' Agreement (i.e. the Equity Noteholders); <br><br>• The transfer by Quintis Limited of its shareholdings in the Quintis Subsidiaries to Quintis (Australia), which will be wholly owned by Quintis Holdco, as well as other valuable assets to the new Quintis Group; <br><br>• The assumption by Quintis (Australia) of Quintis Limited's role as borrower in respect of the secured debt of the Quintis Group (as restructured by the Scheme), including the giving by Quintis (Australia) of security in favour of the Incoming Collateral Trustee, and the release by the secured creditors of Quintis Limited as a borrower and security provider; <br><br>• An injection of new capital for the Quintis Group by way of the issue of the First Lien Notesby Quintis (Australia); <br><br>• Repayment or roll in full of the Tranche 1 Super Senior Notes and the Tranche 2 Super Senior Notes; <br><br>• Entry into the New Finance Documents which will govern the terms of the restructured secured debt. <br><br>Scheme Creditors must provide the US Securities Representation to Quintis (Australia), Quintis Holdco and the New Guarantors by the Effective Date in order to be entitled to receive the Second Lien Notes and/or First Lien Notes and/or shares in Quintis Holdco (as applicable). |
| What is the effect of the Scheme proposal? | The effect of the Scheme proposal is to recapitalise the Quintis Group, restructure its secured debt and create a new Quintis Group corporate structure (as set out in section 8.8 below), such that the Quintis Group will be in a position to continue operating on a going concern basis. |
| How do I confirm that I am eligible to receive Second Lien Notes and/or First Lien Notes and/or shares in Quintis Holdco? | In order to receive the Second Lien Notes and/or First Lien Notes (both of which are governed by New York law)  and/or shares in Quintis Holdco, Scheme Creditors must provide the US Securities Representation to Quintis (Australia), Quintis Holdco and the New Guarantors by the Effective Date which certifies that they are either: (i) a 'Qualified Institutional Buyer' under the Securities Act, (ii) an institutional "accredited investor" under the Securities Act; or (iii) eligible pursuant to Regulation S. <br><br>The form of the certification is contained in the Voting Proof of Debt Form set out in Schedule 10, or alternatively you can provide written confirmation of your eligibility to mail to: quintis@mcgrathnicol.com. |

| Question | Answer |
|---|---|
| What if I am not eligible to receive Second Lien Notes and/or First Lien Notes and/or shares in Quintis Holdco? | If the US Securities Representation is not provided by the Effective Date to Quintis (Australia), you may instead be eligible to receive a cash payment equivalent to 30 cents in the dollar of the face value of the Second Lien Notes and/or First Lien Notes that you would otherwise have received under the Scheme, had the US Securities Representation to Quintis (Australia), Quintis Holdco and the New Guarantors been made. |
| What are the reasons to vote in favour of the Scheme proposal? | Reasons for voting in favour of the Scheme proposal are set out in Section 6.3 below. Those reasons include the following:<br><br>• It will give Scheme Creditors the opportunity to receive shares in Quintis Holdco (the new holding company of the Quintis Group) and the potential equity upside of being a shareholder. As the ultimate shareholders of the Quintis Subsidiaries, Scheme Creditors will benefit from any positive returns generated by the Quintis Group business;<br><br>• The Quintis Group will be recapitalised and well positioned to meet the capital requirements associated with the running of its business for a number of years; and<br><br>• The Scheme provides a means by which the Scheme Companies (other than Quintis Limited) can exit external administration as solvent companies and continue their operations on a going concern basis. |
| What are the possible reasons not to vote in favour of the Scheme proposal? | Reasons for voting against the Scheme proposal are set out in Section 6.4 below. Those reasons include the following:<br><br>• The Scheme, if implemented, will not result in any immediate cash return to Scheme Creditors and given the nature of the Quintis Group's business, it will likely be an extended period of time before the Scheme Creditors receive any cash payments in respect of their holdings;<br><br>• As the recapitalisation requirements of the Quintis Group will need to be met in part by the Scheme Creditors (through the issue of the First Lien Notes for which Scheme Creditors will subscribe), Scheme Creditors may form the view they would prefer to use the capital for other purposes; and<br><br>• Scheme Creditors may form the view that they would prefer an immediate return from a liquidation or sale of the Quintis Group, rather than being exposed to the risks associated with their position as shareholders of, and debt financiers of, the Quintis Group business. |
| What voting majority is required to approve the Scheme Approval? | The Scheme proposal will only proceed if:<br><br>• the Scheme is approved by the requisite majority of Scheme Creditors at the Scheme Meeting; and<br>• the Scheme is approved by the Court on or after the Second Court Hearing (expected to be Thursday, 4 October 2018)<br><br>The Scheme must be passed by a majority in number (more than 50%) of Scheme Creditors who are present and voting at the Scheme Meeting (either in person, by proxy or, in the case of corporations, by corporate representative) and whose debts or Claims against the Scheme Companies amount in aggregate to at least 75% of the total amount of the debts and claims of the |

| Question | Answer |
|---|---|
| | Scheme Creditors present and voting at the Scheme Meeting. |
| What do the Receivers recommend? | The Receivers recommend that you vote in favour of the Scheme proposal in the absence of any superior proposal. |
| What has the expert concluded? | The Expert Report is contained at Schedule 2. |
| | The Expert has concluded that: |
| | (a)    the Implied Value (as defined in the Expert Report) of the interests that Scheme Creditors will receive or retain if the Scheme is put into effect as proposed is 88.6c in $; and |
| | (b)    the expected dividend that would be made available to Scheme Creditors if the Scheme Companies were to be wound up within six months of the hearing of the application for an order under section 411 of the Corporations Act is 56.7c in $. |
| | *(See Section 6 of the Expert Report, Table 16)* |
| How do I vote? | Please see section 7 of this Explanatory Statement. |
| Where do I return my Voting Proof of Debt Form and my Proxy Form? | Your Voting Proof of Debt Form and your Proxy Form must be: |
| | **sent or hand delivered to** |
| | Attention: Chris Prestwich |
| | Address: Allens, Deutsche Bank Place, Corner Hunter and Phillip Streets, Sydney NSW 2000 Australia |
| | or |
| | **faxed to** +61 02 9230 5333 |
| | or |
| | **submitted by email to** chris.prestwich@allens.com.au |
| Is voting compulsory? | Voting is not compulsory. |
| What happens if I do not vote or if I vote against the Scheme proposal? | If the Scheme is approved by the requisite majority of Scheme Creditors and approved by the Court, it will bind all Scheme Creditors in respect of their Claims against the Scheme Companies (including in respect of the Original Notes held by all Scheme Creditors), including any Scheme Creditors who did not vote or voted against the Scheme at the Scheme Meeting. |
| What are the tax implications of the Scheme proposal? | As the taxation consequences of the Scheme may be different for each Scheme Creditor, it is recommended that Scheme Creditors seek professional taxation advice in relation to the Scheme and its effect. See section 9 below. |
| Who will administer the Scheme? | The Scheme Administrators will be Richard Tucker, Scott Langdon and Jennifer Nettleton of KordaMentha. |
| When and where is the Scheme Meeting to be held? | The Scheme Meeting will be held at:<br>10am on Thursday, 27 September 2018 |
| | at |
| | Allens<br>Level 28 |

| Question | Answer |
|----------|--------|
|  | 126 Phillip Street<br>Sydney  NSW  Australia |
| What if I cannot attend the Scheme Meeting? | You should complete and lodge your Proxy Form and Voting Proof of Debt Form, in accordance with the instructions on the forms. |
| Who will be bound by the Scheme proposal? | If the Scheme is approved by the requisite majority of Scheme Creditors and approved by the Court, it will bind all Scheme Creditors in respect of their Claims against the Scheme Companies (including in respect of the Original Notes held by all Scheme Creditors), including any Scheme Creditors who did not vote or voted against the Scheme at the Scheme Meeting. |
| What will I receive if the Scheme proposal proceeds? | Under the Scheme, Scheme Creditors will receive the following:<br><br>• A pro rata share of the Second Lien Notes;<br><br>• First Lien Notes, the amount of which will be calculated by reference to each Scheme Creditor's pro rata share of an amount of US$10 million of Original Notes which is to be repaid by way of application in payment of the subscription price for First Lien Notes for an equivalent amount;<br><br>• The opportunity to subscribe for further First Lien Notes by entering into the Note Subscription and Purchase Agreement by 8:00am on the date of the Second Court Meeting;<br><br>• A pro rata issue of equity in Quintis Holdco, which will be the new holding company of the newly recapitalised Quintis Group, for those Scheme Creditors who enter into the Shareholders' Agreement by the Completion Date; and<br><br>• To the extent a Scheme Creditor is a Super Senior Noteholder, repayment or roll of the Tranche 1 Super Senior Notes and the Tranche 2 Super Senior Notes (as applicable).<br><br>A Scheme Creditor who does not provide the US Securities Representation to Quintis (Australia), Quintis Holdco and the New Guarantors by the Effective Date will not be eligible to receive any Second Lien Notes, First Lien Notes or shares in Quintis Holdco and may instead be entitled to receive the Cash Payment in lieu of these entitlements (to the extent applicable to the Scheme Creditor in question). |
| What happens to my Claims against the Scheme Companies if the Scheme proposal proceeds? | Scheme Creditors will provide a broad release in favour of Quintis Limited to the extent of its obligations as borrower and security provider in respect of the existing secured debt, as well as certain other releases. Quintis Limited will be replaced by Quintis (Australia) as the borrower to the secured debt (as restructured by the Scheme) and Quintis (Australia) will provide security in support of obligations with respect to the secured debt. Fieldpark Pty Ltd (which will replace Quintis Limited in respect of certain contracts to which Quintis Limited is currently party that will be transferred to Fieldpark Pty Ltd under the Scheme) will also provide security in support of its obligations with respect to the secured debt (as restructured under the Scheme).<br><br>Scheme Creditors' rights against the other Scheme Companies (i.e. excluding Quintis Limited) in respect of the Original Notes will be replaced with claims against those entities in respect of the Second Lien Notes and the First Lien |

| Question | Answer |
|---|---|
|  | Notes (so long as the relevant Scheme Creditor provides the US Securities Representation to Quintis (Australia), Quintis Holdco and the New Guarantors by the Effective Date). |
| What happens if the Scheme proposal is not approved? | If the Scheme proposal is not approved, the Scheme will not proceed. The conditions to the DOCA will not be satisfied, and subject to any other proposal being put forward, it can be expected that the Scheme Companies and the rest of the Quintis Group will go into liquidation. |
| What other information is available? | This Explanatory Statement provides detailed information in relation to the Scheme proposal that all Scheme Creditors should read.

Alternatively, please contact your legal, financial, taxation or other professional advisor. |

## 5       Overview of the Scheme

### 5.1    Events leading up to voluntary administration and receivership of the Quintis Group

The Quintis Group commenced a review of its operations and potential restructure opportunities to improve its liquidity position during April 2017. On 15 May 2017, Quintis Limited was placed into a trading halt and on 17 May 2017 the shares in Quintis Limited were suspended from official quotation to allow the Quintis Group to perform a review of its operations and outlook, including revision of earnings guidance.

In June 2017, the Quintis Group failed to lodge accounts with its secured creditors as required under the terms of the Original Notes and entered into several forbearance agreements with the secured creditors while it sought to agree a recapitalisation proposal.

In November 2017, Quintis executed a non-binding term sheet for potential recapitalisation with new equity investors, however final binding terms could not be agreed by the parties. Concurrently, Quintis engaged with a separate consortium of potential investors, including the former Managing Director, Frank Wilson. After significant due diligence, the consortium was requested to provide equity commitment letters to the Quintis Group and its secured creditors. No commitment letters capable of acceptance were received.

On 19 January 2018, an institutional investor exercised an option to require the Quintis Group to acquire 400 hectares of plantations at a pre-determined price of approximately A$37 million with a settlement date of 2 February 2018. The Quintis Group did not have the financial capacity to make the payment and accordingly, on 20 January 2018 the board of Quintis Limited resolved to appoint Richard Tucker, Scott Langdon and John Bumbak of KordaMentha as voluntary administrators of Quintis Limited and the other Scheme Companies. As a result of the appointment of Administrators, on 23 January 2018 the secured creditors of the Quintis Group appointed Jason Preston, Shaun Fraser and Robert Brauer of McGrathNicol as receivers and managers of the Scheme Companies.

Following their appointment, with the support of their appointors, the secured creditors, the Receivers have maintained the operations of the Scheme Companies and recommenced the sale and recapitalisation process described below.

### 5.2    Sale and Recapitalisation Process

Prior to the Receivers' appointment, Quintis had engaged UBS in March 2017 as its sale advisers to assess a potential offer received from a consortium linked to Frank Wilson (former Managing Director of the Quintis Group) and assist with a sale and recapitalisation process (the **Sale and**

*Recapitalisation Process*). As part of its role, UBS approached approximately 100 strategic parties to assess their level of interest in the Quintis Group. Some level of engagement was received from approximately 35 parties. The Sale and Recapitalisation Process continued for approximately nine months, however a solvent, 'all of company' sale or recapitalisation of the Quintis Group could not be achieved prior to the appointment of the Receivers.

On 6 February 2018, the Receivers recommenced the Sale and Recapitalisation Process. The Receivers engaged Sternship Advisers Pty Ltd (the previous UBS team) to manage the Sale and Recapitalisation Process.

On 6 February 2018, the Receivers placed advertisements in the Australian Financial Review and the Australian and on 15 February 2018 in the Financial Times (Asia) requesting urgent expressions of interest by 23 February 2018 in relation to the Sale and Recapitalisation Process. In addition, the Receivers and Sternship Advisers Pty Ltd proactively reached out to industry participants and the parties from the pre-appointment process.

As part of the Sale and Recapitalisation Process, the Receivers sought indicative offers from parties interested in the recapitalisation or purchase of the business and/or assets of the Quintis Group either on an all of company or separate assets basis. The Sale and Recapitalisation Process was intended to be conducted in two stages, stage 1 (non-binding offers) and stage 2 (final binding offers).

Stage 1 of the process ran from 6 February 2018 until 23 March 2018. During stage 1, 104 strategic parties were identified and contacted. Sixteen expressions of interest were received from interested parties. Following completion of stage 1 of the process, six non-binding indicative offers were received; a single whole of company proposal and five partial asset or marketing proposals. The single whole of company proposal was considered not capable of acceptance by the Receivers on the basis that the offer fell short of the secured debt of the secured creditors and was not pursued further.

In the absence of any acceptable 'all of company' or recapitalisation  proposals, Sternship Advisers Pty Ltd conducted a secondary process for those parties who were interested in specific assets of the Quintis Group and all parties who had submitted non-binding indicative proposals in stage 1 were given the opportunity to put forward revised proposals. These parties were requested to submit non-binding indicative offers by 20 April 2018. Three offers were received which were determined by the Receivers to be opportunistic and under valuing the assets of the Quintis Group and were therefore not capable of acceptance.

## 5.3    The Scheme proposal

Following the unsuccessful Sale and Recapitalisation Process described above, the Receivers engaged in further discussions with the secured creditors of the Quintis Group regarding alternative options for recapitalisation.

The outcome of those discussions is a proposed recapitalisation plan for the Quintis Group in the form of the Scheme proposal, in conjunction with the DOCA(details of which are set out below in section 5.8).

If the Scheme is implemented, it will bind the Scheme Creditors and the Scheme Companies.

If you are a Scheme Creditor and you do not vote at the Scheme Meeting, or you voted against the Scheme, you will be bound by the Scheme, provided that the Scheme is agreed by the requisite majority of creditors and is approved by the Court.

In addition, the Outgoing Agent and Indenture Trustee, the Incoming Agent and Indenture Trustee, the Outgoing Collateral Trustee, the Incoming Collateral Trustee, the Scheme Administrators, the Receivers, the Santalis Subsidiaries, Fieldpark Pty Ltd, Quintis (Australia) and

Quintis Holdco will each agree to be bound by the terms of the Scheme by executing the relevant deed poll to which it is party.

**5.4    Overview of the Scheme**

In summary, the Scheme provides for the following:

(a)     reducing the debt burden of Quintis Limited and the Guarantors to the Scheme Creditors by effecting the cancellation and discharge of the Original Notes and exchanging the Original Notes for the Second Lien Notes;

(b)     effecting the release of the obligations and liabilities of the Guarantors under the Indenture in respect of the Original Notes

(c)     releasing certain intercompany debts owed between various Scheme Companies;

(d)     effecting a release in full of Quintis Limited from its obligations in relation to the Secured Debt;

(e)     effecting the assumption by Quintis (Australia) of Quintis Limited's obligations as borrower and security provider under the Finance Documents and New Finance Documents;

(f)     effecting the transfer by Quintis Limited of its shareholdings in the Quintis Subsidiaries to Quintis (Australia) and certain of its remaining assets to the newly recapitalised Quintis Group;

(g)     recapitalising the Quintis Subsidiaries, Quintis Holdco and Quintis (Australia) by the injection of new capital through the issue by Quintis (Australia) of First Lien Notes;

(h)     effecting the establishment of Quintis Holdco as the ultimate parent company of the newly recapitalised Quintis Group and providing for the issue of shares in Quintis Holdco to Equity Noteholders; and

(i)     providing transactional certainty for all parties in relation to the restructure of the Quintis Group.

**5.5    Conditions Precedent**

The Scheme is conditional upon, and will have no force or effect until, the satisfaction of each of the following conditions precedent:

(a)     by 8:00am on the date of the Second Court Hearing:

(i)     (**FIRB Approval**) FIRB Approval is obtained;

(ii)     (**Regulatory Approvals**) all other Regulatory Approvals required to implement the Scheme (if any) are granted or obtained and those Regulatory Approvals are not withdrawn, cancelled or revoked, and each is granted or obtained subject to conditions that Quintis (Australia) reasonably considers to be acceptable;

(iii)     (**Court orders**) no Court or Governmental Agency has issued or taken steps to issue an order, temporary restraining order, preliminary or permanent injunction, decree or ruling or taken any action enjoining, restraining or otherwise imposing a legal restraint or prohibition preventing the Scheme and no such order, decree, ruling, other action or refusal is in effect that prohibits, materially restricts, makes illegal or restrains the implementation of the Scheme;

(iv)     (**Scheme Creditors' approval**) the Scheme is approved by the Scheme Creditors under section 411(4)(a)(i) of the Corporations Act;

(v)    (**First Lien Notes Subscription Amount**) Quintis (Australia) has received executed counterparts from Participating Noteholders of the Note Subscription and Purchase Agreement which in aggregate subscribe for an amount equal to, or greater than, the Minimum Subscription Amount;

(vi)   (**New Finance Documents**) each of the Incoming Agent and the Indenture Trustee and Incoming Collateral Trustee has executed each New Finance Document to which it is party and provided Quintis (Australia) with its executed counterpart of each document; and

(vii)  (**Deeds Poll**) each of the Outgoing Agent and Indenture Trustee, the Incoming Agent and Indenture Trustee, the Outgoing Collateral Trustee, the Incoming Collateral Trustee, the Scheme Administrators, the Receivers, the Santalis Subsidiaries, Fieldpark Pty Ltd, Quintis (Australia) and Quintis Holdco has executed the relevant deed poll to which it is party.

(b)    prior to the commencement of Step One of the Scheme:

(i)    (**Court approval of Scheme**) the Scheme is approved by the Court in accordance with section 411(4)(b) (and, if applicable, section 411(6)) of the Corporations Act; and

(ii)   (**DOCA**) Completion has occurred under the Deed of Company Arrangement;

These conditions precedent may not be waived.

If there is a breach or non-fulfilment of a condition precedent before the Sunset Date or a condition precedent becomes incapable of satisfaction, each party to the Scheme, other than a party that has caused the breach or non-fulfilment, may serve notice on the other parties, and the parties must then consult in good faith with a view to determining whether:

(a)    the Scheme may proceed by way of alternative means or methods;

(b)    to extend the relevant time or date for satisfaction of the condition precedent;

(c)    to change the date of the application to be made to the Court for orders under the Corporations Act approving the Scheme or to adjourn that application (as applicable) to another date agreed by the parties; or

(d)    to extend the Sunset Date.

If the parties are unable to reach agreement by the time required under the Scheme, any party may terminate the Scheme by notice in writing to the other parties (provided that the party has not contributed to the relevant condition precedent not being satisfied).

## 5.6    Chapter 15 recognition

Unless waived by Majority Consent, an Administrator or other authorised representative of the Scheme must seek the entry of an order recognising and enforcing the Scheme within the territorial jurisdiction of the United States from a United States bankruptcy court of competent jurisdiction under chapter 15 of title 11 of the United States Code.

Neither the implementation nor the effectiveness of the Scheme is conditional on Chapter 15 recognition being provided.

If a United States bankruptcy court recognises the Scheme, actions against the Scheme Companies or against property of the Scheme Companies in the United States are stayed.

In the event that the Scheme is approved by the requisite majority of Scheme Creditors and the Court but Chapter 15 recognition is either not granted or not sought (as a result of a waiver by way of Majority Consent), the restrictions contained in the Indenture and the Collateral Trust

Deed will continue to apply and any action of a Scheme Creditor against the Scheme Companies would remain subject to these restrictions.

## 5.7 Sunset Date

If the Scheme has not been implemented on or before the Sunset Date, the Scheme will lapse and be of no further force or effect (and any steps taken under the Scheme will be taken to be of no force or effect).

## 5.8 Deed of Company Arrangement

The DOCA was proposed by the Receivers following the unsuccessful Sale and Recapitalisation Process, as part of the broader recapitalisation proposal for the Quintis Group, which is intended to be implemented by way of the inter-conditional Scheme and the DOCA.

The DOCA is between the Scheme Companies, the Deed Administrators and the Receivers who were also the Deed Proponents. The DOCA was approved by creditors on 8 June 2018 and executed on 29 June 2018.

Under the DOCA:

(a)     unsecured creditors (subject to conditions precedent) will be transferred to a creditors' trust and will receive a distribution from a distribution pool of A$2.5 million to be made available by the secured creditors of the Quintis Group on Completion; and

(b)     the funds will be distributed from the creditors' trust to unsecured creditors based on classes/pools of unsecured Claims (with employee creditors retaining their statutory priority).

The creditors' trust contribution has been made available by secured creditors to ensure that the Quintis Group's unsecured creditors receive a better return than in a liquidation scenario. The Deed Administrators concluded in their report under section 439A of the Corporations Act that the DOCA provides a better outcome for unsecured creditors than the likely outcome if the Quintis Group was placed in liquidation.

The conditions precedent to the DOCA include:

(a)     delivery of the signed Receiver Scheme Certificate by the Receivers to the Deed Administrators; and

(b)     execution of the Creditors' Trust Deed which will govern the terms of the creditors' trust.

The conditions precedent must be satisfied by the Sunset Date, otherwise the Deed Administrators will convene a meeting of creditors to determine the future of the Scheme Companies. As stated above, if the Scheme has not been implemented on or before the Sunset Date, the Scheme will lapse and be of no further force or effect (and any steps taken under the Scheme will be taken to be of no force or effect). Accordingly, both the DOCA and the Scheme must be implemented by the Sunset Date in order for the recapitalisation of the Quintis Group to proceed.

At completion of the DOCA (which will occur immediately prior to Completion of the Scheme and only if the Scheme is ready to be implemented in accordance with its terms), the funds for the creditors' trust will be paid to the Trustees to be administered as the Trust Fund under the Creditors' Trust Deed and immediately after this occurs, the DOCA will:

(a)     effectuate and terminate in respect of the Scheme Companies other than Quintis Limited and Claims (other than Excluded Claims) of creditors against these companies will be replaced by Claims against the creditors' trust; and

(b)    will remain in place for Quintis Limited while the Deed Administrators finalise the realisation of its remaining assets that are not transferred to the newly recapitalised Quintis Group pursuant to the Scheme. The DOCA will terminate in respect of Quintis Limited on the later of:

(i)    12 months from the DOCA Completion Date (or such earlier date notified by the Receivers or the secured creditors of the Quintis Group to the Deed Administrators in writing); and

(ii)    the Deed Administrators having formed the view that the DOCA is fully effectuated in respect of Quintis Limited and the realisation of its remaining assets has been completed or that as a commercial matter it should not be pursued.

On and from completion of the DOCA all Claims (other than Excluded Claims) against the Scheme Companies will be released and extinguished in full. The Excluded Clams will remain in place.

Quintis (Australia) will also be beneficially entitled to the benefit of all Contracts and Quintis Limited will hold each Contract for the benefit of Quintis (Australia) in accordance with the terms of the Scheme (and Quintis Limited will appoint Quintis (Australia) as its attorney for the purpose of enabling Quintis (Australia) to exercise or refrain from exercising Quintis Limited's rights, powers and interests in relation to the Contracts).

The Deed Administrators' report under section 439A of the Corporations Act provides further detail on the impact of the DOCA on various stakeholders of the Quintis Group, including unsecured creditors, employees, BC investors, SIO investors, MIS investors and landlords.

The position of BC investors, SIO investors and MIS investors under the DOCA and the Scheme is also discussed in sections 6.5(d), 6.5(e) and 6.5(f) below.

Importantly, completion of the DOCA will not occur until such time as the Scheme is ready to be implemented in accordance with its terms, which will be confirmed by delivery of the Receiver Scheme Certificate.

## 5.9    Existing Debt Capital Structure

The current structure of the Secured Debt is as follows:

(a)    **Notes on Issue**

| Notes | Face value | Term |
|---|---|---|
| Original Notes (Senior Secured Notes) | USD 250,000,000 | Currently due and payable |
| Tranche 1 Super Senior Notes | USD 15,000,000 | Currently due and payable |
| Tranche 2 Super Senior Notes | USD 15,000,000 | Due 30 September 2018 |

(b)    **Borrower and Security Details**

| Borrower | Security Providers/Guarantors | Security |
|---|---|---|
| Quintis Limited | Each of the Scheme Companies<br><br>Each of the Santalis Subsidiaries | • Real property mortgages<br>• Fixed and floating charges over the Australian security providers (subject to certain excluded property) |

| Borrower | Security Providers/Guarantors | Security |
|---|---|---|
| | | • US Security Agreement and accompanying US Patent Security Agreement and US Trademark Security Agreement (subject to certain excluded property) |

Further details of the terms governing the current Notes on issue and the existing security are contained in the Finance Documents.

**5.10    Proposed New Debt Capital Structure**

On implementation of the Scheme, the new debt capital structure of the Quintis Group would be as described below.

(a)    **The First Lien Indenture**

The First Lien Notes will be issued subject to and in accordance with the First Lien Indenture. Below is a summary of certain of the provisions contained in the First Lien Indenture. You are urged to read the First Lien Indenture (set out Schedule 3), in full to understand the terms of the First Lien Notes. In the event of any inconsistency between the First Lien Indenture and the summary below, the First Lien Indenture prevails.

All capitalised terms as defined in the First Lien Indenture.

| | |
|---|---|
| Issuer | Quintis (Australia) Pty Limited |
| Subsidiary Guarantors (New Guarantors) | Arwon Finance Pty Limited<br>Australian Sandalwood Oil Co. Pty Limited<br>MT Romance Australia Pty Limited<br>MT Romance Holdings Pty Limited<br>Quintis Leasing Pty Limited<br>Sandalwood Properties Limited<br>Quintus Forestry Limited<br>Fieldpark Pty Ltd<br>Santalis Healthcare Inc.<br>Santalis Pharmaceuticals Inc. |
| Principal Amount | up to US$156,000,000 |
| Maturity Date | October, 2026 |
| Interest Rate | Option (in the Issuer's discretion to be exercised in connection with each interest payment) to pay interest in kind or in cash in years one through six at a rate of 7.5% per annum if paid in cash and 8.0% per annum if paid in kind, and to be paid in cash at 7.5% per annum in years seven and eight. |
| Interest Payment Dates | Payable/capitalized semi-annually in arrears on interest payment dates to be agreed. Interest to be payable on a 360-day year with twelve 30-day months. |
| Form and Denomination | The First Lien Notes will be issued in registered form in minimal denominations of US$1,000 and integral multiple of US$1,000 in excess thereof, with any PIK payments in integral multiples of US$1.00. |
| Ranking of the First Lien Notes | The First Lien Notes will:<br><br>• be general obligations of the Issuer;<br>• be secured by liens over any collateral subject to the Collateral Trust Deed;<br>• be senior to the Second Lien Notes and any other existing and future Second Lien Pari Passu Debt with respect to proceeds of |

| | collateral as set forth in the Indentures and the Collateral Trust Deed, except with respect to proceeds of certain Plantation Sales; <br><br> • rank pari passu in right of payment with any and all of the Issuer's existing and future indebtedness that is not subordinated in right of payment to the First Lien Notes; and <br><br> • rank senior in right of payment to any and all of the Issuer's existing and future indebtedness that is subordinated in right of payment to the First Lien Notes. |
|---|---|
| Ranking of the First Lien Notes Guarantees | Each of the guarantees provided by the Subsidiary Guarantors with respect to the First Lien Notes will: <br><br> • be a general obligation of the relevant Subsidiary Guarantor; <br><br> • be secured by liens over collateral subject to the Collateral Trust Deed; <br><br> • be senior to the guarantees of the Second Lien Notes and guarantees of any other existing and future Second Lien Pari Passu Debt with respect to proceeds of collateral as set forth in the Indentures and the Collateral Trust Deed, except with respect to proceeds of certain Plantation Sales; <br><br> • rank pari passu in right of payment with any and all of the relevant Subsidiary Guarantor's existing and future indebtedness and obligations that are not subordinated in right of payment to such Subsidiary Guarantor's guarantee; and <br><br> • rank senior in right of payment to any and all of the relevant Subsidiary Guarantor's existing and future indebtedness that is subordinated in right of payment to its guarantee of the First Lien Notes. |
| Collateral | The First Lien Notes and the guarantees provided by the Subsidiary Guarantors with respect to the First Lien Notes will be secured by substantially all assets of the Issuer and the Subsidiary Guarantors to the extent provided under the Security Documents and subject to the Collateral Trust Deed. |
| Amended Collateral Trust Deed | The First Lien Indenture will be subject to the terms of the Collateral Trust Deed, and the rights and benefits of the holders of the First Lien Notes will be limited accordingly and subject to the terms of the Collateral Trust Deed. |
| Optional Redemption | The Issuer may not redeem any of the First Lien Notes at any time prior to October, 2021. <br><br> On or after October, 2021 and prior to the Maturity Date, the Issuer may redeem all or a portion of the First Lien Notes, at its option, upon not less than 30 nor more than 60 days' prior notice. These redemptions will be in amounts of US$1,000 or integral multiples thereof (or if the Issuer pays PIK Interest with PIK Notes, in denominations of US$1.00 and any integral multiple of US$1.00 in excess thereof with respect to a PIK Note or the portion of a Global Note constituting PIK Interest) at the following Redemption Prices (expressed as percentages of the aggregate principal amount at the Maturity Date), plus accrued and unpaid interest, if any, to, but excluding, the redemption date, if redeemed during the 12-month period commencing on October of the years set forth below: |

| Year | Redemption Price |
|---|---|
| 2021 | 105.625% |
| 2022 | 103.375% |
| 2023 | 101.875% |

|  |  |
|---|---|
|  | 2024 and thereafter                    100% |
|  | In addition, at any time prior to October, 2021, the Issuer may redeem on one or more occasions, at its option, First Lien Notes in an aggregate principal amount not to exceed 35% of the original aggregate principal amount of the First Lien Notes (calculated after giving effect to any issuance of PIK Notes and additional First Lien Notes), at a redemption price equal to 100% of the principal amount thereof, plus accrued and unpaid interest to, but excluding, the redemption date, subject to the rights of Holders on the relevant record date to receive interest due on the relevant Interest Payment Date, with the Net Offering Proceeds from one or more Equity Offerings; provided that: |
|  | (1)    at least 65% of such original aggregate principal amount of First Lien Notes (calculated after giving effect to any issuance of PIK Notes and additional First Lien Notes) remains outstanding immediately after the occurrence of each such redemption (any First Lien Notes held by the Issuer, Holdco or any of its subsidiaries will not be deemed to be outstanding for purposes of this clause (1)); and |
|  | (2)    each such redemption occurs within 90 days after the date of the closing of such equity offering. |
| Mandatory Redemption | In addition, notwithstanding anything to the contrary, if, at any time prior to the later of (x) April, 2024 or (y) the Issuer has elected or is otherwise required to make all future payments of interest on the First Lien Notes in cash, the Issuer or a Subsidiary Guarantor enters into one or more Plantation Sales, the Issuer shall use the net cash proceeds of such Plantation Sales to redeem on one or more occasions, First Lien Notes at a redemption price equal to 100% of the principal amount thereof, plus accrued and unpaid interest to, but excluding, the redemption date; provided that certain conditions set forth in the First Lien Indenture are met. For purposes of this section, the defined term "Plantation Sale" shall mean any sale of assets of or relating to the disposition of agricultural land, biological assets (as such term is used under IFRS) or a commitment to create and/or manage future biological assets.<br><br>If the Issuer or a Subsidiary Guarantor enters into one or more Plantation Sales involving the sale of land by the Issuer or a Subsidiary Guarantor (each, a "Plantation Sale—Owned"), the Issuer or Subsidiary Guarantor shall use an amount equal to 35% of the net cash proceeds of such Plantation Sale—Owned to redeem on one or more occasions, First Lien Notes at a redemption price equal to 100% of the principal amount thereof, plus accrued and unpaid interest to, but excluding, the redemption date.<br><br>If the Issuer or a Subsidiary Guarantor enters into one or more Plantation Sales not involving the sale of land by the Issuer or a Subsidiary Guarantor (each, a "**Plantation Sale—Leased**"), the Issuer or Subsidiary Guarantor shall not use any amount of the Net Cash Proceeds of such Plantation Sale—Leased to redeem Notes for so long as any Second Lien Obligations are outstanding. |
| Change of Control | In the event of a change of control, then the Issuer must make an offer to each Holder to purchase such Holder's First Lien Notes in whole or in part in integral multiples of US$1,000 (or if a PIK Payment has been made, in denominations of US$1.00 and any integral multiple of US$1.00 in excess thereof with respect to a PIK Note or the portion of a Global Note constituting PIK Interest), at the change of control purchase price in cash in an amount equal to 101% of the principal amount thereof, plus accrued and unpaid interest, if any, to, but |

| | |
|---|---|
| | excluding, the date of the change of control. |
| Certain Covenants | The First Lien Indenture will contain covenants that restrict the ability of the Issuer and the Restricted Subsidiaries to:<br><br>• incur or guarantee additional indebtedness;<br>• create or incur certain liens;<br>• pay dividends, repurchase stock, and make distributions and certain other payments and investments;<br>• enter into certain transactions with affiliates;<br>• transfer or sell assets;<br>• engage in certain activities;<br>• impair security interests;<br>• agree to restrictions on dividends by subsidiaries; and<br>• merge or consolidate with certain other entities,<br>• among others. Each of these covenants (and those not mentioned) is subject to significant exceptions and qualifications. |
| Transfer Restrictions | The First Lien Notes and the guarantees provided by the Subsidiary Guarantors with respect to the First Lien Notes have not been, and will not be, registered under the Securities Act or the securities laws of any other jurisdiction, and are subject to restrictions on transferability and resale. |
| Listing | The First Lien Notes will not be listed on any exchange. The Issuer cannot guarantee that a public market will ever develop for the First Lien Notes |
| Governing Law | New York law |
| Trustee and Security Agent | Incoming Agent and Indenture Trustee |
| Principal Paying Agent | Incoming Agent and Indenture Trustee |

(b)     **Second Lien Indenture**

The Second Lien Notes will be issued subject to and in accordance with the Second Lien Indenture. Below is a summary of certain of the provisions contained in the Second Lien Indenture. You are urged to read the Second Lien Indenture (set out in Schedule 4) in full to understand the terms of the Second Lien Notes. In the event of any inconsistency between the Second Lien Indenture and the summary below, the Second Lien Indenture prevails.

Capitalised terms as set out in the Second Lien Indenture.

| | |
|---|---|
| Issuer | Quintis (Australia) Pty Limited |
| Subsidiary Guarantors (New Guarantors) | Arwon Finance Pty Limited<br>Australian Sandalwood Oil Co. Pty Limited<br>MT Romance Australia Pty Limited<br>MT Romance Holdings Pty Limited<br>Quintis Leasing Pty Limited<br>Sandalwood Properties Limited<br>Quintus Forestry Limited<br>Fieldpark Pty Ltd<br>Santalis Healthcare Inc.<br>Santalis Pharmaceuticals Inc. |
| Principal Amount | US$185,000,000 |
| Maturity Date | October, 2028 |
| Interest Rate | For the first 5 years the Second Lien Notes do not accrue interest. |

| | |
|---|---|
| | Option (in the Issuer's discretion to be exercised in connection with each interest payment) to pay interest in kind or in cash in years six through eight at a rate of 12.0% per annum if paid in cash or if paid in kind, and to be paid in cash at 12.0% per annum in years nine and ten. |
| Interest Payment Dates | Payable/capitalized semi-annually in arrears on interest payment dates to be agreed. Interest to be payable on a 360-day year with twelve 30-day months. |
| Form and Denomination | The Second Lien Notes will be issued in registered form in minimal denominations of US$1,000 and integral multiples of US$1,000 in excess thereof, with any PIK payments in integral multiples of US$1.00. |
| Ranking of the Second Lien Notes | The Second Lien Notes will:<br><br>• be general obligations of the Issuer;<br>• be secured by liens over any collateral subject to the Collateral Trust Deed;<br>• rank pari passu in right of payment with any and all of the Issuer's existing and future indebtedness that is not subordinated in right of payment to the Second Lien Notes;<br>• be subordinate to the First Lien Notes and any other existing and future First Lien Pari Passu Debt with respect to proceeds of collateral as set forth in the Indentures and the Collateral Trust Deed, except with respect to proceeds of certain Plantation Sales; and<br>• rank senior in right of payment to any and all of the Issuer's existing and future indebtedness that is subordinated in right of payment to the Second Lien Notes. |
| Ranking of the Second Lien Notes Guarantees | Each of the guarantees provided by the Subsidiary Guarantors with respect to the Second Lien Notes will:<br><br>• be a general obligation of the relevant Subsidiary Guarantor;<br>• be secured by liens over collateral subject to the Collateral Trust Deed;<br>• rank pari passu in right of payment with any and all of the relevant Subsidiary Guarantor's existing and future indebtedness and obligations that are not subordinated in right of payment to such Subsidiary Guarantor's guarantee;<br>• be subordinate to the guarantees of the First Lien Notes and the guarantees of any other existing and future First Lien Pari Passu Debt with respect to proceeds of collateral as set forth in the Indentures and the Collateral Trust Deed, except with respect to proceeds of certain Plantation Sales; and<br>• rank senior in right of payment to any and all of the relevant Subsidiary Guarantor's existing and future indebtedness that is subordinated in right of payment to its guarantee of the Second Lien Notes. |
| Collateral | The Second Lien Notes and the guarantees provided by the Subsidiary Guarantors with respect to the Second Lien Notes will be secured by substantially all assets of the Issuer and the Subsidiary Guarantors to the extent provided under the Security Documents and subject to the Collateral Trust Deed. |
| Amended Collateral Trust Deed | The Second Lien Indenture will be subject to the terms of the Collateral Trust Deed, and the rights and benefits of the holders of the Second Lien Notes will be limited accordingly and subject to the terms of the Collateral Trust Deed. |
| Optional Redemption | On or after the Issue Date and prior to October, 2023, the Issuer may redeem all or a portion of the Notes, at its option, upon not less than 30 nor more than 60 days' prior notice.  These redemptions will be in amounts of US$1,000 or integral multiples thereof in an aggregate |

principal amount of not less than US$10,000,000 at the following
Redemption Prices (expressed as percentages of the aggregate
principal amount at Maturity), plus accrued and unpaid interest, if any,
to, but excluding, the Redemption Date, if redeemed during the 12-
month period commencing on the Issue Date and, thereafter, on
October of the years set forth below.  The Issuer may not redeem any
of the Notes from OCtober, 2023 to October 2024.

| Year | Redemption Price |
|------|------------------|
| 2018 | 90% |
| 2019 | 92% |
| 2020 | 94% |
| 2021 | 96% |
| 2022 | 98% |
| 2023 | 100% |

On or after October, 2024 and prior to the Maturity Date, the Issuer
may redeem all or a portion of the Second Lien Notes, at its option,
upon not less than 30 nor more than 60 days' prior notice. These
redemptions will be in amounts of US$1,000 or integral multiples
thereof (or if the Issuer pays PIK Interest with PIK Notes, in
denominations of US$1.00 and any integral multiple of US$1.00 in
excess thereof with respect to a PIK Note or the portion of a Global
Note constituting PIK Interest) at the following Redemption Prices
(expressed as percentages of the aggregate principal amount at the
Maturity Date), plus accrued and unpaid interest, if any, to, but
excluding, the redemption date, if redeemed during the 12-month
period commencing on October of the years set forth below:

| Year | Redemption Price |
|------|------------------|
| 2024 | 109% |
| 2025 | 106% |
| 2026 | 103% |
| 2027 | and    100% thereafter |

In addition, at any time prior to October, 2024, the Issuer may redeem
on one or more occasions, at its option, Second Lien Notes in an
aggregate principal amount not to exceed 35% of the original
aggregate principal amount of the Second Lien Notes (calculated after
giving effect to any issuance of PIK Notes and additional Second Lien
Notes), at a redemption price equal to 100% of the principal amount
thereof, plus accrued and unpaid interest to, but excluding, the
redemption date, subject to the rights of Holders on the relevant record
date to receive interest due on the relevant Interest Payment Date, with
the Net Offering Proceeds from one or more Equity Offerings; provided
that:

(1)     at least 65% of such original aggregate principal amount of
        Second Lien Notes (calculated after giving effect to any
        issuance of PIK Notes and additional Second Lien Notes)
        remains outstanding immediately after the Second Lien Notes
        held by the Issuer, Holdco or any of its subsidiaries will not be
        deemed to be outstanding for purposes of this clause (1));
        and

| | |
|---|---|
| | (2)    each such redemption occurs within 90 days after the date of the closing of such equity offering. |
| Mandatory Redemption | In addition, notwithstanding anything to the contrary, if, at any time prior to the later of (x) April, 2024 or (y) the Issuer has elected or is otherwise required to make all future payments of interest on the Second Lien Notes in cash, the Issuer or a Subsidiary Guarantor enters into one or more Plantation Sales, the Issuer shall use the net cash proceeds of such Plantation Sales to redeem on one or more occasions, Second Lien Notes at a redemption price equal to 100% of the principal amount thereof, plus accrued and unpaid interest to, but excluding, the redemption date; provided that certain conditions set forth in the Second Lien Indenture are met. For purposes of this section, the defined term "Plantation Sale" shall mean any sale of assets of or relating to the disposition of agricultural land, biological assets (as such term is used under IFRS) or a commitment to create and/or manage future biological assets.

If the Issuer or a Subsidiary Guarantor enters into one or more Plantation Sales involving the sale of land by the Issuer or a Subsidiary Guarantor (each, a "Plantation Sale—Owned"), the Issuer or Subsidiary Guarantor shall use an amount equal to 65% of the net cash proceeds of such Plantation Sale—Owned to redeem on one or more occasions, Second Lien Notes at a redemption price equal to 100% of the principal amount thereof, plus accrued and unpaid interest to, but excluding, the redemption date.

If the Issuer or a Subsidiary Guarantor enters into one or more Plantation Sales not involving the sale of land by the Issuer or a Subsidiary Guarantor (each, a "Plantation Sale—Leased"), the Issuer or Subsidiary Guarantor shall use an amount equal to 100% of the net cash proceeds of such Plantation Sale—Leased to redeem on one or more occasions, Second Lien Notes at a redemption price equal to 100% of the principal amount thereof, plus accrued and unpaid interest to, but excluding, the redemption date. |
| Change of Control | In the event of a change of control, then the Issuer must make an offer to each Holder to purchase such Holder's Second Lien Notes in whole or in part in integral multiples of US$1,000 (or if a PIK Payment has been made, in denominations of US$1.00 and any integral multiple of US$1.00 in excess thereof with respect to a PIK Note or the portion of a Global Note constituting PIK Interest), at the change of control purchase price in cash in an amount equal to 101% of the principal amount thereof, plus accrued and unpaid interest, if any, to, but excluding, the date of the change of control. |
| Certain Covenants | The Second Lien Indenture will contain covenants that restrict the ability of the Issuer and the Restricted Subsidiaries to:

• incur or guarantee additional indebtedness;
• create or incur certain liens;
• pay dividends, repurchase stock, and make distributions and certain other payments and investments;
• enter into certain transactions with affiliates;
• transfer or sell assets;
• engage in certain activities;
• impair security interests;
• agree to restrictions on dividends by subsidiaries; and
• merge or consolidate with certain other entities,
• among others. Each of these covenants (and those not mentioned) is subject to significant exceptions and qualifications. |
| Transfer Restrictions | The Second Lien Notes and the guarantees provided by the Subsidiary Guarantors with respect to the Second Lien Notes have not been, and will not be, registered under the Securities Act or the securities laws of |

| | any other jurisdiction, and are subject to restrictions on transferability and resale. |
|---|---|
| Listing | The Second Lien Notes will not be listed on any exchange. The Issuer cannot guarantee that a public market will ever develop for the Second Lien Notes. |
| Governing Law | New York law |
| Trustee and Security Agent | Incoming Agent and Indenture Trustee |
| Principal Paying Agent | Incoming Agent and Indenture Trustee |

Further details of the terms governing the Second Lien Notes and First Lien Notes and the Existing Security (as amended by the Scheme) are contained in the New Finance Documents, including the First Lien Indenture contained at Schedule 3, Second Lien Indenture contained at Schedule 4, Amended Collateral Trust Deed contained at  Schedule 5 and Note Subscription and Purchase Agreement contained at Schedule 6.

The Security will be transferred by the Outgoing Collateral Trustee and all registrations applicable to the Security, to the Incoming Collateral Trustee for the Incoming Collateral Trustee to hold pursuant to the Amended Collateral Trust Deed for the purpose of securing amounts owing under the New Finance Documents.

**5.11    Scheme Steps and Implementation**

Capitalised terms used in this section and not defined in the Glossary have the meaning given to them in the Scheme.

In summary, implementation of the Scheme will be undertaken by nine Steps.

Unless specified otherwise in the Scheme, each Step will not begin until the preceding Steps have been completed. Further, Step Three cannot be commenced unless the Scheme Administrators are satisfied that Steps Three to Six (inclusive) will be completed on the same day.

The Steps are summarised below. Scheme Creditors should read the Scheme in its entirety to ensure they fully understand the action being undertaken pursuant to each Step.

The following Steps will occur in the following order at the times specified in the Scheme.

(a)    **Step One (Scheme Administrators' calculations and tables)**:

(i)    On the Business Day before the Completion Date, the Scheme Administrators will produce tables showing the calculations for the equity and debt capital restructures that are proposed to take place pursuant to the Scheme, including:

(A)    the amount of Second Lien Notes to be issued to each Scheme Creditor or, if applicable, the amount of Second Lien Notes the Scheme Creditor would have been entitled to receive had it provided the US Securities Representation to Quintis (Australia), Quintis Holdco and the New Guarantors by the Effective Date;

(B)    the amount of First Lien Notes to be issued to the Scheme Creditor by way of application of part repayment of the Original Notes in payment of the subscription price for First Lien Notes for an equivalent amount or, if applicable, the amount of First Lien Notes the Scheme Creditor would have been entitled to receive had it provided the US Securities Representation to Quintis (Australia), Quintis Holdco and the New Guarantors by the Effective Date;

(C)    in respect of each Scheme Creditor who is a Participating Noteholder, the amount of First Lien Notes to be issued to it pursuant to the Note Subscription and Purchase Agreement or, if applicable, the amount that would have been owed had the Scheme Creditor provided the US Securities Representation to Quintis (Australia), Quintis Holdco and the New Guarantors by the Effective Date; and

(D)    the number of shares in Quintis Holdco to be issued to each Equity Holder or, if applicable, the number of shares in Quintis Holdco the Equity Holder would have been entitled to receive had it provided the US Securities Representation to Quintis (Australia), Quintis Holdco and the New Guarantors.

(b)    **Step Two (release of intercompany debt)**: Each Scheme Company will release each other Scheme Company from all Intercompany Claims owed to it by the other Scheme Company.

(c)    **Step Three (partial repayment and exchange of Original Notes for Second Lien Notes and assignment of Security)**:

(i)    in relation to the Original Notes:

(A)    US$10 million of the outstanding amount of the Original Notes is taken (at the time when Step Seven occurs) to be repaid by way of application of that amount by the Scheme Creditors, on a pro rata basis across all Original Notes, in payment of the subscription price for the First Lien Notes for an equivalent amount;

(B)    the remaining Original Notes will be cancelled and exchanged for the Second Lien Notes, with the reduction in the total amount owed by the Scheme Companies under the Original Notes to be:

(1)    applied on a pro rata basis across all the remaining Original Notes; and

(2)    applied first in respect of accrued interest and costs before being applied in respect of outstanding principal;

(C)    the Guarantors will be released from their obligations and liabilities, and will cease to have any rights, under the Indenture in respect of the Original Notes; and

(D)    the Scheme Companies will be liable in respect of the Second Lien Notes in accordance with their terms.

(ii)    Scheme Creditors who do not provide the US Securities Representation to Quintis (Australia), Quintis Holdco and the New Guarantors by the Effective Date will not be entitled to receive Second Lien Notes or First Lien Notes and may instead be entitled to receive the Cash Payment;

(iii)    the Second Lien Indenture, Amended Collateral Trust Deed, US Pledge Agreement, US IP Security Agreement and US Security Agreement will each take effect in accordance with its terms; and

(iv)    the Security will be transferred by the Outgoing Collateral Trustee and all registrations applicable to the Security, to the Incoming Collateral Trustee for the Incoming Collateral Trustee to hold pursuant to the Amended Collateral Trust

Deed for the purpose of securing amounts owing under the New Finance
Documents.

(d)    **Step Four (transfer of shares currently on issue and share issues to Equity
Noteholders by Quintis Holdco)**:

(i)    The shares currently on issue in Quintis Holdco will be transferred to the two
Equity Noteholders which will have the largest shareholdings in Quintis Holdco
following completion of this Step;

(ii)    Quintis Holdco will allot and issue to each Equity Noteholder one fully paid
ordinary share in the capital of the company for each US$1 of reduction in the
total debt owed to each Equity Noteholder effected by the Scheme (the share
issue entitlement of the Equity Noteholders to which shares were transferred
pursuant to (i) will be reduced by one share); and

(iii)    A Scheme Creditor will not be issued any shares under this Step unless it has
entered into the Shareholders' Agreement by the Completion Date and provided
the US Securities Representation to Quintis (Australia), Quintis Holdco and the
New Guarantors by the Effective Date. A Scheme Creditor who does not provide
the US Securities Representation to Quintis (Australia), Quintis Holdco and the
New Guarantors by the Effective Date may be entitled to receive the Cash
Payment in lieu of its entitlement to shares in Quintis Holdco under the Scheme;
and

(iv)    The Shareholders' Agreement will take effect in accordance with its terms.

(e)    **Step Five (transfer of Quintis Subsidiaries and other assets)**:

(i)    Quintis Limited will transfer to Quintis (Australia) the shares which it holds in each
of the Quintis Subsidiaries, in consideration of the releases to be provided by the
Scheme Creditors pursuant to Step Six;

(ii)    Quintis Limited must transfer to Quintis (Australia) all of its assets and
undertaking other than the Listing Proceeds including, but not limited to, the
following assets and undertaking:

(A)    any units in trusts held by Quintis Limited;

(B)    all of Quintis Limited's rights or powers in relation to, or in connection
with, its right, title and interest in any Tax Refunds that it successfully
claims (and Quintis Limited must claim any Tax Refunds as directed by
Quintis (Australia));

(C)    all of Quintis Limited's rights or powers in relation to, or in connection
with, its right, title and interest in any loans owed to it by any person that
is not released under the DOCA or the Scheme, including all loans owed
to Quintis Limited by SPL. The terms of all loans owed to Quintis Limited
by SPL transferred to Quintis (Australia) under this Step will be taken to
be amended such that they are on the Subordination Terms and the
terms of any new loans made by Quintis (Australia) to SPL following
implementation of the Scheme (which Quintis (Australia) may elect to
advance in its absolute discretion if requested by SPL) will be on the
Subordination Terms;

(D)    to the extent that they have not already been novated, all of Quintis
Limited's rights or powers in relation to, or in connection with, its right, title
and interest in the Contracts;

(E)    all claims or causes of action that are capable of being assigned, including any causes of action which Quintis Limited may have against any of its directors or officers or former directors or former officers; and

(F)    any cash held by Quintis Limited.

(f)    **Step Six (assumption by Quintis (Australia) of Quintis Limited's obligations under Finance Documents, giving of security by Quintis (Australia) and Fieldpark Pty Ltd and release of Quintis Limited)**:

(i)    Quintis (Australia) will assume all of Quintis Limited's rights, obligations and liability under the Indenture in respect of the Original Notes, under the Note Agreement and Guaranty in respect of the Tranche 1 Super Senior Notes and the Second Note Agreement and Guaranty in respect of the Tranche 2 Super Senior Notes as if it had been Quintis Limited and entered into the Indenture and issued those notes instead of Quintis Limited and Quintis Limited will cease to have those rights and will be released from those obligations and liabilities and those agreements will apply with Quintis (Australia) as a party in place of Quintis Limited;

(ii)    Each of Quintis (Australia) and Fieldpark Pty Ltd will accede to the Fixed and Floating Charge;

(iii)    Each of Quintis (Australia) and Fieldpark Pty Ltd will accede to the Collateral Trust Deed;

(iv)    Quintis Limited will cease to be a party under any of the Finance Documents and cease to have any rights or obligations under them or be bound by them;

(v)    All Security granted by Quintis Limited will be discharged and released;

(vi)    Quintis Limited will cease to have any power of attorney or authorisation under any of the Finance Documents, and will waive any such right power or authorisation;

(vii)    The Outgoing Agent and Indenture Trustee, Outgoing Collateral Trustee and Scheme Creditors will cease to have any power of attorney or authorisation to act on behalf of Quintis Limited under any of the Finance Documents;

(viii)    Each Scheme Creditor will not seek or act upon any agreement, consent, approval or notice, certificate, or request, made or given by Quintis Limited after completion of Step Six;

(ix)    The Scheme Creditors, the Outgoing Agent and Indenture Trustee, the Outgoing Collateral Trustee and each Guarantor on the one part and Quintis Limited on the other, will release each other from all obligations and liability to each other and all Claims (whether present or future) under or in respect of the Finance Documents except in relation to a breach of the Scheme;

(x)    The Outgoing Collateral Trustee will execute a PPS release, pursuant to which Security granted by SPL will be released, except in relation to any land or buildings owned or leased by SPL; and

(xi)    SPL will agree that it will pay to Quintis (Australia) all realisations from the asset represented by the Accrued Income line item in the Balance Sheet of SPL for the financial year ending 30 June 2018 (but no subsequent financial years), as and when the realisations are made.

(g)    **Step Seven (funding and issue of First Lien Notes and repayment of Tranche 1 Super Senior Notes and Tranche 2 Super Senior Notes)**:

(i)    The First Lien Indenture will take effect in accordance with its terms.

(ii)    Each Scheme Creditor will be taken to have paid to Quintis (Australia) its pro rata share of US$10 million of the remaining outstanding amount of the Original Notes towards the subscription price for the First Lien Notes pursuant to Step Three;

(iii)    Quintis (Australia) shall confirm in writing to the Scheme Administrators that each New Finance Document has taken effect in accordance with its terms (including all conditions precedent to each New Finance Document having been satisfied or waived in accordance with the terms of that document);

(iv)    Following the matters in sub paragraphs (i), (ii) and (iii) occurring, each Participating Noteholder will make a payment to Quintis (Australia) of an amount equal to that Participating Noteholder's share of First Lien Notes as calculated by the Scheme Administrators in Step One by:

(A)    payment of that amount in cleared funds into the account notified by Quintis (Australia) to the Incoming Agent and Indenture Trustee in writing; and/or

(B)    where a Participating Noteholder (who is also a Super Senior Noteholder) has prior to the Completion Date given Quintis (Australia) written notice that it will pay all or part of its subscription amount for First Lien Notes by way of application in full or part repayment of its Tranche 1 Super Senior Notes or Tranche 2 Super Senior Notes (as applicable), which a Participating Noteholder may elect to do in its absolute discretion, effecting the repayment and providing evidence of the repayment to Quintis (Australia).

(v)    Quintis (Australia) will confirm to the Incoming Agent and Indenture Trustee and Scheme Administrators as soon as practicable whether payment has been received from each Participating Noteholder in an amount equal to that Participating Noteholder's share of First Lien Notes and concurrently with such confirmation:

(A)    the aggregate payments made by Participating Noteholders pursuant to sub paragraph (iv) above shall be taken to have been paid by the Participating Noteholders to Quintis (Australia) in satisfaction of the subscription price of the First Lien Notes under the Note Subscription and Purchase Agreement; and

(B)    The First Lien Notes shall be taken to have been issued to:

(1)    each Scheme Creditor who has provided the US Securities Representation to Quintis (Australia), Quintis Holdco and the New Guarantors but has not entered into the Note Subscription and Purchase Agreement, in a number equivalent to the First Lien Notes to which that Scheme Creditor is entitled pursuant to Step Three above; and

(2)    the Participating Noteholders in a number equivalent to the payments made or taken to have been made by Participating Noteholders pursuant to sub paragraph (iv) above;

(vi)    Immediately following the matters referred to in sub-paragraphs (i) to (v) above occurring, Quintis (Australia) shall apply the funds received from the issue of the First Lien Notes as follows:

    (A)    first, in relation to the Tranche 1 Super Senior Notes and the Tranche 2 Super Senior Notes as follows:

        (1)    to the extent the Tranche 1 Super Senior Notes have not been, or will not be, repaid in accordance with Step Seven, in full repayment of the Tranche 1 Super Senior Notes (including outstanding principal and interest accrued through to and including the Completion Date); and

        (2)    to the extent the Tranche 2 Super Senior Notes have not been, or will not be, repaid in accordance with Step Seven, in full repayment of the Tranche 2 Super Senior Notes (including outstanding principal and interest accrued through to and including the Completion Date); and

    (B)    second, by way of provisional application in payment of the Cash Payment to each applicable to Scheme Creditor in accordance with, and subject to the conditions set out in, sub paragraph (vii).

(vii)    A Scheme Creditor who does not provide the US Securities Representation to Quintis (Australia), Quintis Holdco and the New Guarantors by the Effective Date will not be eligible to receive any Second Lien Notes, First Lien Notes or shares in Quintis Holdco. In relation to each such Scheme Creditor:

    (A)    the Scheme Creditor may be entitled to receive the Cash Payment in lieu of Second Lien Notes and/or First Lien Notes and/or shares in Quintis Holdco (as applicable) to which it otherwise would be entitled pursuant to the Scheme, if it satisfies the requirements prescribed by sub paragraph (B);

    (B)    the Scheme Creditor will have a period of 12 months from the Effective Date to claim the Cash Payment from Quintis (Australia) by providing Quintis (Australia) with evidence to Quintis (Australia)'s reasonable satisfaction of it having been a holder of Original Notes as at the Effective Date;

    (C)    if the Scheme Creditor successfully makes a claim and provides satisfactory evidence within those 12 months, Quintis (Australia) will make the Cash Payment to the Scheme Creditor at a time determined by Quintis (Australia) in its absolute discretion within three years from the Effective Date and no interest will accrue on the Cash Payment until such time as it is made to the Scheme Creditor. The Scheme Creditor will:

        (1)    accept the Cash Payment in full payment and satisfaction of the Scheme Creditor's entitlement to Second Lien Notes and/or First Lien Notes and/or shares in Quintis Holdco (as applicable) pursuant to the Scheme; and

        (2)    agree to not make a Claim against Quintis (Australia), the Incoming Agent and Indenture Trustee or any other person arising out of or in connection with its entitlement to Second Lien

Notes and/or First Lien Notes and/or shares in Quintis Holdco (as applicable) pursuant to the Scheme;

(D)     if the Scheme Creditor fails to make a claim or fails to provide satisfactory evidence within those 12 months it:

(1)     will forego its entitlement to the Cash Payment, Second Lien Notes and/or the First Lien Notes and/or shares in Quintis Holdco (as applicable) with effect from the date that is one year from the Completion Date; and

(2)     must not make a Claim against Quintis (Australia), the Incoming Agent and Indenture Trustee or any other person arising out of or in connection with its entitlement to the Cash Payment, Second Lien Notes and/or the First Lien Notes and/or shares in Quintis Holdco (as applicable) pursuant to the Scheme; and

(3)     Quintis (Australia) will be entitled to retain the Cash Payment with effect from the date that is one year from the Completion Date.

(h)     **Step Eight (final releases)**: The Scheme will provide for certain releases of various parties bound by the Scheme.

(i)     **Step Nine (retirement of Receivers)**: The Receivers will retire in accordance with their appointment documents.

It is anticipated that there may be a delay of several days between payment being made by Participating Noteholders pursuant to sub paragraph (iv) Step Seven and Quintis (Australia) being in a position to provide confirmation of having received such payments pursuant to sub paragraph (v) of Step Seven, while the payments are transferred and processed. Implementation of the Scheme will be temporarily suspended while this occurs and will recommence once Quintis (Australia) provides the required confirmation, following which completion of the remaining actions pursuant to Step Seven and Steps Eight to Nine will occur.

**5.12    Minimum Subscription Amount**

In order for the Scheme to proceed, Quintis (Australia) must receive by 8:00am on the Second Court Hearing, executed counterparts from Participating Noteholders of the Note Subscription and Purchase Agreement which subscribe for an amount equal to, or greater than, an aggregate subscription amount for the First Lien Notes of US$140.7 million or such other amount  as agreed by Majority Consent (being an amount that is exclusive of the US$10 million of the remaining outstanding amount of the Original Notes which is applied in payment of the subscription price for First Lien Notes pursuant to Step Three of the Scheme). This is a Condition Precedent to the Scheme.

**5.13    Eligibility to be an Equity Noteholder**

In order to be eligible to receive their entitlement to shares in Quintis Holdco under the Scheme, Scheme Creditors must:

(a)     execute  the Shareholders' Agreement and provide a copy of their signed counterpart to Quintis (Australia) by the Completion Date; and

(b)     provide the US Securities Representation to Quintis (Australia), Quintis Holdco and the New Guarantors by the Effective Date.

Scheme Creditors can obtain a copy of the Shareholders' Agreement from Quintis Holdco (subject only to providing satisfactory evidence that they are a Scheme Creditor).

A Scheme Creditor who provides the US Securities Representation to Quintis (Australia), Quintis Holdco and the New Guarantors by the Effective Date but does not execute  the Shareholders' Agreement and provide a copy of their signed counterpart to Quintis (Australia) by the Completion Date will receive First Lien Notes and Second Lien Notes but will not receive shares in Quintis Holdco under the Scheme and the Cash Payment will not be available.

**5.14    Shareholders' Agreement**

Scheme Creditors can obtain a copy of the Shareholders' Agreement from Quintis Holdco on request (subject only to providing satisfactory evidence that they are a Scheme Creditor). Any such request can be sent to chris.prestwich@allens.com.au

The Shareholders' Agreement will prescribe the corporate governance arrangements for Quintis HoldCo and govern the rights and obligations of shareholders in Quintis HoldCo and contain customary provisions for agreements of this type.

In circumstances where the shares in Quintis HoldCo following Completion will be held by a small number of shareholders, the Shareholders' Agreement will provide for certain protections including:

(a)    restrictions on the transfer of shares by other shareholders, including the requirement for certain shareholder consent to transfers;

(b)    larger shareholders having director appointment, removal and replacement rights;

(c)    majority shareholders having customary drag rights; and

(d)    certain matters being shareholder reserved matters requiring a majority shareholder decision.

**5.15    Eligibility to receive Second Lien Notes or First Lien Notes**

In order to be eligible to receive Second Lien Notes or First Lien Notes under the Scheme, Scheme Creditors must provide the US Securities Representation to Quintis (Australia), Quintis Holdco and the New Guarantors by the Effective Date.

A Scheme Creditor who fails to provide the US Securities Representation to Quintis (Australia), Quintis Holdco and the New Guarantors by the Effective Date may be eligible to receive the Cash Payment in lieu of Second Lien Notes and/or First Lien Notes and/or shares in Quintis Holdco (as applicable) to which it otherwise would be entitled pursuant to the Scheme, if, within 12 months from the Effective Date, it provides evidence to Quintis (Australia)'s reasonable satisfaction of it having been a holder of Original Notes as at the Effective Date, in which case:

(a)    Quintis (Australia) will make the Cash Payment to the Scheme Creditor at a time determined by Quintis (Australia) in its absolute discretion within three years from the Effective Date and no interest will accrue on the Cash Payment until such time as it is made to the Scheme Creditor; and

(b)    the Scheme Creditor will:

(i)    accept the Cash Payment in full payment and satisfaction of the Scheme Creditor's entitlement to Second Lien Notes and/or First Lien Notes and/or shares in Quintis Holdco (as applicable) pursuant to the Scheme; and

(ii)    agree that it will not make a Claim against Quintis (Australia), the Incoming Agent and Indenture Trustee or any other person arising out of or in connection with its entitlement to Second Lien Notes and/or First Lien Notes and/or shares in Quintis Holdco (as applicable) pursuant to the Scheme.

If a Scheme Creditors does not make a claim for the Cash Payment or fails to provide evidence to Quintis (Australia)'s reasonable satisfaction of it having been a holder of Original Notes as at the Effective Date within 12 months from the Effective Date:

(i)     it will forego its entitlement to the Cash Payment, Second Lien Notes and/or the First Lien Notes and/or shares in Quintis Holdco (as applicable) with effect from the date that is one year from the Completion Date;

(ii)    it must not make a Claim against Quintis (Australia), the Incoming Agent and Indenture Trustee or any other person arising out of or in connection with its entitlement to the Cash Payment, Second Lien Notes and/or the First Lien Notes and/or shares in Quintis Holdco (as applicable) pursuant to the Scheme; and

(iii)   Quintis (Australia) will be entitled to retain the Cash Payment with effect from the date that is one year from the Completion Date.

## 5.16    First Lien Notes and Participating Noteholders

All Scheme Creditors who provide the US Securities Representation to Quintis (Australia), Quintis Holdco and the New Guarantors by the Effective Date will receive an amount of First Lien Notes by reason of application of US$10 million of the Original Notes in payment of the subscription price for First Lien Notes for an equivalent amount, such application of the amount to be made on a pro rata basis across all Original Notes (pursuant to Step Three of the Scheme).

Scheme Creditors by the Effective Date will also have the opportunity to subscribe for further First Lien Notes by entering into the Note Subscription and Purchase Agreement by 8:00am on the date of the Second Court Hearing, in which case they will be Participating Noteholders for the purpose of the Scheme.

As stated above, in order for the Scheme to proceed, Quintis (Australia) must receive by 8:00am on the date of the Second Court Hearing an aggregate subscription amount for the First Lien Notes of a minimum of US$140.7 million or such other amount as agreed by Majority Consent.

## 5.17    Incoming Agent and Indenture Trustee and Incoming Collateral Trustee

Under the New Finance Documents:

(a)     the Incoming Agent and Indenture Trustee will be GLAS Trust Company LLC; and

(b)     the Incoming Collateral Trustee will be Global Loan Agency Services Australia Nominees Pty Ltd.

## 5.18    Scheme Administrators

Richard Tucker, Scott Langdon and Jennifer Nettleton of KordaMentha have agreed to act as Scheme Administrators. Richard Tucker and Scott Langdon of KordaMentha were the voluntary administrators of the Scheme Companies, are the deed administrators of the Scheme Companies and will act as trustees of the creditors' trust created under the terms of the DOCA.

If the Scheme is approved, Richard Tucker, Scott Langdon and Jennifer Nettleton's partners have prepared the Expert Report.

ASIC has confirmed that the restriction contained in s 411(7) of the Corporations Act that would otherwise prevent Richard Tucker and Scott Langdon of KordaMentha from acting as Scheme Administrators will not apply.

Under the terms of the Scheme Administrators' Deed Poll, each Scheme Administrator will among other things:

(a)     agree to be bound by the Scheme as if they were a party to the Scheme; and

(b)     undertake to perform all obligations and to undertake all actions attributed to it under the
Scheme.

The Scheme Administrators' liability in the performance or exercise of their powers, obligations
and duties under the Scheme is limited as set out in clause 7 of the Scheme.

The Scheme Administrators' Declaration of Independence, Relevant Relationships and
Indemnities as required by the ARITA Code of Professional Practice is set out in Schedule 12.

### 5.19    Expert Report recommendation

The Expert has concluded that:

(a)     the Implied Value (as defined in the Expert Report) of the interests that Scheme Creditors
will receive or retain if the Scheme is put into effect as proposed is 88.6c in $; and

(b)     the expected dividend that would be made available to Scheme Creditors if the Scheme
Companies were to be wound up within six months of the hearing of the application for an
order under section 411 of the Corporations Act is 56.7c in $.

*(See Section 6 of the Expert Report, Table 16)*

### 5.20    Transaction costs

At Completion, the total transaction costs payable in connection with the recapitalisation are
expected to be A$17.2m (excluding GST) and A$7,500,000 (excluding GST) of these costs are
costs directly referable to the Scheme, comprising: (a) the Receivers' fees, costs and legal
expenses; (b) costs of the KordaMentha expert report; (c) the Scheme Administrators' fees, costs
and legal expenses; and (d) taxes and other regulatory costs. Some of the costs associated with
the Scheme have already been paid by the Scheme Companies.

### 5.21    Consequences if Scheme is not implemented

If the Scheme is not implemented, no alternative transaction or recapitalisation plan has been
proposed. Subject to another transaction being proposed, it is likely that the Scheme Companies
would go into liquidation and the Receivers would seek to sell the available assets of the Quintis
Group. The DOCA will also not be implemented.

## 6        Key Considerations for Scheme Creditors

### 6.1    Why you are receiving this Explanatory Statement

This Explanatory Statement contains information about the Scheme and is required by
section 412(1) of the Corporations Act to be issued, together with the Scheme Meeting Notice, to
each Scheme Creditor.

You have been sent this Explanatory Statement because, according to the records of the
Outgoing Agent and Indenture Trustee and the Scheme Companies, you are a Scheme Creditor.

Receipt of this Explanatory Statement does not amount to confirmation that you have a valid
Claim against or are owed any amount by any Scheme Company.

If you are a Scheme Creditor as at the Effective Date, you will be eligible to vote at the Scheme
Meeting provided that:

(a)        the Chairperson receives a completed Voting Proof of Debt Form from you by no later
than 5pm on Tuesday, 25 September 2018; and

(b)        if you wish to vote by proxy, the Chairperson receives a completed Proxy Form from you
by no later than 5pm on Tuesday, 25 September 2018.

Additionally, if you wish to vote at the Scheme Meeting by appointing an attorney or corporate
representative, such attorney or corporate representative should bring to the Scheme Meeting
evidence of his or her appointment including authority under which the appointment was made.

The Voting Proof of Debt Form and the Proxy Form are set out in Schedule 10 this Explanatory
Statement.

Further details of the Scheme Meeting, including the procedure for voting, can be found in
Section 7 of this Explanatory Statement and the Scheme Meeting Notice at Schedule 7.

### 6.2    Scheme Procedure

The proposed Scheme is a creditors' scheme of arrangement. A creditors' scheme of
arrangement is a compromise or arrangement between a company and its creditors, or any class
of them, effected in accordance with Part 5.1 of the Corporations Act.

A resolution to agree a scheme of arrangement must be passed by a majority in number (more
than 50%) of the creditors present and voting at the scheme meeting, either in person or by
proxy, corporate representative or attorney, being a majority whose claims against the company
amount in the aggregate to at least 75% of the total amount of the claims of the creditors present
and voting at the scheme meeting (either in person or by proxy, corporate representative or
attorney).

If a scheme of arrangement is approved by the requisite majority at a scheme meeting, in order to
become effective, a scheme of arrangement must then be approved by the Court. The Court may
grant its approval subject to such alterations or conditions as it thinks just.

A scheme of arrangement may also be subject to certain other conditions precedent which must
be satisfied before the scheme of arrangement becomes effective. The Conditions Precedent to
the Scheme are set out in section 5.5 above. If the conditions precedent are satisfied and the
scheme of arrangement is approved by the Court, and the Court orders are lodged with ASIC,
then the scheme of arrangement becomes effective from the date on which the orders are lodged
with ASIC.

Once a scheme of arrangement becomes effective, it will be binding upon the company (or
companies) and the creditors to the scheme, including those creditors that did not vote in favour

of the scheme of arrangement, or those that did not attend, or vote at, the scheme meeting. A scheme of arrangement may also be binding upon various parties, including security trustees, obligors and creditor agents, if those parties have signed a deed poll to that effect.

The Scheme is proposed between the Scheme Companies and a class of its creditors, being the holders of Original Notes as at the Effective Date.

More information about the procedure for the Scheme Meeting and voting at the Scheme Meeting is set out in section 7.

### 6.3 Reasons why Scheme Creditors may consider voting in favour of the Scheme

The reasons why individual Scheme Creditors may consider voting in favour of the Scheme include the following:

(a) **Acquisition of equity**: if the Scheme is approved by a requisite majority of Scheme Creditors and approved by the Court, it will give Scheme Creditors the opportunity to receive shares in Quintis Holdco (which will be the new holding company of the recapitalised Quintis Group, in place of Quintis Limited) and the potential equity upside of being a shareholder. Subject to signing the Shareholders' Agreement and providing the US Securities Representation to Quintis (Australia), Quintis Holdco and the New Guarantors by the Effective Date, the Scheme provides for Scheme Creditors to receive shares in Quintis Holdco in exchange for a reduction of a portion of the secured debt which is owed to them.

(b) **Recapitalisation of the Quintis business and potential upside**: the Scheme provides for a very substantial injection of new liquidity into the Quintis Group business. That funding (to be mainly provided by way of the First Lien Notes) will enable the Quintis Group to meet the capital requirements associated with the running of its business for a number of years, and provide it with the opportunity to develop the end market for sandalwood products. In the event that the Quintis Group's business is successful, the Scheme Creditors as the owners of the Quintis Group (through their shareholdings in Quintis Holdco) will benefit from that success, both in terms of the Quintis Group being able to meet its debt obligations and the potential equity upside.

(c) **Return to Scheme Creditors:** the return to Scheme Creditors under the Scheme will be a combination of Second Lien Notes, shares in Quintis Holdco (provided that they enter into the Shareholders' Agreement), First Lien Notes (to be allocated to Scheme Creditors according to their respective holdings of Original Notes) and the opportunity to subscribe for additional First Lien Notes. In order to be eligible to receive all or any of this consideration, Scheme Creditors must provide the US Securities Representation to Quintis (Australia), Quintis Holdco and the New Guarantors by the Effective Date.

(d) **Deed of company arrangement will become effective and unsecured liabilities released**: the DOCA entered into by the Scheme Companies will become effective, resulting in (among other things) certain unsecured liabilities of the Scheme Companies being released and the Scheme Companies other than Quintis Limited exiting external administration as solvent entities. The Quintis Subsidiaries, as well as certain other assets of Quintis Limited, will be transferred under the Scheme by Quintis Limited into the new Quintis Group of which Quintis Holdco will be the new holding company. The Scheme Creditors, as the indirect owners of the Quintis Subsidiaries through their shareholdings in Quintis Holdco, will benefit from the Quintis Subsidiaries continuing operations in a stronger financial position and on a going concern basis.

(e)     **Transactional certainty**: effecting the capital restructure of the Quintis Group and business by way of the Scheme provides greater deal certainty for the Scheme Creditors than could be achieved without the Scheme. In the event that the Scheme is approved by the requisite majority of Scheme Creditors and the Court makes orders approving the Scheme, the steps that give effect to the restructure will have the force of law once those orders are lodged with ASIC. By comparison, a restructure of the Quintis Group and business by way of private contractual arrangements only, outside of the statutory framework which supports the Scheme, would be likely to involve greater risk for the Scheme Creditors as there would likely be more conditions required and other transactional uncertainty inherent in private negotiations.

(f)     **Control**: Quintis Holdco will be the new holding company of the Quintis Group (in place of Quintis Limited) and will be fully owned by Scheme Creditors who sign the Shareholders' Agreement and provide the US Securities Representation to Quintis (Australia), Quintis Holdco and the New Guarantors by the Effective Date (i.e. Equity Noteholders). Scheme Creditors (in their capacity as Equity Noteholders) will therefore have the benefit of all associated shareholder rights and, depending on the extent of its shareholding, a Scheme Creditor may also have rights under the Shareholders' Agreement in relation to the management of the business of Quintis Holdco.

(g)     **Stamp duty exemption**: the acquisition of land owning entities which would otherwise be subject to stamp duty may be exempt from stamp duty in jurisdictions in which the Quintis Group holds significant assets if the acquisitions arise under a compromise or arrangement with the land owning entity. The restructure of the Quintis Group pursuant to the Scheme means that Scheme Creditors will indirectly acquire land owning entities as part of the transfer of the Quintis Subsidiaries from Quintis Limited to the new Quintis Group, of which Quintis Holdco will be the new holding company and they will have the benefit of this potential stamp duty exemption which would not be available if the restructure was effected other than by way of the Scheme.

(h)     **Solvency of the Scheme Companies:** KordaMentha, in preparing the Expert Report, have concluded that following implementation of the Scheme, the Scheme Companies (other than Quintis Limited) will be solvent (see Schedule 2 of this Explanatory Statement). As the ultimate owners of these companies and the other Quintis Subsidiaries (through their shareholdings in Quintis Holdco) and continuing lenders to the Quintis Group, Scheme Creditors will benefit from the solvency of the Scheme Companies (other than Quintis Limited) and the ability of the Scheme Companies (other than Quintis Limited) to continue operations on a going concern basis following implementation of the Scheme.

(i)     **Repayment of Tranche 1 Super Senior Notes and Tranche 2 Super Senior Notes:** Scheme Creditors who participated in the provision of the Tranche 1 Super Senior Notes and/or Tranche 2 Super Senior Notes will benefit from the repayment in full of both tranches.

(j)     **Scheme Companies (other than Quintis Limited) to emerge from external administration**: the Scheme provides a means by which the secured debt of the Quintis Group can be restructured and the exit of the Scheme Companies (other than Quintis Limited) from external administration, following which they will be solvent. The Scheme will facilitate the return to ordinary business operations on a going concern basis for these companies and remove the disruption to those business activities that has resulted from the external administration.

(k)     **Speed and efficiency:** the Scheme enables all Scheme Creditors to be bound by Court order to the transactions effected by the Scheme and to the releases effected by the Scheme.

(l)     **Comparison with a liquidation outcome:** Scheme Creditors may form the view that the consideration they will receive under the Scheme (which includes a potential equity upside from their position as shareholders of Quintis Holdco that will ultimately depend on the performance of the restructured Quintis Group) is more valuable than the return which they would receive in a liquidation of the Quintis Group. In this regard, the Expert Report concludes that:

(i)     the Implied Value (as defined in the Expert Report) of the interests that Scheme Creditors will receive or retain if the Scheme is put into effect as proposed is 88.6c in $; and

(ii)    the expected dividend that would be made available to Scheme Creditors if the Scheme Companies were to be wound up within six months of the hearing of the application for an order under section 411 of the Corporations Act is 56.7c in $.

*(See Section 6 of the Expert Report, Table 16)*

(m)     **Release of intercompany debt:** the Scheme will provide for the release of certain intercompany debts which will benefit Scheme Creditors as the ultimate owners of the Scheme Companies (through their shareholdings in Quintis Holdco) and continuing financiers of the Quintis Group.

(n)     **Replacement of Quintis Limited with Quintis (Australia) under Finance Documents:** the Scheme will provide for the release of Quintis Limited from its obligations in respect of the secured debt owing under the Finance Documents and the adoption by Quintis (Australia) of those obligations. The replacement of Quintis Limited (which will remain subject to the DOCA following implementation of the Scheme) with a newly capitalised solvent entity will benefit Scheme Creditors as the continuing financiers of the Quintis Group under the New Finance Documents.

(o)     **Rectification of AFSL and other compliance breaches**: prior to the appointment of the Voluntary Administrators and Receivers, SPL was, and remains, in breach of certain obligations under its AFSL and other related compliance obligations. It is expected that the implementation of the Scheme, in conjunction with further remedial action proposed to be taken by the Quintis Group following Scheme implementation, will enable these breaches to be rectified. These matters will need to be confirmed with ASIC in due course to ensure that SPL retains its AFSL.

## 6.4     Reasons why Scheme Creditors may consider voting against the Scheme

The reasons why individual Scheme Creditors may consider voting against the Scheme include the following:

(a)     **Delay in cash return to Scheme Creditors**: except to the extent that a Scheme Creditor participated in the Tranche 1 Super Senior Notes or Tranche 2 Super Senior Notes (which will be repaid in full), the Scheme, if implemented, will not result in any immediate cash return to Scheme Creditors. The Original Notes will be exchanged for the Second Lien Notes and the terms of the Second Lien Notes and the First Lien Notes give Quintis (Australia) the option to capitalise interest payments for the initial term of the Notes. As such, it may be a number of years before cash payments are received by Scheme Creditors.

(b)     **New capital required to be invested by Scheme Creditors**: as stated above, a condition of the Scheme proceeding is that Quintis (Australia) receives subscriptions for an amount equal to, or greater than, an aggregate subscription amount for the First Lien Notes of not less than US$140.7 million (or such other amount agreed by Majority Consent). In practice, the Scheme Creditors will need to provide the funding to satisfy this condition.

(c)     **Risks associated with Quintis' business**: the ultimate return to Scheme Creditors as equity holders in Quintis Holdco and continuing financiers of the restructured Quintis Group will depend on the future success of the Quintis Group's business, including the Group's ability to develop an end market for sandalwood products (which is not without risk) and the price the Quintis Group is able to secure for those products. Scheme Creditors may form the view that they would receive a superior return through a realisation of the Quintis Group's assets, such as an immediate liquidation.

(d)     **Consideration required to be paid under the Deed of Company Arrangement**: if the Scheme is approved by the requisite number of creditors and the Court, the DOCA will become effective. The terms of the DOCA provide that A$2.5 million will be made available for payment of the deed administrators' costs and for distribution to beneficiaries of the creditors' trust, being unsecured creditors of the Scheme Companies. While some of those liabilities would have had priority in any event (e.g. employee entitlements), part of those funds would otherwise have been available to Scheme Creditors and Quintis Group's other secured creditors.

(e)     **Complete release of amounts owing by Quintis Limited and of Claims against Quintis Limited**: the Scheme, if implemented, will result in a complete release of Quintis Limited from its obligations in respect of the secured debt owing under the Finance Documents, all Security granted by Quintis Limited in favour of the Outgoing Collateral Trustee and all Claims which the Scheme Creditors may have against Quintis Limited.

(f)     **Partial release of amounts owing under Original Notes**: the Scheme, if implemented, will result in the Original Notes being exchanged for the Second Lien Notes. The amount owing as a result of that exchange will be reduced to US$185 million, a reduction of approximately US$100 million taking into account accrued interest. A further US$10 million of the outstanding amounts owing under the Original Notes will be applied on a pro rata basis across all Original Notes towards the subscription price for the First Lien Notes for an equivalent amount. While Scheme Creditors will receive shares in Quintis Holdco which correspond to the reduction in the amounts owing to them under the Original Notes if they execute a Shareholders' Agreement and provide the US Securities Representation to Quintis (Australia), Quintis Holdco and the New Guarantors by the Effective Date, their total debt claim will be reduced.

(g)     **Scheme Creditors will relinquish certain Claims against directors**: if the Scheme is implemented, certain Claims of the Scheme Creditors against the individuals who were directors of Quintis Limited at the time of the appointment of voluntary administrators (and remains a director as at the Effective Date) will be released (although Claims against individuals who had resigned prior to the appointment of the voluntary administrators will be retained).

(h)     **Costs of implementation**: there will be transaction costs associated with the implementation of the Scheme, including legal and advisory fees and the fees of the Scheme Administrators to manage the Scheme.

**6.5    Key risks**

Other key risks and challenges for the Quintis Group's business include the following:

(a)    **Marketing and selling sandalwood products**: the long term success of the Quintis Group and ultimate return to Scheme Creditors as equity holders in Quintis Holdco will be dependent on the Group's ability to market and sell Indian sandalwood ingredients and products and market demand for those products. This includes obtaining government and marketing approvals for the sale of the pharmaceutical or dermatological products currently being developed by the Santalis Subsidiaries.

(b)    **Risks associated with growing sandalwood trees**: there are certain specific risks associated with growing sandalwood trees, in particular:

(i)    natural disasters, including fire, floods and cyclones, which can result in the destruction of the trees;

(ii)    disease and pests, which can damage or destroy the trees; and

(iii)    the amount of oil that can ultimately be extracted from sandalwood trees.

(c)    **Other operational risks**:

(i)    the Quintis Group will face increasing operational challenges as plantation sizes and harvest quantities increase;

(ii)    new technologies may be introduced and impact demand for Indian Sandalwood oil;

(iii)    the Quintis Group's ability to secure wood from the harvest of Australian Sandalwood in Western Australia is constrained by government regulation;

(iv)    the Quintis Group's financial performance may be adversely affected by fluctuations in exchange rates; and

(v)    the Quintis Group cannot guarantee that insurance coverage will be sufficient to cover future liabilities or that the Quintis Group will be able to renew coverage on reasonable terms (or at all).

(d)    **BC Investors**: under the terms of the DOCA (if implemented), BC Investors have the opportunity to novate their Investment Management Agreements from Quintis Limited to Fieldpark Pty Ltd (a subsidiary in the Quintis Group which will be transferred to Quintis (Australia) under the Scheme) as Quintis Limited will remain subject to the DOCA following implementation of the DOCA and the Scheme, with such novation effective on implementation of the Scheme. Negotiations with the BC Investors are continuing and there is no certainty that satisfactory terms can be agreed with some or all of the investors (who are entitled to terminate their Investment Management Agreements) regarding their arrangements with the Quintis Group following implementation of the Scheme. It should be noted that in the event terms are not able to be agreed for the novation of existing arrangements with any BC Investors, Quintis Limited will hold the benefit of these existing arrangements on trust for Quintis (Australia) and it has not yet been determined whether Quintis Limited will perform all or some its obligations under the existing agreements going forward.

(e)    **Sophisticated Investor Offer**: under the terms of the DOCA (if implemented), investors in the Sophisticated Investor products have the opportunity to novate their Lease and Management Agreements from Quintis Limited to Fieldpark Pty Ltd (a subsidiary in the Quintis Group which will be transferred to Quintis (Australia) under the Scheme) as Quintis Limited will remain subject to the DOCA following implementation of the DOCA

and the Scheme, with such novation effective on implementation of the Scheme. Under the terms of the proposed novation, Sophisticated Investors would retain 50% of their rights to defer plantation management costs. The Quintis Group expects that a substantial majority of Sophisticated Investors will novate their Lease and Management Agreements, however some Sophisticated Investors may decline to do so. Plantations of any Sophisticated Investors who do not agree to novate their Lease and Management Agreements (and are not otherwise willing to contribute to the maintenance costs of their plantations), will likely not be maintained, giving rise to a potential right for SPL as lessor to terminate those investors' leases. This would have the result of SPL becoming the owner of the relevant trees and the Quintis Group being required to meet all of the plantation management costs associated with those plantations (including any additional remediation costs resulting from the extended period of non-maintenance).

(f)     **Managed Investment Schemes:** SPL acts as the responsible entity of the Quintis registered managed investment schemes. It has substantial obligations in its capacity as responsible entity (including funding obligations in circumstances where growers elect to defer lease and management fees, which they are entitled to do under the terms of their agreements). Prior the date of this Explanatory Statement, growers have voted to replace SPL with an alternative responsible entity in respect of the 2002 managed investment scheme and a meeting has taken place to replace SPL as the responsible entity in respect of the 2003 managed investment scheme (the conduct and outcome of that meeting is being challenged by SPL and the Receivers). It is possible that growers in other schemes may also seek the replacement of SPL as the responsible entity.

(g)     **Rectification of AFSL and other compliance related breaches**: prior to the appointment of the Voluntary Administrators and Receivers, SPL was, and remains, in breach of certain obligations under its AFSL and other compliance related obligations. It is expected that the implementation of the Scheme, in conjunction with further remedial action proposed to be taken by the Quintis Group following Scheme implementation, will enable these breaches to be rectified. These matters will need to be confirmed with ASIC in due course to ensure that SPL retains its AFSL.

(h)     **Other counterparty risks**: certain counterparties with whom Quintis Group entities have contractual arrangements, including landlords, have termination rights arising from the external administration of the Quintis Group. It is possible that some counterparties may seek to exercise those rights, in which case the relevant Quintis Group may be deprived of the benefits of those contracts (unless alternative solutions with the counterparties can be arranged. For example, in respect of landlords, an application for relief against forfeiture could potentially be sought).

(i)     **Regulation and legislation risks:**

    (i)     foreign investment in the BC investment product is dependent upon FIRB approval;

    (ii)    the Quintis Group is subject to extensive environmental laws and regulations; and

    (iii)   acquisition of new land for plantations could be delayed or made more costly as a result of 'native title' claims or cultural heritage management.

(j)     **Other strategic risks**:

    (i)     the Quintis Group may be unsuccessful in carrying out the land acquisition strategy with sufficient water supplies;

(ii)     the Quintis Group may be unable to finance future land acquisitions on favourable terms;

(iii)    the Quintis Group's future growth will depend on the ability to increase direct ownership of plantations;

(iv)    the Quintis Group's future growth will depend on the ability to attract investments in the financial investment products;

(v)     the Quintis Group's plantations are geographically concentrated in Northern Australia and if the Quintis Group expands operations into new geographic regions, Quintis Group may not be able to attract sufficient numbers of adequately trained and qualified personnel to manage the plantations.

(k)     **Staffing issues**: the Receivers have put in place temporary retention arrangements for key management and staff members. Those staff members hold significant corporate, historical and technical knowledge in relation to the Quintis Group and its operations. Ongoing staff retention will be a matter for the reconstituted boards of the Quintis Group.

(l)     **Legal proceedings:** Arwon Finance has commenced a number of proceedings to recover debts owing to it, each of which is being defended. In the event that Arwon Finance succeeds in those claims, it remains to be seen if the relevant defendant will be in a position to satisfy the judgment debt or, to the extent that Arwon holds security, whether the secured assets will be of sufficient value to satisfy the debt.

## 7        Scheme Meeting and Voting Procedures

### 7.1    Scheme Meeting

The Scheme Meeting will be held to consider and, if thought fit, approve the Scheme on:

Thursday, 27 September 2018 at 10am

at
Allens
Level 28
126 Philip Street
Sydney  NSW  Australia

### 7.2    Eligibility and entitlement to vote

Only secured creditors who are holders of Original Notes as at the Effective Date (i.e. Scheme Creditors) are eligible to vote at the Scheme Meeting.

Voting is not compulsory. However, Scheme Creditors who do not vote at the Scheme Meeting will be bound by the Scheme, provided that the Scheme is approved by the requisite majority at the Scheme Meeting and approved by the Court.

Voting at the Scheme Meeting will be conducted by poll.

### 7.3    How to vote at the Scheme Meeting

Scheme Creditors will be required to complete a Voting Proof of Debt Form (set out in Schedule 10) in accordance with the instructions set out in the Voting Proof of Debt Form and ensure that it is received by the Chairperson by 5pm on Tuesday, 25 September 2018.

### 7.4    Voting in person

A Scheme Creditor who wishes to vote in person on the Scheme will also be allowed to attend the Scheme Meeting in person.

Where the Scheme Creditor is a corporation, it may appoint a proxy, attorney or corporate representative to attend the meeting on its behalf. Any attorney or corporate representative should bring to the Scheme Meeting evidence of his or her appointment including the authority under which the appointment was made.

### 7.5    Voting by proxy, attorney or corporate representative

If you cannot attend the Scheme Meeting and wish to vote, you may vote by proxy, attorney or by corporate representative in accordance with section 250D of the Corporations Act.

If you appoint a proxy, you will need to complete and lodge a Proxy Form as set out in Schedule 10, in accordance with the instructions on the form, so that it is received by the Chairperson by 5pm on Tuesday, 25 September 2018.

Any attorney or corporate representative should bring to the Scheme Meeting evidence of his or her appointment including authority under which the appointment was made.

### 7.6    Adjudication of Voting Proof of Debt Forms

The Chairperson of the Scheme Meeting has power to admit (wholly or in part) or reject a Proof of Debt or Claim, for the purposes of voting at the Scheme Meeting.

The Chairperson will adjudicate upon the Scheme Creditor's Claim as set out in a Voting Proof of Debt Form based on the information contained in or provided with the Voting Proof of Debt Form, as well the information known to the Chairperson, including information provided to the Chairperson by the Outgoing Agent and Indenture Trustee. This information will be used by the

Chairperson acting in its capacity as a scrutineer to determine whether each resolution is passed at the Scheme Meeting. This may result in the Scheme Creditor's Claim being rejected, in whole or in part, or admitted for a higher or lower amount.

The admission of a Scheme Creditor's Claim is for voting purposes only and does not constitute an admission of the existence or amount of the Scheme Creditor's Claim against the Scheme Companies or any other person, and will not bind the Scheme Companies or the Scheme Creditor concerned for any other purpose.

### 7.7    Modification of Scheme

(a)    Modifications by Scheme Creditors

It is possible that a Scheme Creditor may propose a modification to the terms of the Scheme at the Scheme Meeting (prior to passing of the resolution to agree the Scheme) or apply to the Court for a modification of the terms of the Scheme.

Scheme Creditors should be aware that the consequences of modifying the terms of the Scheme include:

(i)    if the modification is materially adverse to a Scheme Company or any particular Scheme Creditor, it may give rise to a basis, which may not otherwise exist, for the Court to refuse to approve the modified Scheme.  In such circumstances, the Scheme will not become effective (in either the modified or original form); and

(ii)    the Scheme Companies may not consent to the modified Scheme and therefore the Scheme Companies may not be prepared to seek the Court's approval of the modified Scheme.

(b)    Modifications by the Court

Under section 411(6) of the Corporations Act, the Court may approve the proposed Scheme at the Second Court Hearing subject to alterations or conditions as it thinks just provided that such alterations or conditions will not, directly or indirectly, materially adversely affect the rights or interests of Scheme Creditors, or any Scheme Creditor, under the Scheme.

### 7.8    Lodgement of documents and queries

Complete Voting Proof of Debt Forms and Proxy Forms should be lodged in accordance with the instructions on those forms.

If you have any questions in relation to the Scheme, including in relation to the lodgement of Proxy Forms, you may direct your questions to the Receivers:

(a)    by email to quintis@mcgrathnicol.com; and/or

(b)    by telephone to Anna Schwartz on +61 3 96138657 between 9:00am and 5:00pm (Sydney time), Monday to Friday.

## 8    Current operations of the Quintis Group and following Scheme implementation

### 8.1    Overview

The Quintis Group is the largest owner, manager and grower of Indian Sandalwood plantations in the world. As of 30 June 2018, the Quintis Group owned or managed sustainable plantations on 12,701 hectares (31,387 acres) in northern Australia that contained an estimated 5.6 million Indian Sandalwood trees.

The Quintis Group's fully vertically integrated operations comprise every aspect of the Indian Sandalwood lifecycle, including land search and acquisition, plantation establishment, cultivation and management, tree and oil processing, and marketing and distribution. The Quintis Group also owns a U.S.- based pharmaceutical product development company, Santalis Pharmaceuticals, Inc., which creates and commercializes dermatology products containing Indian Sandalwood oil.

The company was founded in 1997 after more than 15 years of government-funded pilot programs in Western Australia. The company commenced the commercial planting of Indian Sandalwood trees in 1999 and successfully completed its  first commercial harvests of Quintis Group planted and grown Indian Sandalwood in 2014. The company has produced pharmaceutical grade Indian Sandalwood oil from its last four annual harvests that has largely been sold into the into the U.S. pharmaceutical market through a contract with Galderma (a global dermatology company and a wholly owned subsidiary of Nestle), essential oils market through a contract with Young Living and into the cosmetics market through a contract with Lush.

Indian Sandalwood (also known as Santalum album) is an aromatic oil-bearing tree and is one of the world's most valuable hardwoods. It grows naturally in only a few places in the world, including India and, to a limited extent, Southeast Asia and China. Indian Sandalwood has been used for over 2,500 years. It was declared a royal tree in India in 1792 and is recognized as a vulnerable species by the International Union for Conservation of Nature on its Threatened Species Red List. Due to increasing domestic consumption of sandalwood, the Indian government imposed export restrictions on oil and wood. The Indian Sandalwood tree's value lies in its heartwood, the oil bearing innermost layer of timber. Heartwood found at the core of Indian Sandalwood trees, and the oil distilled from it, has many applications and end markets. It is used in fragrances, cosmetics, toiletries, medicines, medicinal skin care products, carvings, furnishings, incense and religious ceremonies around the globe (including the United States, China, India and Europe).

Quintis Limited (ABN 97 092 200 854) was listed on the ASX in 2004 (ASX Code: QIN).

### 8.2    Financial Position

Copies of Quintis Limited's audited financial statements for 30 June 2017 are attached in Schedule 8.

### 8.3    Australian Operations

(a)    **Current operations**

The Quintis Group owns, or has assumed economic interests in, approximately 34% of all the hectares of plantations under the Quintis Group's management. The Quintis Group's Indian sandalwood plantations are located in six separate locations and three states with plantations aged up to 15 years. The Quintis Group plantations are strategically located across Northern Australia, including Kununurra and Kingston Rest in the East Kimberley region of Western Australia, the Burdekin region in Queensland, and the Douglas Daly, Mataranka and Katherine regions in the Northern Territory.

All of its plantation locations have been carefully assessed across criteria that the company believes will deliver optimal growing conditions, including fertile land with sufficient irrigation and natural rainfall, a sub-tropical climate, free draining soils, and situated mostly outside of cyclone and flood prone areas. As at 30 June 30 2018, the Quintis Group had 12,701 hectares (31,387 acres) planted, and also owned an additional 356 hectares (880 acres) of unplanted land suitable for commercial plantation. The Quintis Group expects that Indian Sandalwood will be planted on this unplanted land in the future.

Indian Sandalwood is a partially parasitic tree, meaning these trees can only thrive when their roots form a union with the roots of another tree or shrub growing near them. These "host" plants provide the Sandalwood with nutrients, metabolites and meet some of its water needs via the joined roots. The tree flourishes and becomes commercially productive in a plantation only when provided with host species that have been selected and proven in trials to be highly suited to the hosting function. Since inception, the Quintis Group has refined its silviculture techniques to improve Indian Sandalwood tree survival rates through to harvest, and to maximize the heartwood yield achieved from each harvested tree. Currently, the company's average annualized mortality rate after the first year of planting across our plantations is 2%, in line with recent years.

The Quintis Group has two processing facilities located in Kununurra and Albany. The facility in Kununurra is used to process harvested logs into wood end-products for sale, or into wood chips to be transported down to the Quintis Group's Mt Romance distillation facility in Albany to be processed into sandalwood oil.

The Quintis Group has three small retail outlets located in Albany, Broome and Kununurra which sell its Australian and Indian sandalwood products. Those outlets are supplied by a small cosmetics production facility belonging to Mt Romance.

The Quintis Group has a corporate head office in Perth, with several operational offices based in Albany, Kununurra, Darwin, Katherine and Burdekin.

The Quintis Group has fully vertically integrated operations which comprise each part of the Indian sandalwood tree's life cycle. The Quintis Group's operation lifecycle principally includes the following.

(i)     Establishment of plantations: the successful growth of Indian sandalwood on a plantation is largely dependent upon the suitability of the land, along with superior seeds. The sandalwood seedlings and their host trees are grown in the Quintis Group's nursery or Katherine or by a contract nursery ready to be planted from March to August each year. Land purchase and preparation needs to happen well in  advance of planting.

(ii)     Plantation management: Plantation management is led by staff teams resident in Kununurra (Western Australia), Dalbeg (Queensland) and Douglas Daly, Darwin and Katherine (Northern Territory). The plantation management team is responsible for the establishment and maintenance of Indian sandalwood plantations on behalf of MIS, SIO and BC investors as well as company owned plantations.

(iii)     Plantation harvest: The Quintis Group intends to harvest the Indian sandalwood trees when they are between 14 to 16 years old. Due to a significant portion of the heartwood and oil being found in the butt of trees aged 14 to 16 years, it is necessary to remove the entire tree from the ground, apart from the small roots.

(iv)    Processing of logs into wood and oil end-products: The Quintis Group has a
primary processing centre that allows logs to be graded, sorted and processed
into value-added wood products, or chipped prior to transport to the distillation
facility, Mt Romance in Albany. The Quintis Group owns and operates a
sandalwood oil processing facility, situated at Mt Romance. The Quintis Group,
through its wholly owned subsidiary, Mt Romance Australia, distils Australian
sandalwood (spicatum) purchased from Forest Products Commission of WA and
Indian sandalwood (album) at this facility.

(v)    Marketing and distribution of end-product: The Quintis Group, via Mt Romance
Australia, has a large number of existing customers for spicatum and has been
working to introduce Indian sandalwood (album), oil and wood products to the
market. In many cases potential customers are familiar with Indian sandalwood,
however the lack of a legal reliable and sustainable supply has meant that they
no longer use album. The Quintis Group is the largest legal reliable and
sustainable source of Indian sandalwood. The Quintis Group's target markets
covers a broad range of locations, including India, the Middle East and Northern
Africa, Europe, China and the rest of Asia and the United States.

(b)    **Planned operations following Scheme implementation**

Following implementation of the Scheme, the Quintis Group intends to refocus its
business operations around the following core activities

(i)    Plantation Management: Application of leading silviculture and forestry practices
to deliver yield improvements.

(ii)    Market Development and Sales: Using market research to focus on developing
broad geographic and market segment demand for products.

(iii)    Research and Development: R&D to support the forestry and silviculture activities
and build on the 19 years of expertise which the Quintis Group already has, and
continued work on pharmaceutical and over the counter products.

(iv)    Future plantings: Development of a sustainable reinvestment model for future
plantings:

## 8.4    US Operations

In 2011, the Quintis Group entered into a 50% joint venture with the management of Santalis
Healthcare (formerly known as ViroXis Corporation) to create "Santalis".

In July 2015, Quintis Limited acquired 100% of Santalis Healthcare and the remaining 50% of
Santalis Pharmaceuticals Inc. (collectively referred to as the "Santalis Subsidiaries"). The Santalis
business is a mid to late stage pharmaceutical company with a focus on developing products that
use East Indian sandalwood oil as an active pharmaceutical ingredient.

The Santalis Subsidiaries are not subject to external administration and continue to operate on a
going concern basis.

## 8.5    Investor Product Offerings

As discussed above, the Quintis Group sells its investment products to three groups of investors:
BC, MIS and SIO.

(a)    **Beyond Carbon (BC)**

BC is the Quintis Group's global institutional investor product offering. As part of the BC
product offering, the Quintis Group has flexibility to tailor investments to each investor's

individual requirements. The Quintis Group acquires and prepares land suitable for Indian sandalwood cultivation and typically sells the land to BC investors. The Quintis Group is paid establishment fees by the investors to establish plantations. The Quintis Group is then retained as investment manager by the investor to cultivate, maintain and eventually harvest the trees. The Quintis Group recovers its annual costs and receives a management fee for services. At the conclusion of, or exit from each BC investment, the Quintis Group may receive a performance fee, which, subject to satisfying certain requirements, is generally a 20% share of all returns in excess of an annual rate of 8-10%.

The Quintis Group currently has several BC investors, including a large Middle East sovereign wealth fund, a large triple A-rated U.S. endowment fund and a significant U.K. institutional investor. As at 31 December 2017, the Quintis Group had 3,261 hectares of Indian sandalwood plantation under management on behalf of BC investors, representing 25% of the total plantations under its management.

The treatment of the BC Investors under the DOCA is described at section 6.5(c) above.

BC investments are a negotiated agreement between the Quintis Group and the investor. Following implementation of the Scheme, the Quintis Group intends to continue to seek to sell plantations under its BC model.

(b)     **Sophisticated Investment Offer (SIO)**

Similar to the Quintis Group's institutional BC product, SIO investors engage the Quintis Group to establish and maintain an Indian sandalwood plantation on a parcel of land. The Quintis Group charges an upfront one-time establishment fee and annual lease and management fees for planting and managing the plantations on the investor's behalf. At the conclusion of, or exit from, each SIO investment, the Quintis Group may receive a performance fee, which is generally a 20% share of all returns in excess of an annual rate of 7%. Fees charged by the Quintis Group have varied over time. By way of example, the most recent SIO project included an establishment fee, a management fee, rent (when the property is not owned by the SIO investor), a harvesting and processing fee, a selling and marketing fee and a performance fee.

Under the SIO product, two investment options are offered to investors:

(i)     annual investment option: an option under which the SIO investor pays the establishment fee upfront, makes annual payments of the management fee and the rent through the life of the project, with any remaining fees deducted from the gross proceeds of sale; and

(ii)    annual deferred investment option: a varying option under which the management fee and rent may be deferred on a year-by-year basis with the Quintis Group earning indirect interests in the project which are paid from the net proceeds of sale according to the years in which the SIO investors elected to make any such deferral.

As at 31 December 2017, the Quintis Group had 3,284 hectares of Indian sandalwood plantations under management on behalf of over 90 SIO investors, representing 25% of total plantations under its management.

The treatment of the SIO investors under the DOCA is described at section 6.5(e) above.

The Quintis Group considers that it is unlikely that it will offer this product in the future following implementation of the Scheme.

(c)     **Managed Investment Schemes (MIS)**

Under the Quintis Group's MIS projects, the investor engages the Quintis Group to establish and maintain an Indian sandalwood plantation on a parcel of land they lease from the Quintis Group until plantation harvest. The Quintis Group charges an upfront one-time establishment fee and annual management and rental fees for planting and managing the plantations on their behalf. When MIS investors' trees reach maturity, the Quintis Group harvests and processes the Indian sandalwood and then markets and sells the Indian sandalwood for the highest practicable price obtainable, unless the MIS investor has elected to collect the Indian sandalwood for its own purposes. The Quintis Group has the right to buy the logs from the MIS investors provided that it offers the highest price in the sale process.

Fees charged by the Quintis Group have varied over time. By way of example, the most recent MIS project included an establishment fee, a management fee, rent, a harvesting and processing fee, a selling and marketing fee and an incentive fee.

Under the MIS product, the Quintis Group offers the annual investment option and annual deferred investment option (see SIO section above) as well as a pre-payment option, a discontinued option available in earlier MIS projects under which the MIS investor pre-pays the entire management fee and rent at a discounted rate.

As at 31 December 2017, the Quintis Group had 3,140 hectares of Indian sandalwood plantations under management on behalf of over 3,600 MIS investors, representing 24% of the total plantations under its management.

The treatment of the MIS investors under the DOCA is described at section 6.5(f) above.

As mentioned above, SPL has been replaced as the responsible entity of the 2002 TFS Sandalwood Project (only 8 hectares of that project remain to be harvested). A meeting has taken place to replace SPL as the responsible entity in respect of the 2003 TFS Sandalwood Project and the conduct and outcome of that meeting is being challenged by SPL and the Receivers.

The Quintis Group considers that it is unlikely that it will offer this product in the future following implementation of the Scheme.

## 8.6    AFSL and Compliance Matters

SPL holds an AFSL. Prior to its external administration, SPL was in breach of certain requirements of its AFSL and other compliance related obligations. It is expected that implementation of the Scheme and certain action planned to be taken following its implementation will enable SPL to remedy these breaches, including the following:

(a)     in order to enable SPL to satisfy the 'net tangible asset' requirements under its AFSL, the Scheme and the New Finance Documents provide for:

(i)      the guarantee given by SPL in its capacity as Guarantor being made limited recourse by reference to the land and buildings that it owns;

(ii)     the Security granted by SPL will be discharged (except in respect of its land and buildings); and

(iii)    SPL will pay to Quintis (Australia) all realisations from the asset represented by the Accrued Income line item in the Balance Sheet of SPL for the financial year ending 30 June 2018 (but no subsequent financial years), as and when the realisations are made.

(b)      SPL will have an Independent Board and appoint a Compliance Officer to assist with the rectification of existing breaches and ensure that future breaches do not occur.

## 8.7    Current Corporate Structure

The Quintis Group's operations are primarily conducted through Quintis Limited's wholly-owned subsidiaries. The following chart shows a simplified summary of the Quintis Group's current corporate structure, excluding dormant entities. All entities listed below are incorporated in Australia, except for Santalis Healthcare and Santalis Pharmaceuticals, which are incorporated in Texas, USA.



## 8.8    Post-Scheme Corporate Structure

The following chart shows a simplified summary of what the Quintis Group's corporate structure would look like if the Scheme is implemented.



## 8.9    Directors of Quintis Holdco

The only current director of Quintis Limited is Mr Julius Matthys.

If the Scheme is implemented, the directors of Quintis Holdco, which will replace Quints Limited as the holding company of the Quintis Group, will be appointed by the Equity Noteholders in accordance with the terms of the Shareholders' Agreement.

Insofar as the broader group is concerned, the board composition of each Quintis Subsidiary will be a matter for Quintis Holdco to determine following implementation of the Scheme.

## 9    Taxation Considerations

As the financial, legal and taxation consequences of the Scheme may be different for each Scheme Creditor, it is recommended that Scheme Creditors seek professional financial, legal and taxation advice in relation to the Scheme.

### 9.1    Certain Australian Tax Considerations

Scheme Creditors should note the following matters:

- In circumstances where Quintis Limited's existing debt obligations under the Finance Documents will be assumed by Quintis (Australia), any existing section 128F exemption for interest on the bonds will fall away and Quintis (Australia) will be taken to have issued new debt to the current secured creditors. However, because the secured creditors will hold indirect interests in Quintis (Australia) (via their shares in Quintis Holdco), they are likely to be 'associates' of Quintis (Australia), in which case, it will not be possible for the new debt issued to secured creditors under the Scheme to comply with the section 128F exemption requirements. As such, interest payable to non-resident lenders on the new debt will be subject to interest withholding tax at the rate of 10%.

- Dividends paid on shares or returns on debt which is characterised for tax purposes as an equity interest are potentially subject to the dividend withholding tax regime:

  - to the extent that dividends are paid out of profits which have already borne corporate tax at 30%, those dividends can be fully franked and will therefore be exempt from any withholding tax; and

  - if the company pays dividends out of profits which have not borne corporate tax then those unfranked dividends will be prima facie subject to dividend withholding tax at 30%.

  Scheme Creditors that are tax resident in jurisdictions with which Australia has a double tax treaty should benefit from a reduction in the treaty rate from 30% to, typically, 15% (but Scheme Creditors should confirm the terms of each tax treaty relevant to them). Dividend withholding tax is not relevant to onshore lenders.

- Quintis Holdco is likely to be a foreign controlled Australian entity and the 'thin capitalisation' rules will be relevant to the level of tax deductible debt that the Quintis Group can have.

### 9.2    Certain U.S. Federal Income Taxation Considerations

The following discussion is a summary of certain U.S. federal income tax consequences relevant to the exchange by Scheme Creditors who are U.S. Holders (defined below) of Original Notes for First Lien Notes or Second Lien Notes issued by Quintis (Australia) and shares issued by Quintis Holdco as well as the ownership and disposition of the First Lien Notes or Second Lien Notes and shares of Quintis Holdco by U.S. Holders. This discussion applies to U.S. Holders that hold their Original Notes, First Lien Notes, Second Lien Notes and shares in Quintis Holdco as capital assets for U.S. federal income tax purposes. This summary is based on the U.S. Internal Revenue Code of 1986, as amended (the "Code"), existing, temporary and proposed U.S. Treasury regulations issued thereunder, and administrative and judicial interpretations thereof, each as available and in effect on the date hereof, and all of which are subject to change, possibly with retroactive effect or differing interpretations that could affect the tax consequences

described herein. This discussion does not address all of the tax consequences that may be relevant to specific U.S. Holders in light of their particular circumstances or to U.S. Holders subject to special tax rules, such as banks, insurance companies, individual retirement and other tax-deferred accounts, regulated investment companies, real estate investment trusts, grantor trusts, traders that have elected the "mark-to-market" method of accounting, individuals who are former U.S. citizens or former long-term U.S. residents, dealers in securities or currencies, tax-exempt entities, persons subject to the alternative minimum tax, persons that hold Original Notes, First Lien Notes, Second Lien Notes, or shares in Quintis Holdco as a position in a straddle or as part of a hedging, constructive sale or conversion transaction for U.S. federal income tax purposes, persons that have a functional currency other than the U.S. dollar, or persons that own (directly, indirectly or constructively) 10% or more of Quintis (Australia)'s or Quintis Holdco's equity.

If a partnership holds Original Notes, First Lien Notes, Second Lien Notes, or shares in Quintis Holdco, the U.S. federal income tax treatment of a partner will generally depend on the status of the partner and the tax treatment of the partnership. A partner in a partnership holding such instruments should consult its tax adviser with regard to the U.S. federal income tax treatment of its investment.

For purposes of this description, a **"U.S. Holder"** means a beneficial owner of Original Notes, First Lien Notes, Second Lien Notes, or shares in Quintis Holdco that is, for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the U.S. for U.S. federal income tax purposes;

- a corporation, or other entity treated as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the U.S. or any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust (i) the administration of which is subject to the primary supervision of a court in the U.S. and for which one or more U.S. persons have the authority to control all substantial decisions or (ii) that has an election in effect under applicable income tax regulations to be treated as a U.S. person.

If you are not a U.S. Holder, this discussion does not apply to you.

THE SUMMARY OF U.S. FEDERAL INCOME TAX CONSEQUENCES SET OUT BELOW IS FOR GENERAL INFORMATION ONLY.  ALL SCHEME CREDITORS SHOULD CONSULT THEIR TAX ADVISERS AS TO THE PARTICULAR TAX CONSEQUENCE TO THEM OF EXCHANGE OF ORIGINAL NOTES FOR FIRST LIEN NOTES, SECOND LIEN NOTES, OR SHARES IN QUINTIS HOLDCO, INCLUDING THE APPLICABILITY AND EFFECT OF STATE, LOCAL, FOREIGN AND OTHER TAX LAWS AND POSSIBLE CHANGES IN TAX LAW.

*Exchange of Original Notes for Cash Payment*

Scheme Creditors will receive a Cash Payment that is equal to 30% of the face value of the Second Lien Notes and/or First Lien Notes (as applicable) to which a Scheme Creditor who has not provided the US Securities Representation to Quintis (Australia), Quintis Holdco and the New Guarantors by the Effective Date would otherwise have been entitled pursuant to the Scheme, had the US Securities Representation been made.

If a U.S. Holder receives a Cash Payment in lieu of an ownership interest in the First Lien Notes or the Second Lien Notes, each such U.S. Holder generally will be treated as exchanging its Original Notes for cash in a taxable exchange under Section 1001 of the Code. Accordingly, in

such case, each U.S. Holder should recognize capital gain or loss equal to: (1) the cash received, minus (2) the U.S. Holder's adjusted basis, if any, in the Original Notes surrendered in exchange therefor. Such gain or loss should be (subject to the "market discount" rules described below) long-term capital gain or loss if the holder has a holding period in the Original Notes of more than one year. The deductibility of capital losses is subject to significant limitations.

Notwithstanding the general treatment described above, if a U.S. Holder receives a Cash Payment and a portion of such payment is allocated to accrued interest on the Original Notes that has not been previously included in the U.S. Holder's gross income for U.S. federal income tax purposes, such amount so allocated and received should be taxable to the U.S. Holder as interest income.

*Exchange of Original Notes for Shares in Quintis Holdco*

If a U.S. Holder receives shares in Quintis Holdco for Original Notes, such U.S. Holder should be treated as exchanging its Original Notes for shares in Quintis Holdco in a taxable exchange under Section 1001 of the Code. Accordingly, each U.S. Holder should recognize capital gain or loss equal to: (1) the sum of the fair market value of the shares in Quintis Holdco minus (2) the U.S. Holder's adjusted basis, if any, in the Original Notes surrendered in exchange therefor. Such gain or loss should be (subject to the "market discount" rules described below) long-term capital gain or loss if the holder has a holding period for Original Notes of more than one year. The deductibility of capital losses is subject to limitations. A U.S. Holder's tax basis in the shares in Quintis Holdco received should equal their fair market value. A Holder's holding period for shares in Quintis Holdco should begin on the day following the Effective Date.  Notwithstanding the general treatment described above, if a U.S. Holder receives shares in Quintis Holdco that are allocated to accrued interest on the Original Notes that has not been previously included in the U.S. Holder's gross income for U.S. federal income tax purposes, the fair market value of the shares so allocated and received should be taxable to the U.S. Holder as interest income.

There is a possibility that the exchange of Original Notes for shares in Quintis Holdco will be treated as a tax-free exchange under Section 351 of the Code. Under Section 351, no gain or loss is recognized if property is transferred to a corporation by one or more persons solely in exchange for stock in such corporation and immediately after the exchange such person or persons own at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation.  Such facts could be present if, for example, a significant number of Quintis Holdco's existing shares were owned by Scheme Creditors, or if a significant number of existing shareholders in Quintis Holdco receive shares in Quintis Holdco in exchange for Original Notes. However, we do not have enough information to make this determination, and noteholders are urged to consult their own tax adviser regarding the possibility that the exchange of Original Notes for shares in Quintis Holdco might be treated as a tax-free exchange under Section 351.

*Exchange of Original Notes for First Lien Notes and/or Second Lien Notes*

The U.S. federal income tax consequences to a U.S. Holder of exchanging Original Notes for First Lien Notes and/or Second Lien Notes will depend in part on whether the Original Notes and the First Lien Notes and/or Second Lien Notes exchanged therefor are treated as "securities" for purposes of the reorganization provisions of the Code.  Whether an instrument constitutes a "security" is determined based on all the facts and circumstances and evaluation of the factors listed below, but some authorities have held that the term of a debt instrument at issuance is a factor in determining whether the instrument is a security for United States federal income tax purposes. Such authorities have indicated that a term of ten years or more is evidence that such debt instrument is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including, without limitation: (a) the

security for payment; (b) the creditworthiness of the obligor; (c) the subordination or lack thereof
to other creditors; (d) the right to vote or otherwise participate in the management of the obligor;
(e) convertibility of the instrument into stock of the obligor; (f) whether payments of interest are
fixed, variable or contingent; and (g) whether such payments are made on a current basis or
accrued. The discussion below summarizes each alternative with respect to the treatment of the
First Lien Notes and Second Lien Notes.

*Treatment if the Original Notes, First Lien Notes, and Second Lien Notes Are Securities*

If the Original Notes and First Lien Notes and/or Second Lien Notes are treated as securities of
Quintis (Australia), then the exchange of the Original Notes for First Lien Notes and/or Second
Lien Notes should be treated as a recapitalization within the meaning of Section 368(a)(1)(E) of
the Code, and a U.S. Holder should not recognize any gain or loss on the exchange. As a result,
the recognition of a gain or loss, if any, with respect to the Original Notes will be deferred until the
sale or other taxable disposition of the First Lien Notes and/or Second Lien Notes. See
"Consequences of Holding and Disposing of First Lien Notes and/or Second Lien Notes —
Disposition" below. The aggregate adjusted tax basis of the First Lien Notes and/or Second Lien
Notes received should initially be equal to the aggregate tax basis of the Original Notes
surrendered and should be allocated among such First Lien Notes and/or Second Lien Notes
based on their relative fair market values. The holding period for the First Lien Notes and/or
Second Lien Notes received should include the holding period for the Original Notes exchanged
therefor.

*Treatment if the Original Notes, First Lien Notes, and Second Lien Notes Are Not
Securities*

If the Original Notes or First Lien Notes and/or Second Lien Notes are not treated as securities,
each U.S. Holder will be treated as exchanging its Original Notes for First Lien Notes and/or
Second Lien Notes in a taxable exchange under Section 1001 of the Code. Accordingly, in such
case, each U.S. Holder should recognize capital gain or loss equal to: (1) the issue price (as
described below) of the First Lien Notes and/or Second Lien Notes received, minus (2) the U.S.
Holder's adjusted basis, if any, in the Original Notes surrendered in exchange therefor. Such gain
or loss should be (subject to the "market discount" rules described below) long-term capital gain
or loss if the holder has a holding period for Original Notes of more than one year. The
deductibility of capital losses is subject to limitations. U.S. Holder's tax basis in the First Lien
Notes or Second Lien Notes should initially be the issue price thereof. A Scheme Creditor's
holding period for First Lien Notes and/or Second Lien Notes should begin on the day following
the Effective Date.

*Accrued but Unpaid Interest*

To the extent U.S. Holders receive any of First Lien Notes and/or Second Lien Notes on the
Effective Date in an amount that is allocable to the accrued but unpaid interest on their Original
Notes as of such date, such amount so allocated and received should be taxable to a U.S. Holder
as interest income if such accrued interest has not been previously included in its gross income
for U.S. federal income tax purposes.

*Market Discount*

If a U.S. Holder purchased the Original Notes at a price lower than the principal amount thereof
by more than a de minimis amount (i.e., if a U.S. Holder held the Original Notes with market
discount) and did not elect to currently include market discount in income, then a portion of any
gain recognized as a result of the exchange will be taxed as ordinary income to the extent of the
accrued market discount on the Original Notes.  Noteholders are urged to consult their own tax

adviser as to the applicability of the provisions of Sections 1276 through 1278 of the Code to their particular circumstances.

*Consequences of Holding and Disposing of First Lien Notes and/or Second Lien Notes*

### Payments of Interest

Generally, the amount of any interest payments on a note will be taxable to a U.S. Holder as ordinary interest income at the time such payments are received or accrued in accordance with the U.S. Holder's method of accounting for U.S. federal income tax purposes.

### Original Issue Discount

Both the First Lien Notes and/or Second Lien Notes will be issued with an option, in the Issuer's discretion to be exercised in connection with each interest payment (First Lien Notes) or some interest payments (Second Lien Notes), to pay interest in kind (i.e., to issue PIK Notes). Accordingly, the First Lien Notes and Second Lien Notes are likely to be treated as being issued with "original issue discount" ("OID") for U.S. federal income tax purposes. The Code provides generally that the gross income of the holder of a debt instrument having OID includes an amount equal to the sum of the daily portions of the OID for each day during the tax year on which the holder held the debt instrument.

Original issue discount is defined in the Code as the excess of a debt instrument's "stated redemption price at maturity" over its "issue price." Stated redemption price at maturity is defined as the sum of all payments provided by the debt instrument other than "qualified stated interest." Qualified stated interest is defined as stated interest that is unconditionally payable in cash or in property (other than debt instruments of the issuer) at least annually at a single fixed rate. Whether a debt instrument that has alternative payment schedules (because, for example, the issuer has an unconditional option, exercisable on one or more dates during the term of the debt instrument, to make a payment in kind rather than a payment of interest) provides for qualified stated interest is made by analysing each alternative payment schedule (i.e., the stated cash payment schedule and the alternate payment in kind schedule) as if it were the debt instrument's sole payment schedule. Under this analysis, the debt instrument provides for qualified stated interest to the extent of the lowest fixed rate at which qualified stated interest would be payable under any payment schedule. Accordingly, because a payment of PIK Notes cannot constitute qualified stated interest and because the notes allow the Issuer the option of making payment in PIK Notes for at least some years (meaning that the holders would not receive cash or other qualifying property in such years), it is likely that neither the First Lien Notes nor the Second Lien Notes will have any qualified stated interest and the entire difference between each note's stated redemption price at maturity and such note's issue price will constitute OID.

The issue price of a debt instrument depends upon whether the debt instrument is issued for money or property and, in the latter case, whether there is public trading of either the debt instrument or the property (if any) exchanged for the debt instrument. If a substantial amount of the debt instruments in an issue is issued for money, the issue price of each debt instrument in the issue is the first price at which a substantial amount of the debt instruments is sold for money. For these purposes, the relevant issue date is the first settlement date or closing date, whichever is applicable, on which a substantial amount of the debt instruments in the issue is sold for money. In a circumstance where a new debt instrument that is not "publicly traded" is issued in exchange for property (such as another debt instrument) that is treated as "publicly traded," the issue price of the new debt instrument will be the fair market value of the exchanged, publicly traded property, determined as of the first date on which a substantial amount of the new debt instruments are issued for the publicly traded property. If there is no public trading of either the debt instrument or the exchanged property, and the debt instrument is issued with "adequate

stated interest," the issue price equals the "stated principal amount" of the debt instrument. The stated principal amount of a debt instrument is the aggregate amount of all payments due under the debt instrument, excluding any amount of stated interest. If the debt instrument does not have adequate stated interest, then the issue price shall be the "imputed principal amount" of the instrument. There is adequate stated interest with respect to any debt instrument if the stated principal amount for such debt instrument is less than or equal to the imputed principal amount of such debt instrument. The imputed principal amount of any debt instrument means the sum of the present values (determined as of the date of the sale or exchange of the debt instrument and by using a discount rate equal to the applicable Federal rate, compounded semi-annually) of all payments, including payments of stated interest, due under the debt instrument. Where a debt instrument is subject to the issuer's option to make payments in kind rather than one or more payments of interest, special rules apply to the determination of issue price. Under these rules, the issuer will be deemed to exercise or not exercise an option or combination of options in a manner that minimizes the instrument's imputed principal amount.

Assuming that the First Lien Notes and Second Lien Notes will be issued with more OID than the OID de minimis amount (i.e., an amount of OID that is less than an amount equal to 0.0025 multiplied by the product of the stated redemption price at maturity and the number of complete years to maturity from the issue date), a U.S. Holder may be required to include OID in gross income before it receives the associated cash payment, regardless of the U.S. holder's accounting method for U.S. federal income tax purposes. In that case, the amount of the OID a U.S. Holder should include in gross income is generally the sum of the daily accruals of the OID for the note for each day during the taxable year (or portion of the taxable year) on which the U.S. Holder held the note. The daily portion is determined by allocating the OID to each day of the accrual period. An accrual period may be of any length and the accrual periods may vary in length over the term of the note, provided that each accrual period is no longer than one year and each scheduled payment of principal or interest occurs either on the first day of an accrual period or on the final day of an accrual period. For both the First Lien Notes and Second Lien Notes, the accrual periods will likely be the period between the semi-annual payment dates.

The amount of OID allocable to an accrual period is equal to the difference between (1) the product of the "adjusted issue price" of the note at the beginning of the accrual period and its "yield to maturity" and (2) the amount of any qualified stated interest allocable to the accrual period. The adjusted issue price of a note at the beginning of any accrual period is the sum of the issue price of the note plus the amount of OID allocable to all prior accrual periods reduced by any payments received on the note that were not qualified stated interest. As observed above, it is likely that neither the First Lien Notes nor the Second Lien Notes will have any qualified stated interest and the entire difference between each note's stated redemption price at maturity and such note's issue price will constitute OID. The yield to maturity of a debt instrument generally is the discount rate that, when used in computing the present value of all principal and interest payments to be made under the debt instrument, produces an amount equal to the issue price of the debt instrument. The yield must be constant over the term of the debt instrument. Special rules apply, however, to the determination of the yield and maturity of debt instruments, (such as the First Lien Notes and Second Lien Notes) where the issuer holds an unconditional option to make a payment in kind in lieu of one or more stated interest payments. Under these rules, an issuer with such an unconditional option is deemed to exercise or not exercise an option or combination of options in a manner that minimizes the yield on the debt instrument. If exercise of an option would not decrease the yield, it is also presumed not exercised. Consistent with these rules, the yield and maturity of the First Lien Notes and Second Lien Notes will likely be determined based upon the assumption that Issuer will not exercise its option to pay interest in kind. If, contrary to these Treasury Regulation-mandated assumption, the Issuer does make a

payment in kind, then at the time of the issuance of the PIK Notes and solely for purposes of computing OID, the relevant First Lien Note or Second Lien Note will be considered retired and reissued from the date of the change in circumstances and OID will be recomputed going forward.

Under the applicable U.S. Treasury Regulations, a U.S. Holder of a note with OID may elect to include in gross income all interest that accrues on the note using the constant yield method. Once made with respect to a new note, the election cannot be revoked without the consent of the Internal Revenue Service ("IRS"). A U.S. Holder considering an election under these rules should consult its tax adviser.

Interest and any OID included in a U.S. Holder's gross income with respect to the First Lien Notes and/or Second Lien Notes will be treated as foreign source income for U.S. federal income tax purposes, including U.S. foreign tax credit limitation purposes. The limitation on foreign taxes eligible for the U.S. foreign tax credit is calculated separately with respect to specific "baskets" of income. For this purpose, interest and any OID on the notes should generally constitute "passive category income," or in the case of certain U.S. Holders, "general category income."  As an alternative to the foreign tax credit, a U.S. Holder may elect to deduct such taxes (the election would then apply to all foreign income taxes such U.S. Holder paid in that taxable year). The rules relating to foreign tax credits and the timing thereof are complex and a U.S. Holder should consult its own tax advisers regarding the availability of a foreign tax credit and the application of the foreign tax credit limitations to its particular situation.

Certain U.S. Holders will receive IRS Forms 1099-OID, which report interest accruals on their First Lien Note and/or Second Lien Note. Those forms will not, however, reflect the effect of any positive or negative adjustments resulting from such U.S. Holders' purchase of the First Lien Note and/or Second Lien Note in the remarketing at a price that differs from its adjusted issue price on the date of purchase. U.S. Holders are urged to consult their tax advisors as to whether, and how, such adjustments should be made to the amounts reported on any IRS Form 1099-OID.

*Disposition*

A U.S. Holder will ordinarily recognize gain or loss on the sale, exchange, redemption or other

disposition of a First Lien Note and/or Second Lien Note in an amount equal to the difference, if any, between the amount realized (less any accrued but unpaid interest, which will be taxable as such) and the U.S. Holder's adjusted tax basis in the First Lien Note and/or Second Lien Note. A U.S. Holder's adjusted tax basis in a First Lien Note and/or Second Lien Note generally will be the holder's initial basis in that First Lien Note and/or Second Lien Note (determined as discussed above under "Exchange of Original Notes for First Lien Notes and/or Second Lien Notes" and "Exchange of Original Notes for Shares in Quintis Holdco"), increased by the amount of interest previously accrued with respect to the First Lien Notes and/or Second Lien Notes, increased or decreased by the amount of any positive or negative adjustments that the U.S. Holder was required to make with respect to the First Lien Notes and/or Second Lien Notes as a result of having purchased the First Lien Notes and/or Second Lien Notes for an amount that differs from their adjusted issue price, and decreased by the amount of any non-contingent payments and the projected amount of any contingent payments received with respect to the First Lien Notes and/or Second Lien Notes.

Any gain recognized upon the sale, exchange, redemption or maturity of the First Lien Notes and/or Second Lien Notes will generally be ordinary income. Any loss recognized will generally be ordinary loss to the extent the interest included as income in the current or previous taxable years in respect of the First Lien Notes and/or Second Lien Notes exceeded the total net negative adjustments taken into account as ordinary loss, and thereafter will be U.S. source long-term

capital loss if the U.S. Holder's holding period in the First Lien Notes and/or Second Lien Notes is more than one year at the time of disposition. The deductibility of capital losses is subject to significant limitations.

> *Premium and Market Discount if First Lien Notes and/or Second Lien Notes Are Issued in a Carryover Basis Transaction*

As discussed above, if the First Lien Notes and/or Second Lien Notes are treated as acquired in a recapitalization within the meaning of Section 368(a)(1)(E) of the Code, a U.S. Holder's tax basis in its First Lien Notes and/or Second Lien Notes will be determined by reference to that holder's tax basis in the Original Notes that were surrendered, and therefore may not be equal to the principal amount of the First Lien Notes and/or Second Lien Notes or the issue price of the First Lien Notes and/or Second Lien Notes. If a U.S. Holder's adjusted tax basis in the First Lien Notes and/or Second Lien Notes is greater than or equal to the principal amount of the notes, then such U.S. Holder would not include any OID that may accrue on the First Lien Notes and/or Second Lien Notes in income. If a U.S. Holder's adjusted tax basis in the First Lien Notes and/or Second Lien Notes is less than or equal to the principal amount of the First Lien Notes and/or Second Lien Notes but greater than the issue price of such notes, the excess of the U.S. Holder's basis in the First Lien Notes and/or Second Lien Notes over the issue price of the First Lien Notes and/or Second Lien Notes would be treated as "acquisition premium", which would reduce the amount of OID that U.S. Holder would be required to include in income.

If a U.S. Holder acquired the Original Notes with market discount and (i) the First Lien Notes and/or Second Lien Notes are not treated as issued with OID and the U.S. Holder's initial tax basis in the First Lien Notes and/or Second Lien Notes is less than the principal amount of the First Lien Notes and/or Second Lien Notes, or (ii) the First Lien Notes and/or Second Lien Notes are treated as issued with OID and the U.S. Holder's initial tax basis in the First Lien Notes and/or Second Lien Notes is less than the issue price of such notes, in each case by more than a de minimis amount, then such difference will be treated as market discount on the First Lien Notes and/or Second Lien Notes, which will accrue rateably from the time of the exchange acquisition to the maturity date of the First Lien Notes and/or Second Lien Notes (unless the holder elects to accrue on a constant yield method). The U.S. Holder will be required to treat any gain on the sale, exchange or other taxable disposition of the First Lien Notes and/or Second Lien Notes as ordinary income to the extent of the market discount that is treated as having accrued on the First Lien Notes and/or Second Lien Notes at the time of the sale, exchange or other taxable disposition, and which has not previously been included in income. In addition, the U.S. Holder may be required to defer, until the maturity of the First Lien Notes and/or Second Lien Notes or their earlier disposition in a taxable transaction, the deduction of all or a portion of the interest expense on any indebtedness attributable to the First Lien Notes and/or Second Lien Notes. A U.S. Holder may elect to include market discount in income currently as it accrues, on either a ratable or constant yield method, in which case the rules described above regarding the treatment of gain to the extent of market discount and the deferral of interest deductions will not apply.

As discussed above, if the First Lien Notes and/or Second Lien Notes as considered received in a recapitalization within the meaning of Section 368(a)(1)(E) of the Code, any accrued market discount on a U.S. Holder's Original Notes will be treated as accrued market discount on the First Lien Notes and/or Second Lien Notes. Currently, no legal authority directly addresses the method pursuant to which a U.S. Holder should accrue market discount on First Lien Notes and/or Second Lien Notes that have both accrued market discount carried over from the Original Notes in this manner (the "Carryover Market Discount") and unaccrued new market discount determined pursuant to the rules in the immediately preceding paragraph ("**Unaccrued Market Discount**"). One possible method for accrual is for the U.S. Holder to treat the Carryover Market Discount as

the initial amount of accrued market discount on the First Lien Notes and/or Second Lien Notes as of the date of the Deemed Exchange, and accrue the excess of Unaccrued Market Discount over the Carryover Market Discount over the life of the First Lien Notes and/or Second Lien Notes ratably (or if the U.S. Holder elects, using a constant yield method). Under this method, if the Carryover Market Discount exceeds the Unaccrued Market Discount on the U.S. Holder's First Lien Notes and/or Second Lien Notes, the U.S. Holder would not accrue any additional market discount on the First Lien Notes and/or Second Lien Notes. In this scenario, a U.S. Holder that holds the First Lien Notes and/or Second Lien Notes to maturity generally would not recognize any "extra" ordinary income as a result of the Carryover Market Discount exceeding the Unaccrued Market Discount, because under the market discount rules, gain is subject to characterization as ordinary income only to the extent that the gain is actually recognized.

However, no legal authority directly discusses how to accrue market discount on the First Lien Notes and/or the Second Lien Notes that have both Carryover Market Discount and Unaccrued Market Discount, and alternative methods may be applicable. There is no guarantee that the IRS or a court would agree with the method described in the immediately preceding paragraph, and the IRS could assert, or a court could sustain, a position that one of the other methods should apply. Given the substantial uncertainty on this issue, U.S. Holders that hold First Lien Notes and/or Second Lien Notes with both Carryover Market Discount and Unaccrued Market Discount are strongly encouraged to consult their tax advisers regarding the method pursuant to which such holder should accrue market discount on the First Lien Notes and/or Second Lien Notes.

*Consequences of Holding and Disposing Shares in Quintis Holdco*

> *Distributions*

Subject to the discussion below under "Passive Foreign Investment Company Considerations," a U.S. Holder that receives a distribution with respect to shares in Quintis Holdco generally will be required to include the U.S. dollar value of the gross amount of such distribution (before reduction for any Australian withholding taxes) in gross income as a dividend when actually or constructively received to the extent of the U.S. Holder's pro-rata share of Quintis Holdco 's current and/or accumulated earnings and profits (as determined under U.S. federal income tax principles). To the extent a distribution received by a U.S. Holder is not a dividend because it exceeds the U.S. Holder's pro-rata share of Quintis Holdco's current and accumulated earnings and profits, the distribution will be treated first as a tax-free return of capital and reduce (but not below zero) the adjusted tax basis of the U.S. Holder's ordinary shares. To the extent the distribution exceeds the adjusted tax basis of the U.S. Holder's ordinary shares, the remainder will be taxed as capital gain. Notwithstanding the foregoing, Quintis Holdco may not currently or prospectively maintain calculations of its current and accumulated earnings and profits in accordance with U.S. federal income tax principles. Therefore, U.S. holders may be required to treat any distributions received from Quintis Holdco as dividends.

The U.S. dollar value of any distribution on ordinary shares paid in Australian dollars, including any Australian withholding taxes, should be calculated by reference to the exchange rate in effect on the date of the actual or constructive receipt of such distribution, regardless of whether the Australian dollars are converted into U.S. dollars at that time. If Australian dollars are converted into U.S. dollars on the date of actual or constructive receipt of the distribution, the tax basis of the U.S. Holder in those Australian dollars will be equal to their U.S. dollar value on that date and, as a result, a U.S. Holder generally should not be required to recognize any foreign exchange gain or loss. If Australian dollars so received are not converted into U.S. dollars on the date of actual or constructive receipt, the U.S. Holder will have a basis in the Australian dollars equal to their U.S. dollar value on the date of receipt. Any gain or loss on a subsequent conversion or other disposition of the Australian dollars generally will be treated as ordinary income or loss to

such U.S. Holder and generally such gain or loss will be income or loss from sources within the U.S. for U.S. foreign tax credit limitation purposes.

Subject to the passive foreign investment company rules, certain distributions treated as dividends that are received by non-corporate U.S. Holders from a "qualified foreign corporation" generally qualify for a 20% reduced maximum tax rate so long as certain holding period and other requirements are met. A non-U.S. corporation (other than a corporation that is treated as a passive foreign investment company for the taxable year in which the dividend is paid or the preceding taxable year) generally will be considered to be a qualified foreign corporation (i) if it is eligible for the benefits of a comprehensive tax treaty with the U.S. which the Secretary of Treasury of the U.S. determines is satisfactory for purposes of this provision and which includes an exchange of information program, or (ii) with respect to any dividend it pays on stock which is readily tradable on an established securities market in the U.S. We expect Quintis Holdco to be considered a qualified foreign corporation with respect to its shares because we believe it is eligible for the benefits under the Double Taxation Convention between Australia and the U.S. Accordingly,

dividends paid by Quintis Holdco should generally be eligible for the reduced income tax rate. However, the determination of whether a dividend qualifies for the preferential tax rates must be made at the time the dividend is paid. U.S. Holders should consult their own tax advisers.

The additional 3.8% "net investment income tax" ("**NIIT**") (described below) may apply to dividends received by certain U.S. Holders who meet certain modified adjusted gross income thresholds.

Dividends received by a U.S. Holder with respect to ordinary shares will be treated as foreign source income, which may be relevant in calculating the holder's foreign tax credit limitation. The limitation on foreign taxes eligible for credit is calculated separately with respect to specific classes of income. For these purposes, dividends will be categorized as "passive" or "general" income depending on a U.S. Holder's circumstance.

Subject to certain complex limitations, a U.S. Holder generally will be entitled, at its option, to claim either a credit against its U.S. federal income tax liability or a deduction in computing its U.S. federal taxable income in respect of any Australian taxes withheld by Quintis Holdco. If a U.S. Holder elects to claim a deduction, rather than a foreign tax credit, for Australian taxes withheld for a particular taxable year, the election will apply to all foreign taxes paid or accrued by or on behalf of the U.S. Holder in the particular taxable year.

The availability of the foreign tax credit and the application of the limitations on its availability are fact-specific. You are urged to consult your own tax adviser as to the consequences of Australian withholding taxes and the availability of a foreign tax credit or deduction.

*Sale, Exchange, or Other Taxable Disposition of Shares in Quintis Holdco*

Subject to the passive foreign investment company rules, discussed below, a U.S. Holder generally will, for U.S. federal income tax purposes, recognize capital gain or loss on a sale, exchange or other disposition of shares in Quintis Holdco equal to the difference between the amount realized on the disposition and the U.S. Holder's tax basis in the shares. This gain or loss recognized on a sale, exchange or other disposition of shares in Quintis Holdco generally will be long-term capital gain or loss

if the U.S. Holder has held the shares for more than one year. Generally, for U.S. Holders who are individuals (as well as certain trusts and estates), long-term capital gains are subject to U.S. federal income tax at preferential rates. For foreign tax credit limitation purposes, gain or loss recognized upon a disposition generally will be treated as from sources within the U.S. The

deductibility of capital losses is subject to limitations for U.S. federal income tax purposes. You should consult your own tax adviser regarding the availability of a foreign tax credit or deduction in respect of any Australian tax imposed on a sale or other disposition of shares in Quintis Holdco.

### Passive Foreign Investment Company Considerations

The Code provides special, generally adverse, rules regarding certain distributions received by U.S. Holders with respect to, and sales, exchanges and other dispositions, including pledges, of shares of

stock of, a passive foreign investment company, or "PFIC". A foreign corporation will be treated as a PFIC for any taxable year if at least 75% of its gross income for the taxable year is passive income or at least 50% of its gross assets during the taxable year, based on a quarterly average and generally by value, produce or are held for the production of passive income. Passive income for this purpose generally includes, among other things, dividends, interest, rents, royalties, gains from commodities and securities transactions and gains from assets that produce passive income. In determining whether a foreign corporation is a PFIC, a pro-rata portion of the income and assets of each corporation in which it owns, directly or indirectly, at least a 25% interest (by value) is taken into account.

Although it is unlikely that Quintis Holdco is or will be considered a PFIC, the determination of whether or not Quintis Holdco is a PFIC is a factual determination that must be determined annually at the close of each taxable year. Thus, PFIC status is a fact-intensive determination made on an annual basis, and no assurance can be given that Quintis Holdco is not or will not become a PFIC.  Quintis Holdco's U.S. counsel expresses no opinion with respect to its PFIC status in any prior taxable year or the current taxable year ending December 31, 2018 and also expresses no opinion with respect to Quintis Holdco's predictions regarding its PFIC status in the future.

If Quintis Holdco is a PFIC for any taxable year during which a U.S. Holder holds ordinary shares, any "excess distribution" that the holder receives and any gain realized from a sale or other disposition (including a pledge) of such ordinary shares will be subject to special tax rules, unless the holder makes a mark-to-market election or qualified electing fund election, as discussed below. Any distribution in a taxable year that is greater than 125% of the average annual distribution received by a U.S. Holder during the shorter of the three preceding taxable years or such holder's holding period for the ordinary shares will be treated as an excess distribution.

Under these special tax rules:

*   the excess distribution or gain will be allocated ratably over the U.S. Holder's holding period for the ordinary shares;

*   the amount allocated to the current taxable year, and any taxable year prior to the first taxable year in which we were a PFIC, will be treated as ordinary income; and

*   the amount allocated to each other year will be subject to income tax at the highest rate in effect for that year and the interest charge generally applicable to underpayments of tax will be imposed on the resulting tax attributable to each such year;

The tax liability for amounts allocated to years prior to the year of disposition or excess distribution cannot be offset by any net operating loss, and gains (but not losses) realized on the transfer of the ordinary shares cannot be treated as capital gains, even if the ordinary shares are held as capital assets. In addition, individual shareholders will be denied a "step up" in the tax basis of any shares in a PFIC at death.

If Quintis Holdco is a PFIC for any taxable year during which any of its non-U.S. subsidiaries is also a PFIC, a U.S. Holder of ordinary shares during such year would be treated as owning a proportionate amount (by value) of the shares of the lower-tier PFIC for purposes of the application of these rules to such subsidiary. You should consult your tax advisers regarding the tax consequences if the PFIC rules apply to any of Quintis Holdco's subsidiaries.

If a U.S. Holder owns ordinary shares during any year in which Quintis Holdco is a PFIC, the U.S. Holder generally will be required to file an IRS Form 8621 (Information Return by a Shareholder of a Passive Foreign Investment Company or Qualified Electing Fund) with respect to Quintis Holdco, generally with the U.S. Holder's federal income tax return for that year. U.S. Holders should consult their tax advisers regarding whether Quintis Holdco is a PFIC and the potential application of the PFIC rules.

A U.S. Holder may avoid some of the adverse tax consequences of owning shares in a PFIC by making a "qualified electing fund" election. However, the availability of this election with respect to Quintis Holdco's ordinary shares requires that Quintis Holdco provide information to shareholders making the election. If Quintis Holdco is or becomes a PFIC, Quintis Holdco may not be able to provide U.S. Holders with the information necessary to make or maintain a qualified electing fund election. U.S. holders will, therefore, not be able to make a "qualified electing fund" election with respect to their ordinary shares.

Alternatively, a U.S. Holder owning "marketable stock" in a PFIC may make a mark-to-market election to elect out of the tax treatment discussed above. If a valid mark-to-market election for the ordinary shares is made, the electing U.S. Holder will include in income each year an amount equal to the excess, if any, of the fair market value of the ordinary shares as of the close of the holder's taxable year over the adjusted basis in such ordinary shares. The U.S. Holder is allowed a deduction for the excess, if any, of the adjusted basis of the ordinary shares over their fair market value as of the close of the holder's taxable year. Deductions are allowable, however, only to the extent of any net mark-to-market gains on the ordinary shares included in the U.S. Holder's income for prior taxable years. Amounts included in the U.S. Holder's income under a mark-to-market election, as well as gain on the actual sale or other disposition of the ordinary shares, are treated as ordinary income. Ordinary loss treatment also applies to the deductible portion of any mark-to-market loss on the ordinary shares, as well as to any loss realized on the actual sale or disposition of the ordinary shares, to the extent the amount of such loss does not exceed the net mark-to-market gains previously included for such ordinary shares. The tax basis in the ordinary shares will be adjusted to reflect any such income or loss amounts. A mark-to-market election will be effective for the taxable year for which the election is made and all subsequent taxable years unless the ordinary shares are no longer regularly traded on an applicable exchange or the IRS consents to the revocation of the election.

As noted above, a mark-to-market election is available only for "marketable stock". For this purpose, "marketable stock" is stock which is regularly traded on (i) a national securities exchange that is registered with the U.S. Securities and Exchange Commission, (ii) NASDAQ, or (iii) an exchange or market that has certain rules described in Treasury regulations sufficient to ensure that the market price represents a legitimate and sound fair market value. There is currently no guidance as to whether any particular non-U.S. exchange satisfies these rules. U.S. Holders are urged to contact their own tax advisers regarding the determination of whether Quintis Holdco is a PFIC (including whether the mark-to-market election is available) and the tax consequences of such status.

In addition to the above, notwithstanding any election that is made with respect to ordinary shares, dividends received from Quintis Holdco will not constitute qualified dividend income if

Quintis Holdco is a PFIC (or is treated as a PFIC with respect to a U.S. holder) either in the taxable year of the distribution or in a preceding taxable year.

*Net Investment Income Tax and Certain Reporting Obligations*

Certain U.S. Holders that are individuals, estates or trusts will be subject to the additional 3.8% NIIT on, among other things, certain interest income and net gains from the disposition of property, such as the First Lien Notes and/or Second Lien Notes, Original Notes, and shares in Quintis Holdco, less certain deductions. U.S. Holders that are individuals, estates or trusts should consult their tax advisers regarding the effect, if any, of this NIIT on their ownership and disposition of the First Lien Notes and/or Second Lien Notes, Original Notes, and shares in Quintis Holdco.

Individuals who are U.S. Holders, and who hold "specified foreign financial assets" (as defined in section 6038D of the Code), including debt or ordinary shares of a non-U.S. corporation that are held for investment and not held in an account maintained by a U.S. "financial institution" (as defined in section 6038D of the Code), whose aggregate value exceeds US$50,000 during the tax year, may be required to attach to their tax returns for the year certain specified information. An individual who fails to timely furnish the required information may be subject to a penalty. Additionally, in the event a U.S. Holder does not file the required information, the statute of limitations may not close before such information is filed. Under certain circumstances, an entity may be treated as an individual for purposes of the foregoing rules.

*Information Reporting and Backup Withholding*

Information reporting requirements generally apply in connection with payments on the Original Notes and First Lien Notes and/or Second Lien Notes to, and proceeds from a sale or other disposition of Original Notes and First Lien Notes and/or Second Lien Notes by, non-corporate U.S. Holders. A U.S. Holder will be subject to backup withholding tax (currently at a 24% rate) on such payments and proceeds if the U.S. Holder fails to provide its correct taxpayer identification number to the paying agent in the manner required under U.S. federal income tax law, fails to comply with applicable backup withholding tax rules or does not otherwise establish an exemption from backup withholding. Any amounts withheld under the backup withholding rules will entitle that U.S. Holder to a credit against that U.S. Holder's U.S. federal income tax liability and may entitle that U.S. Holder to a refund, provided that the required information is timely and properly furnished to the IRS.

U.S. Holders should consult their tax advisors regarding the application of backup withholding in their particular situation, the availability of an exemption from backup withholding and the procedure for obtaining such an exemption, if available.

**The above summary is not intended to constitute a complete analysis of all tax consequences relating to the exchange of the Original Notes for First Lien Notes and/or Second Lien Notes or shares in Quintis Holdco.**

**Scheme Creditors should consult their own tax advisers concerning the tax consequences of exchanging the Original Notes for First Lien Notes and/or Second Lien Notes or shares in Quintis Holdco in light of their particular circumstances, including the application of the U.S. federal income tax considerations discussed above, as well as the application of state, local, foreign or other laws.**

## 10      Proforma Balance Sheet

The balance sheet below shows a comparison of the balance sheet for the Quintis Group as at 31 August 2018 prior to and following implementation of the Scheme. The purpose of this balance sheet is to demonstrate how the financial position of the Quintis Group will be affected by the Scheme.

| Quintis Group - Proforma balance sheet | | |
|---|---|---|
| | Pre-recap | Post-recap |
| A$'000 | 31-Aug-18 | 31-Aug-18 |
| **Current assets** | | |
| Cash and cash equivalents | 14,611 | 131,517 |
| Trade and other receivables | 5,062 | 5,062 |
| Inventories | 31,465 | 31,465 |
| Biological assets | - | - |
| Other financial assets | 3,557 | 3,557 |
| **Total current assets** | **54,695** | **171,601** |
| **Non-current assets** | | |
| Trade and other receivables | 56,086 | 56,086 |
| Other financial assets | 11,832 | 11,832 |
| Property plant and equipment | 126,927 | 126,927 |
| Biological assets | 553,437 | 553,437 |
| Intangible assets and goodwill | 115,957 | 115,957 |
| Contingent assets | 25,000 | - |
| **Total non-current assets** | **889,239** | **864,239** |
| **Total assets** | **943,934** | **1,035,840** |
| **Current liabilities** | | |
| Trade and other payables | (8,477) | (6,730) |
| Provisions | (2,635) | (1,893) |
| Unearned income | (16,384) | (16,384) |
| **Total current liabilities** | **(27,497)** | **(25,007)** |
| **Non-current liabilities** | | |
| Provisions | (22,131) | (22,131) |
| Financial liabilities - Other | (124,305) | (124,305) |
| Financial liabilities - Senior secured notes (existing) | (373,333) | - |
| Financial liabilities - Interest on senior secured notes | (54,703) | - |
| Financial liabilities - Senior secured notes (1st lien) | - | (196,000) |
| Financial liabilities - Senior secured notes (2nd lien) | - | (246,667) |
| Deferred tax liabilities | (36,596) | - |
| Unearned income | (3,309) | (3,309) |
| Contingent liabilities | (125,429) | - |
| **Total non-current liabilities** | **(739,807)** | **(592,412)** |
| **Total liabilities** | **(767,304)** | **(617,419)** |
| **Net assets** | **176,630** | **418,421** |

*Source: Management accounts for Aug-18 and adjustments*

*Note:  the biological assets valuation is based on the assumptions reflected in the FY17 audited financial accounts. Quintis (Australia) and its auditors will review the assumptions at the time of preparing the FY18 accounts.*

## 11 Additional Information

### 11.1 Material interests of current directors

Except as disclosed below, as at the date of this Explanatory Statement, no director of a Scheme Company has any interest, whether as a director, member or creditor of the Scheme Company or otherwise, that is material in relation to the Scheme, and the Scheme has no effect on the interests of any director of a Scheme Company that is different to the effect on the like interests of other persons.

None of the Scheme Companies currently has a director other than Mr Julius Matthys (who is a director of each of the Scheme Companies other than SPL). Mr Julius Matthys discloses the following interests:

(a) 1.33 hectares in the following MIS projects:

    (i) TFS 2003 - 0.33 hectares;

    (ii) Premium 2004 - 1 hectare; and

(b) 3,348,118 Quintis Limited shares.

If the Scheme is implemented, the Scheme Companies will release each person who was at the Appointment Date a Director of a Scheme Company and who remains a Director of a Scheme Companies as at the Effective Date from any Claim except to the extent the relevant person has engaged in fraud or wilful misconduct or been reckless or grossly negligent (but no release shall be given in respect of any person who ceased to be a director of a Scheme Company prior to the Appointment Date).

### 11.2 Material interests of Scheme Administrators

The Scheme Administrators will be entitled to remuneration for their services. The hourly rates which will apply for the Scheme Administrators' services are set out at Schedule 17 of the Scheme.

### 11.3 Expected dividend if Scheme was implemented as proposed

The information in respect of each Scheme Company that is required by paragraph 8201(b) of Part 2 of Schedule 8 to the Corporations Regulations is set out in the Expert Report (see Schedule 2).

### 11.4 Expected dividend if Scheme Companies were wound up in 6 months

The information in respect of each Scheme Company that is required by paragraph 8201(a) of Part 2 of Schedule 8 of the Corporations Regulations is set out in the Expert Report (see Schedule 2).

### 11.5 Names of all known creditors, guaranteed creditors and internal creditors to the Scheme and the details of debts owed to those creditors

The information in respect of each Scheme Company that is required by paragraphs 8201(c), (d) and (e) of Part 2 of Schedule 8 of the Corporations Regulations is set out at Schedule 11.

### 11.6 Certified copies of financial statements

ASIC has granted relief under Corporations Regulation 5.1.01(1) in respect of the obligation under paragraph 8203(b) of Part 2 of Schedule 8 of the Corporations Regulations, on condition that the Scheme Companies provide copies of the most recent financial statements lodged by the Scheme Companies with ASIC, together with a copy of every document required by law to be annexed to the financial statements.

Certified copies of those financial statements are set out at Schedule 8.

## 11.7    Report as to affairs of Scheme Companies - ASIC Form 507

The report and information in respect of each Scheme Company required by ASIC Form 507 and paragraph 8203(a) of Part 2 to Schedule 8 of the Corporations Regulations are set out at Schedule 9.

## 11.8    No endorsement from the Court or ASIC

The "Important Information" section of this Explanatory Statement contains a statement to the effect that the Court order made under section 411(1) of the Corporations Act is not an endorsement of, or any other expression of opinion on, the Scheme by the Court or ASIC.

## 12      Glossary

Capitalised terms used in this Explanatory Statement have the meanings set out below.

Documents in the Schedules to this Explanatory Statement may have their own defined terms which may be different to those in this Glossary.

*Affiliate* means, in relation to a person, any person which directly or indirectly Controls, is Controlled by, or is under common Control with, the first named person.

*AFSL* means Australian Financial Services Licence.

*Amended Collateral Trust Deed* means the document amending the Collateral Trust Deed in the form of Schedule 18 of the Scheme.

*Appointment Date* means 20 January 2018.

*Arwon Finance* means Arwon Finance Pty Ltd (Subject to Deed of Company Arrangement) (Receivers and Managers Appointed) (ACN 072 486 643).

*ASIC* means the Australian Securities and Investments Commission.

*ASX* means ASX Limited or the financial market operated by ASX Limited.

*BC investor* means an investor in the Quintis Group Beyond Carbon (BC) product, as set out in section 8.5(a).

*BC Investor*  means a person who as at the date of the DOCA has an investment in one or more Quintis Group Beyond Carbon (BC) products and is party to one or more Investment Management Agreements with Quintis Limited (among others).

*Business Day* means any day on which banks (as defined in the *Banking Act 1959* (Cth)) are open for normal banking business in Sydney, excluding Saturdays and Sundays.

*Cash Payment* means a cash payment in the amount that is equal to 30% of the face value of the Second Lien Notes and/or First Lien Notes (as applicable) to which a Scheme Creditor who has not provided the US Securities Representation to Quintis (Australia), Quintis Holdco and the New Guarantors by the Effective Date would otherwise have been entitled pursuant to the Scheme, had the US Securities Representation been made.

*Chairperson* means Shaun Fraser of McGrathNicol (or, if he is unavailable, Jason Preston of McGrathNicol).

*Chapter 15 Recognition* means an order (which has not been stayed or vacated) recognising and enforcing the Scheme within the territorial jurisdiction of the United States has been entered by a United States bankruptcy court of competent jurisdiction under chapter 15 of title 11 of the United States Code.

*Claim* means any allegation, debt, cause of action, liability, claim, proceeding, suit or demand of any nature howsoever arising and whether present or future, fixed or unascertained, actual or contingent or otherwise at law, in equity, under statute or otherwise.

*Collateral Trust Deed* means the deed titled "*Collateral Trust Deed – TFS Corporation Collateral Trust*" dated 21 June 2011 (as amended from time to time but excluding the amendments effected by the Amended Collateral Trust Deed).

*Completion Date* means the date that is as soon as practicable after the Effective Date for implementation of the Scheme but must be no later than the date that is five Business Days after the Effective Date (or such other later date agreed in writing by the Scheme Companies and Majority Consent).

**Control** has the meaning given to it in the Corporations Act.

**Corporations Act** means the *Corporations Act 2001* (Cth).

**Corporations Regulations** means the *Corporations Regulations 2001* (Cth).

**Court** means the Federal Court of Australia, the Supreme Court of New South Wales or such other court having competent jurisdiction to hear and determine matters under the Corporations Act.

**Deed Administrators** means Richard Tucker, Scott Langdon and John Bumbak of KordaMentha in their capacity as deed administrators of the Scheme Companies.

**DOCA** means the Deed of Company Arrangement dated 29 June 2018 between Richard Tucker, Scott Langdon and John Bumbak of KordaMentha as the Deed Administrators, the Receivers in their capacity as Deed Proponents and the Scheme Companies.

**Effective Date** means the date on which the Scheme comes into effect pursuant to section 411(10) of the Corporations Act, of the orders of the Court under section 411(4)(b) (and, if applicable, section 411(6)) of the Corporations Act (i.e. the date on which the Scheme becomes 'Effective').

**Equity Noteholders** means the Scheme Creditors who have entered into the Shareholders' Agreement by the Completion Date and provided the US Securities Representation to Quintis (Australia), Quintis Holdco and the New Guarantors by the Effective Date.

**Expert Report** means the expert report prepared by KordaMentha set out in Schedule 2 of this Explanatory Statement, addressing certain matters required to be set out in the Explanatory Statement by Part 2, Schedule 8 pursuant of regulation 5.1.01 of the Corporations Regulations.

**Explanatory Statement** means this document and its schedules.

**Finance Documents** means:

(a)     the Indenture;

(b)     the Collateral Trust Deed;

(c)     the Note Agreement and Guaranty;

(d)     the Second Note Agreement and Guaranty;

(e)     the Fixed and Floating Charge; and

(f)     each Security.

**FIRB** means Foreign Investment Review Board.

**First Lien Indenture** means the document substantially in the form set out in Schedule 3 to this Explanatory Statement pursuant to which the First Lien Notes are to be issued.

**First Lien Notes** means the first lien secured notes with a face value of US$156 million (or such other amount as agreed by Majority Consent) to be issued by Quintis (Australia) pursuant to the First Lien Indenture as contemplated by Step Seven in clause 6.3 of the Scheme.

**Fixed and Floating Charge** means the fixed and floating charge dated 21 June 2011 between the Outgoing Collateral Trustee and the Scheme Companies (as amended from time to time).

**Governmental Agency** means any government or representative of a government or any governmental, semi-governmental, administrative, fiscal, regulatory or judicial body, department, commission, authority, tribunal, agency, competition authority or entity and includes any minister (including, the Commonwealth Treasurer), ASIC, the Australian Competition and Consumer Commission, the Australian Taxation Office, ASX and any regulatory organisation established

under statute or any stock exchange.

*Guarantors* means the Scheme Companies, excluding Quintis Limited and the Santalis
Subsidiaries.

*Incoming Agent and Indenture Trustee* means GLAS Trust Company LLC, in its capacities as
Trustee, Registrar, Paying Agent and Transfer Agent, as those terms are defined in the First Lien
Indenture and the Second Lien Indenture.

*Incoming Collateral Trustee* means Global Loan Agency Services Australia Nominees Pty Ltd
in its capacity as trustee of the Collateral Trust pursuant to the terms of the Amended Collateral
Trust Deed.

*Indenture* means the Amended and Restated Indenture dated 20 July 2017 among Quintis
Limited and the Outgoing Agent and Indenture Trustee (among others) as supplemented by the
Supplemental Indenture dated 20 September 2017, the Second Supplemental Indenture dated
1 November 2017 and the Third Supplemental Indenture dated 29 May 2018.

*Instructing Scheme Creditor* means each Scheme Creditor who is a signatory to the letter
dated 21 January 2018 providing instructions to the Outgoing Collateral Trustee to appoint the
Receivers to Quintis Limited and the other Scheme Companies.

*Intercompany Claim* means any Claim which a Scheme Company has against any other
Scheme Company as at the Effective Date, other than:

(a)     any Claims against SPL in its capacity as responsible entity (which Claims shall remain
        on foot), and

(b)     any loan provided by Quintis Limited to SPL (which shall be transferred to Quintis
        (Australia) pursuant to Step Five of the Scheme).

*KordaMentha* means KordaMentha Pty Ltd ACN 100 169 391.

*Majority Consent* means the written consent of the holders of not less than a 50% majority in
aggregate principal amount of the Notes then outstanding under the Indenture (where 'Notes' has
the meaning given in the Indenture).

*Minimum Subscription Amount* means an aggregate subscription amount for the First Lien
Notes of US$140.7 million or such other amount as agreed by Majority Consent, being an amount
that is exclusive of the US$10 million of the remaining outstanding amount of the Original Notes
which is applied in payment of the subscription price for First Lien Notes pursuant to Step Three
of the Scheme.

*MIS investor* means an investor in one or more Quintis Group's Managed Investment Schemes
(MIS), as set out in section 8.5(c).

*New Finance Documents* means:

(a)     First Lien Indenture;

(b)     Second Lien Indenture;

(c)     Note Subscription and Purchase Agreement;

(d)     Amended Collateral Trust Deed;

(e)     US Pledge Agreement;

(f)     US IP Security Agreement; and

(g)     US Security Agreement.

*New Guarantors* means the parties who are the 'Subsidiary Guarantors' as that term is defined

in the First Lien Indenture and the Second Lien Indenture.

**Note Agreement and Guaranty** means the agreement titled 'Note Agreement and Guaranty' dated 13 November 2017 between, among others, Quintis Limited and certain Super Senior Noteholders pursuant to which the Tranche 1 Super Senior Notes were issued.

**Note Subscription and Purchase Agreement** means the document substantially in the form set out in Schedule 6 to this Explanatory Statement.

**Original Notes** means the 8.75% Senior Secured Notes due 2023 issued pursuant to the terms of the Indenture by Quintis Limited on or around 27 July 2016 with a face value of US$250 million.

**Outgoing Agent and Indenture Trustee** means the Bank of New York Mellon (ARBN 084 066 419) of 225 Liberty Street, New York 10286, United States, in its capacities as Trustee, Registrar, Paying Agent and Transfer Agent, as those terms are defined in the Indenture.

**Outgoing Collateral Trustee** means BTA Institutional Services Australia Limited (ABN 48 002 916 396) in its capacity as trustee of the Collateral Trust pursuant to the terms of the Collateral Trust Deed.

**Participating Noteholders** means the Scheme Creditors, or any Scheme Creditor Affiliates, who, by 8:00am on the Second Court Hearing, have entered into the Note Subscription and Purchase Agreement and, by the Effective Date, provided the US Securities Representation to Quintis (Australia),  Quintis Holdco and the New Guarantors.

**Proxy Form** means a proxy form set out in Schedule 10 to this Explanatory Statement.

**Quintis (Australia)** means Quintis (Australia) Pty Ltd (ACN 626 970 821).

**Quintis Group** means Quintis Limited and the Quintis Subsidiaries.

**Quintis Holdco** means Quintis Holdco Pty Ltd (ACN 626 968 858).

**Quintis Limited** means Quintis Ltd (Subject to Deed of Company Arrangement) (Receivers and Managers Appointed) (ACN 092 200 854).

**Quintis Subsidiaries** means the Scheme Companies, excluding Quintis Limited, and each other wholly owned Subsidiary of Quintis Limited (including, for the avoidance of doubt, the Santalis Subsidiaries).

**Receivers** means Jason Preston, Shaun Robert Fraser and Robert Conry Brauer of McGrathNicol in their capacity as joint and several receivers and managers of the Scheme Companies.

**Regulatory Approval** means:

(a)    any approval, consent, authorisation, registration, filing, lodgement, permit, franchise, agreement, notarisation, certificate, permission, licence, direction, declaration, authority, waiver, modification or exemption from, by or with a Governmental Agency; or

(b)    in relation to anything that would be fully or partly prohibited or restricted by law if a Governmental Agency intervened or acted in any way within a specified period after lodgement, filing, registration or notification, the expiry of that period without intervention or action.

**Remaining Asset** has the meaning given to it in clause 6.3(e)(iv) of the Scheme.

**Sale and Recapitalisation Process** has the meaning given to it in section 5.2.

**Santalis Subsidiaries** means Santalis Pharmaceuticals Inc and Santalis Healthcare Corporation.

**Scheme** means the scheme of arrangement under Part 5.1 of the Corporations Act between the

Scheme Companies and its Scheme Creditors as set out in Schedule 1 to this Explanatory Statement, subject to any alterations or conditions made or required by the Court and agreed to by the parties to the scheme.

**Scheme Administrators** means Richard Tucker, Scott Langdon and Jennifer Nettleton of KordaMentha, or any other persons who accept the appointment to the role of scheme administrators, subject to section 411(7) of the Corporations Act, provided, in each case, they have each executed the Scheme Administrators' Deed Poll in the form provided at Schedule 2 of the Scheme.

**Scheme Administrators' Deed Poll** means a deed poll executed by each Scheme Administrator substantially in the form set out in Schedule 2 of the Scheme.

**Scheme Companies** means all of the entities listed in Schedule 1 of the Scheme collectively and **Scheme Company** means any of them.

**Scheme Creditor** means, as at the Effective Date, each holder of Original Notes.

**Scheme Creditor Affiliate** means a fund or entity which is managed or advised by the same investment manager or investment adviser as the Scheme Creditor (or its Affiliates) or, if it is managed by a different investment manager or investment adviser, a fund or entity whose investment manager or investment adviser is an Affiliate of the investment manager or investment adviser of the Scheme Creditor (or its Affiliates).

**Scheme Meeting** means the meeting of Scheme Creditors ordered by the Court to be convened under section 411(1) of the Corporations Act in relation to the Scheme, and includes any adjournment of that meeting.

**Scheme Meeting Notice** means the notice of the Scheme Meeting substantially in the form set out in Schedule 7 to this Explanatory Statement.

**Scheme Resolutions** means the resolutions to be put to the Scheme Creditors to approve the Scheme (such resolutions to be put to the Scheme Creditors at the Scheme Meeting and that, to be passed, must be approved by the requisite majority under section 411(4)(a)(i) of the Corporations Act).

**Second Court Hearing** means the first day of hearing of an application made to the Court for orders pursuant to section 411(4)(b) of the Corporations Act approving the Scheme or, if the hearing of such application is adjourned for any reason, means the first day of the adjourned hearing.

**Second Court Hearing** means hearing of an application made to the Court for orders pursuant to section 411(4)(b) of the Corporations Act approving the Scheme or, if the hearing of such application is adjourned for any reason, means the first day of the adjourned hearing.

**Second Lien Indenture** means the document substantially in the form set out in Schedule 4 to this Explanatory Statement pursuant to which the Second Lien Notes are to be issued.

**Second Lien Notes** means the second lien secured notes in the amount of US$185 million governed by, and issued by Quintis (Australia) pursuant to, the terms of the Second Lien Indenture, being the notes to be exchanged for the Original Notes pursuant to Step Three of the Scheme.

**Second Note Agreement and Guaranty** means the agreement titled '*Second Note Agreement and Guaranty*' dated 29 May 2018 between, among others, Quintis Limited and certain Super Senior Noteholders pursuant to which the Tranche 2 Super Senior Notes were issued.

**Secured Debt** means all rights and obligations of all Scheme Creditors under the Finance Documents.

*Security* means each security document granted by a Guarantor in favour of the Outgoing Collateral Trustee under the Finance Documents.

*Shareholders' Agreement* means the Shareholders' Agreement in relation to Quintis Holdco to be entered into by Quintis Holdco and the Equity Noteholders, a copy of which will be provided to Scheme Creditors by Quintis Holdco upon request.

*SIO investor* means an investor in the Quintis Group Sophisticated Investment Offer product, as set out in section 8.5(b).

*SPL* means Sandalwood Properties Ltd (Subject to Deed of Company Arrangement) (Receivers and Managers Appointed) (ACN 093 330 977).

*Step* means any of Steps One to Nine set out in clause 6.3 of the Scheme and Steps means all of them.

*Subordination Terms* means the terms of subordination set out in any deed of subordination between Quintis (Australia) and SPL.

*Sunset Date* means 30 November 2018 or such other date agreed by the written consent of the Scheme Companies and the holders of not less than a 75% majority in aggregate principal amount of the Notes then outstanding under the Indenture (where 'Notes' has the meaning given in the Indenture).

*Super Senior Noteholder* means a holder of Tranche 1 Super Senior Notes and/or a holder of Tranche 2 Super Senior Notes.

*Tax* means any charge, tax, duty, levy, impost or withholding imposed by, or for the support of, any Government Agency, however and wherever collected or recovered and including, but not limited to, Fuel Tax Credits (as defined in the *Fuel Tax Act 2006* (Cth)) and GST (as defined in the *A New Tax System (Goods and Services Tax) Act 1999* (Cth)).

*Tax Refunds* means the amount of any Tax, credited or attributed to the Scheme Companies for the period up to and including effectuation of the DOCA in accordance with its terms.

*Tranche 1 Super Senior Notes* means the notes with a face value of US$15 million issued pursuant to the Note Agreement and Guaranty dated 13 November 2017.

*Tranche 2 Super Senior Notes* means the notes with a face value of US$15 million issued pursuant to the Second Note Agreement and Guaranty dated 29 May 2018.

*US IP Security Agreement* means, collectively:

(a)     that certain security agreement entered into by and between each of the Santalis Subsidiaries and the Incoming Collateral Trustee for the benefit of the secured group, as defined therein, regarding the grant of a security interest over trademarks and related collateral of the grantors in favor of the Incoming Collateral Trustee; and

(b)     that certain security agreement entered into by each of the Santalis Subsidiaries and the Incoming Collateral Trustee for the benefit of the secured group, as defined therein, regarding the grant of a security interest over patents and related collateral of the grantors in favor of the Incoming Collateral Trustee.

*US Pledge Agreement* means that certain pledge agreement entered into by Quintis (Australia) and the Incoming Collateral Trustee for the benefit of the secured group, as defined therein, regarding the pledge of a security interest over its equity interest and related collateral in each of the Santalis Subsidiaries in favor of the Incoming Collateral Trustee.

*US Security Agreement* means that certain security agreement entered into by each of the Santalis Subsidiaries and the Incoming Collateral Trustee for the benefit of the secured group, as

defined therein, regarding the grant of a security interest over all personal property and related collateral of the grantors in favor of the Incoming Collateral Trustee.

**US Securities Representation** means the representation and certification set out in the Voting Proof of Debt Form and Proxy Form in Schedule 10 to this Explanatory Statement..

**Voting Proof of Debt Form** means a proof of debt form in the form set out in Schedule 10 to this Explanatory Statement required to be lodged with the Chairperson by a Scheme Creditor for voting purposes for the Scheme Meeting for the Scheme Companies.